**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DYSON, INC.** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.:** |
| ) | |
| **SYNCREON TECHNOLOGY (AMERICA)** ) | **Hon. Judge:** |
| **INC.** ) | |
| ) | |
| ) | |
| ) | |
| **Defendant.** ) | **JURY TRIAL DEMAND** |
| ) | |
| ) | |

## COMPLAINT

1.　　This is a breach of contract and conversion action arising out of Syncreon's complete failure to honor its obligations under a logistics, warehousing, and fulfillment contract with Dyson and its refusal to allow Dyson to repossess its own products and inventory following contract termination.[1]

2.　　In 2016, Dyson began to search for a new logistics provider. A logistics provider is critical to Dyson's business: it is responsible for crucial aspects of the supply-chain processes that move Dyson's inventory into the hands of retailers and consumers around the country.

3.　　Syncreon, a logistics provider, represented to Dyson that it had the expertise and resources necessary to serve as Dyson's sole logistics provider in the United States. Syncreon represented it would "operate under six sigma quality standards which will meet and surpass

---

[1]　　Throughout its pleadings, Dyson refers to syncreon Technology (America) Inc. as "Syncreon."

industry norms"; its "extensive experience in high-technology logistics is leveraged to deliver on every aspect of Dyson's requirements"; and it had "developed over the years a best in class project management approach." Syncreon also told Dyson that it could back up its promises with action, and that its "Core Value" was "integrity": "We do what we say we are going to do. We take responsibility for our choices. We don't make excuses."

4. Relying on these and other promises, Dyson awarded the logistics contract to Syncreon. The parties' contract contained additional representations about Syncreon's supposed "competent," "professional," and "industry standard" services.

5. Unfortunately, it took no time for Syncreon to renege on its promises and representations and fail to live up to its end of the bargain. Although Dyson signed its contract with Syncreon just six months ago, Syncreon has already breached the agreement repeatedly.

6. Syncreon failed to properly staff and manage its warehouses; logged inventory as shipped when it never left; fell behind on shipping and order delays; sent customers wrong or incomplete shipments; had a lack of adequate inventory IT systems; and committed other major errors. Syncreon either did not have the level of expertise and experience it claimed, or it did not intend to allocate that expertise and experience to the Dyson project.

7. One of Dyson's customers called Syncreon's performance a "*logistical nightmare*." And one of Syncreon's own employees candidly admitted the Syncreon facility was "*hopeless*."

8. Due to Syncreon's abysmal performance, the parties recently agreed to terminate the agreement. Syncreon's Vice President for Business Development and Account Management, Dan Bombrys, described the termination as "our mutual decision to separate ways." A different

logistics provider, Expeditors, has since begun to process all of Dyson's new orders to retailers and customers.

9.      Syncreon initially agreed that it would transfer Dyson's remaining inventory from its facilities to Expeditors' warehouse at a rate of eight trucks per day.  But in the last two weeks, Syncreon abruptly changed course.  To drum up negotiating leverage as the parties move toward finalizing the details ending their relationship, Syncreon cancelled previously scheduled moving trucks and has chosen to hold Dyson's inventory captive unless Dyson succumbs to Syncreon's demands.  In fact, Syncreon has even refused to allow Dyson's own trucks to remove the remaining inventory.

10.     Dyson seeks to recover monetary damages owed to Dyson under the parties' contract for Syncreon's woefully deficient performance, and, in the interim, seeks injunctive relief to regain possession of its remaining inventory in Syncreon's warehouses.

## THE PARTIES

11.     Dyson, an Illinois corporation with its principal place of business in Chicago, Illinois, is a technology company that designs and manufactures vacuum cleaners, hand dryers, and other household products.

12.     Syncreon, a Michigan corporation with its principal place of business in Auburn Hills, Michigan, is a provider of logistics, distribution, and warehouse services.  Syncreon is doing business in Cook County, Illinois with an office located at 1460 Thorndale Avenue, Elk Grove Village, Illinois, 60007.  Syncreon has other offices in the State of Illinois, including in Itasca and Belvidere.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 by virtue of diversity of citizenship and an amount in controversy in excess of $75,000.00, exclusive of interest and costs.

14.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 and because the parties' contract requires venue and jurisdiction to be in court in the State of Illinois.  (Ex. 1, MSA, § 23.4 ("Venue and Jurisdiction.  The venue and jurisdiction for any action arising under this Agreement shall be in the state or federal courts of the United States of America in the State of Illinois.  The parties consent to the jurisdiction and venue of the state or federal courts in Cook County in the State of Illinois and waive any objections to such jurisdiction and venue.").)

## FACTUAL ALLEGATIONS

**A.     Dyson Depends On A Logistics Provider To Deliver Its Products.**

15.     As part of its distribution channel, Dyson relies on a logistics provider to receive, process, and ship its products to commercial retail customers throughout the country.

16.     Once Dyson manufactures a product, it is critical for the product to get on the physical and virtual shelves of retailers and into the hands of consumers.  A logistics provider facilitates this process by receiving Dyson's container shipments, processing them, palletizing them, preparing them for shipment, and sending them to Dyson's retailers and e-commerce companies, as well as to consumers directly.

17.     With the explosion of e-commerce and competition among manufacturers of household goods, customers and retailers have exceedingly high expectations for timely delivery of products.  Dyson's business thus depends on a reliable logistics provider that can deliver on its promises and meet the challenges of a highly competitive marketplace.

**B.    Dyson Searches For A New Logistics Provider.**

18.    In February 2016, Dyson initiated a formal request for proposal (RFP) process for a third-party consulting firm to assist Dyson in facilitating a logistics network study and identifying potential logistics providers.  Dyson retained Cascade Business Group to lead the RFP process.

19.    In September 2016, Cascade began the process to identify a logistics provider for Dyson.  Cascade distributed RFPs to ten different companies.

20.    Six logistics providers, including Syncreon, submitted RFP responses in October 2016.

**C.    To Win The Contract, Syncreon Claims To Be A "Market Leader In Implementation And Operational Start-Ups."**

21.    Syncreon's RFP response promised its "innovative and comprehensive service solution exceed[s] all assessment criteria."  Specifically, Syncreon represented it would exceed Dyson's expectations in the following areas: facilities; ability to support Dyson's growth; technology, systems, and processes; project management and personnel; and inventory control.

22.    Syncreon filled pages of its proposal explaining the suitability of its plants in Sparks, Nevada (near Reno) and Olive Branch, Mississippi (near Memphis).  The proposal provided detailed results of logistical models and expected shipping volumes for both sites, as well as warehouse specifications and features.  Syncreon also provided an "opportunity summary" detailing in flowcharts the expected gross material flows (in pallets) on a daily basis in both locations.  In response to Dyson's request for Syncreon to describe the locations' performance, Syncreon represented it would "provide scorecards and metrics from industry leading customers; we will jointly develop KPI's that accurately depict service quality for Dyson's business and customers.  We operate under six sigma quality standards which will ***meet and surpass industry norms***."

5

23.     Syncreon knew that Dyson planned to continue growing its business in North America, and emphasized its supposed commitment to helping Dyson reach its goals.  In its RFP, Dyson asked vendors how they would "ensure alignments with Dyson's planned growth." Syncreon's response represented it would "assign a dedicated Account Manager [AM] to Dyson. AM is responsible for understanding and internally conveying Dyson's strategy, timing, direction. The AM is the voice of Dyson within the organization.  This position is also responsible to bring Dyson best practices and opportunities for mutual benefit.  In addition, we will engage in Quarterly Business Reviews.   This is including executive interlock to ensure that every level of our organization is aware of Dyson's direction and resource requirements."

24.     The demands of modern logistics, and the scale of Dyson's operations, require distributors to operate using sophisticated and reliable information technology.  Syncreon's RFP response detailed the alleged cutting-edge nature of its IT functions and the thorough and accurate visibility they could provide to Dyson, including access to its "300+ IT professionals." "[S]yncreon's application suite and B2B systems integration are designed, developed and supported in-house by a team of dedicated IT professionals; we believe that by having full control of our Information Technology applications portfolio provides us with the know-how, capability and necessary agility to tailor solutions to our client's requirements."

25.     Syncreon's proposal touted its warehouse management system, which it calls Warehouse in a Box, or WiaB.  WiaB allegedly "enables syncreon to offer full 'end to end' traceability and maximize operator productivity in a real-time environment," as well as "inventory reporting & visibility."   Using WiaB, Dyson was supposed to be able to use a "Gateway web portal" for "real-time visibility" to its inventory and transactions, as well as orders and order statuses.  Syncreon represented that these real-time balances are updated "every minute 24 x 7 x

6

365," and offers "100% accurate retrospective snapshot[s] of any SKU inventory balance for any chosen minute historically." In sum, Syncreon asserted that its IT department could provide "an unrivalled level of traceability of Inventory."

26.     Syncreon also boasted about its ability to craft "tailor-made solutions to provide competitive advantage for Dyson," including using "highly efficient processes based on Dyson's product profile to receive, store, retrieve and ship product with minimal handling and capital expenditures."

27.     Syncreon's proposal is rife with promotion of its general ability to complete its obligations to Dyson's satisfaction, emphasizing its experience and the custom service it promised it could provide. "syncreon's extensive experience in high-technology logistics is leveraged to deliver on every aspect of Dyson's requirements. … syncreon's proposed processes are specifically tailored for Dyson using technologies and methods that are industry tested; we never force a 'one size fits all' solution on a business."

28.     The proposal also specifically touts Syncreon's project management ability as "a core strength and differentiator." The proposal represented that "syncreon has developed over the years a best in class project management approach that is proven through an extensive list of successful facility transitions and new business start-up projects." Syncreon also represented it had a "strong focus on understanding key customer requirements" and that its start-up team would "ensure alignment between Dyson and syncreon while building strong working relationships with Dyson to create a collaborative environment for success."

29.     To ensure that its vendor would be able to successfully support its business goals and requirements, Dyson asked candidates to respond to 56 questions regarding their abilities, experience, and commitments. In its answers to these questions, Syncreon represented it would

be able to meet Dyson's requirements and emphasized its alleged competence and excellence. For example, Syncreon represented it "will provide [a] dedicated Project Launch Team. Our team is an experienced group of professionals that includes PM, Engineering, HR, Operations, IT resources, Security. These SME's stay on task until all processes and systems are stable and processing significant operational volumes. All planning is done in concert with Dyson to ensure complete accountability, predictability and shared information."

30.     Proper inventory control is also a fundamental requirement of a successful distribution relationship. Syncreon represented to specifically support "high technology customers" with inventory worth multiple billions of dollars. "We control multi-thousands of high velocity SKU's into multiple channels. We have the obligation, systems, methodologies and expertise to control inventory accuracy to 99.99% based on gross, net, and location." Moreover, Syncreon asserted that "Dyson's SKU count is, by comparison, is very minimal in relative to most of our clients."

**D.     Dyson And Syncreon Enter The Master Services Agreement.**

31.     Taking Syncreon's representations at face value, Dyson awarded Syncreon the logistics provider contract over other providers. Unbeknownst to Dyson, however, in reality Syncreon either lacked the experience or capability it claimed in its RFP response or never intended to allocate that experience or capability to the warehouses containing Dyson's product.

32.     In February 2017, Dyson and Syncreon entered into a Logistics, Warehousing and Fulfillment Master Services Agreement ("MSA"). (Ex. 1, MSA.)

33.     The MSA required Syncreon to provide "warehousing, receiving, picking, packing, labeling and shipping" services for "Dyson finished goods products to U.S. domestic locations." (*Id.* at § 1.1.)     In particular, Syncreon was "responsible for inbound receipts, inventory

8

management, storage, picking, packing, order fulfillment and outbound shipments of Dyson products and material to Dyson's United States customers." (*Id*. at Ex. D, § 1.1.)

34.     The contract outlined Syncreon's specific responsibilities—all critical to the effective operation of Dyson's business.  They included:

(a)     <u>Facilities and Infrastructure</u>:  Syncreon was required to "provide the required facilities and equipment to support Dyson's logistics requirements, for all Dyson products, at locations in the Eastern and Western regions of the United States." (*Id*. at Ex. D, § 3.1.1.)

(b)     <u>Quality Management System</u>:  Syncreon was required to adhere to "Quality and Reliability Requirements" and "compile and report Performance Measures on a weekly/monthly/quarterly basis." (*Id*. at Ex. D, §§ 4.4–4.5; *id*. at Ex. I, § 1.4.) Syncreon was also required to maintain an "issues log with the description of the issue, root cause, corrective action, dates, and status." (*Id*. at Ex. I, § 1.4.1.)

(c)     <u>Information Technology</u>:  Syncreon was required to "provide the IT infrastructure to support Dyson's logistics requirements," including "hardware, networks, telecommunications, software, and security." (*Id*. at Ex. D, § 5.1.)

(d)     <u>Product Traceability</u>:  Syncreon was required to "have the ability to locate serialized items in the warehouse, using the local warehouse management software application, for recall, rework, and failure analysis efforts." (*Id*. at Ex. I, § 2.4.1.)

(e)     <u>Documentation</u>:  Dyson's products must be shipped timely and in accordance with customer specifications.  Syncreon was required to, among other things, "update and generate shipping documents such as Packing List and Bill of Lading" (*Id*. at Ex. D, § 2.10.3.2); "perform ship confirm and system transactions,"

including reviewing "the order . . . for special requirements for shipment labeling, stacking, or other requirements as well as accuracy of serial number assignment" (*Id.* at Ex. D, § 2.10.3.6.); and "provide an electronic Advanced Shipping Notification (ASN) to Dyson customers" (*Id.* at Ex. D, § 2.10.3.7).

(f)  <u>Supervision</u>:  To ensure that Syncreon's employees properly executed its contractual requirements, Syncreon agreed to "provide a reasonable and customary level of supervision to its employees handling Dyson Product." (*Id.* at Ex. K, § 6.3.)

35.  To ensure that Syncreon provided top-quality service, the parties agreed that Syncreon's work would be governed by performance metrics.  Exhibit E to the MSA created measurable expectations for Syncreon's receiving of containers, order fulfillment rate, order accuracy, and communication response.  (*Id.* at Ex. E.)  For example, each day, Syncreon was required to assess whether it created Advanced Shipping Notifications (ASNs) for all orders, as required by the contract, by calculating the "[t]otal number of order ASNs sent same day for Dyson specified customers divided by the total orders for those customers on that day," with a "target" of "100%." (*Id.*)  Syncreon was also required to assess its ability to exchange data, respond by email and phone, and respond to escalation requests each week, again with a "target" of "100%." (*Id.*)

**E.  Syncreon Makes Multiple Express Representations and Warranties About Its Superior Qualifications and Promised Performance.**

36.  Critically, Syncreon also made numerous express representations and warranties to Dyson in the contract, as it had during the RFP process.  For example, in Section 10.1, Syncreon agreed to provide "competent," "professional," and "industry standard" services.  (*Id.* at § 10.1.) Syncreon repeated that warranty in Section 24.1.  There, Syncreon warranted that it "shall perform the Services with care and diligence consistent with industry standards and in a professional and

10

workmanlike manner, with employees that have sufficient technical expertise to perform the Services." (*Id.* at § 24.1.)

37.    Syncreon further guaranteed that its personnel were "sufficiently experienced, properly qualified, and equipped to perform the Services" and that they would "devote the time, personnel and resources necessary to perform the Services." (*Id.* at § 10.2.)

38.    And in Section 7.1, Syncreon represented that it would "ensure that its employees conduct the Services in an ethical and professional manner." (*Id.* at § 7.1.)

39.    Dyson required each of these representations from Syncreon before it would agree to award Syncreon the contract because each was critical to Dyson to ensure that Dyson could reliably sell its products to third-party retailers.

**F.    The Parties Negotiated Other Contract Protections.**

40.    The parties also negotiated several provisions giving Dyson broad rights to terminate the agreement with Syncreon, both with and without cause. (*Id.* at §§ 2.2, 2.3.) Pursuant to Section 2.2.2, Dyson had the right to terminate the contract without cause at any time by providing 120 days' notice to Syncreon. (*Id.* at § 2.2.2.) And in Section 2.3, Dyson had the right to terminate the contract with cause in the event that Syncreon (a) failed to meet minimum threshold measurements within 90 days of notice from Dyson to cure the failure; (b) failed to cure a material breach of the contract within 60 days of notice from Dyson; and (c) filed for bankruptcy. (*Id.* at § 2.3.)

41.    The parties understood that if Dyson terminated the agreement, it would also need to shift all of its inventory immediately to a different logistics provider to avoid significant harm to its business, reputation, and customer goodwill. Section 2.3.4, therefore, requires Syncreon "to use its best efforts to assist Dyson in transferring the work to another third party service provider" following termination. (*Id.* at § 2.3.4.) Section 21.1, in turn, guaranteed Dyson that it would have

11

"full and unrestricted access to Products and the Distribution Centers" upon twenty-four hours' notice. (*Id.* at § 21.1.) And Section 21.2 contemplated that Dyson would "request, from time to time, permission to handle its Products within the Distribution Center." (*Id.* at § 21.2.)

42. In addition, Syncreon agreed to retain copies of "shipping packing slips, shipment bill of ladings with referenced tracking numbers, receiving bill of lading, receiving pack slips and others as determined by Dyson," and to make copies of such documents available to Dyson upon twenty-four hours' notice. (*Id.* at §§ 16.1, 16.2.)

43. Syncreon also agreed to indemnify Dyson "from and against any and all third party claims, suits, actions, damages, liabilities, costs and expenses including attorneys' fees" due to Syncreon's "breach of any representation, warranty, covenant, or other obligation" or "gross negligence or willful misconduct." (*Id.* at § 12.1.)

**G.    Syncreon Fails to Deliver On Its Contractual Promises.**

44. Syncreon's performance under the contract fell well short of Syncreon's promises, Dyson's expectations, and minimum industry standards. From the start, Syncreon failed to properly staff and manage its warehouses; logged inventory as shipped when it never left; fell behind on shipping and order delays; sent customers wrong or incomplete shipments; had a lack of adequate inventory IT systems; and committed other major errors that severely damaged Dyson's business relationships and caused it to suffer substantial damages.

45. Syncreon's performance was so underwhelming and inconsistent with its contractual obligations and warranties that its own employees have repeatedly acknowledged Syncreon's failings to Dyson. Jaco Knetemann, one of Syncreon's senior operations directors, even characterized the Syncreon facility as "hopeless." Additionally, Stefan de Laat, a Syncreon senior transport planner who worked at one of the Syncreon facilities that serviced Dyson, stated

12

the following in an email to Dyson: "I hope operation is running better than when I left. I might have mentioned it before, but I saw it as a big challenge to contribute in such an [sic] hectic organization [sic]. I hope they are able to build up a team and get it working."

46.     Dyson lodged numerous Corrective Action Requests ("CARs") with Syncreon due to its substandard performance. CARs are formal notifications requesting that non-conforming products or services be remedied and not reoccur.

47.     Syncreon's errors fall into several broad categories including shipping delays, incorrect shipping deliveries, incorrect billing to customers, and insufficient resources, in addition to other major errors not expected from a logistics provider.

### 1.     Inexcusable Shipping Delays

48.     Syncreon consistently failed to deliver Dyson's shipments on time. These delays were a direct result of Syncreon's inability to perform the most basic task of a logistics provider—to document correctly which products were being loaded onto which trucks for delivery.

49.     For example, on June 8, 2017, Dyson informed Syncreon that Dyson had "many Best Buy shipments that show as leaving but are not moving due to missing paperwork" and that Syncreon needed to prioritize this issue of missing paperwork "as the customer has already been invoiced based on the ship confirm date."

50.     In fact, one of Dyson's primary carriers, C.H. Robinson, became so frustrated with Syncreon's lack of adequate documentation that it advised Dyson that it would "no longer dispatch a driver to pick up a loaded drop trailer in [Syncreon's warehouse facility] until Syncreon scans ALL the [Bills of Lading] loaded on that trailer."

51.     Other customers suffered similar problems. Wal-Mart, one of Dyson's biggest customers, was forced to hold Dyson products in its delivery garage for days because Syncreon had not provided all the Bills of Lading required to process the inventory and move it into the

store. Syncreon's inability to generate adequate documents for Dyson's products was "systematic," and the Dyson team dispatched to Syncreon's warehouses soon discovered that Syncreon was not using Bills of Lading as a matter of course. Syncreon's conduct here is a straightforward (and damaging) breach of the shipping specifications the parties negotiated in the MSA. (*See* Ex. 1 at Ex. D, § 2.10.3.2 ("Vendor will update and generate shipping documents such as Packing List and Bill of Lading.").)

52. Another cause of Syncreon's shipping delays stemmed from errors in its IT system. Pallets of Dyson's product had to sit idle in Syncreon's warehouses, even though there were outstanding orders for those exact goods.

53. As of June 16, 2017, according to Syncreon's own data, at least *35 percent* of Dyson's total shipments were delayed by a minimum of 15 days.

### 2. Incorrect Shipping Deliveries

54. Syncreon failed to reliably deliver *correct* shipments to Dyson's customers.

55. Products ordered by Wal-Mart would be shipped to Costco, for instance, resulting in lost business (and frustrated customers) at both stores.

56. Customers flagged Syncreon's recurring wrong deliveries. An Amazon employee, for example, asserted its carrier "believes they received an incorrect [Bill of Lading]" and was "concerned that this could be a repeat of the incorrect freight being shipped to Amazon." Rather than immediately address the problem, Syncreon defensively requested that the carrier provide "pictures of the truck and freight inside" before it would take any further action. As the Amazon employee correctly noted: "This is not [the carrier's] responsibility as Syncreon should know what is on the truck."

14

### 3.     Logging Shipments That Were Never Sent

57.     Dyson later learned that Syncreon employees were falsifying shipment documents. Orders had been logged as shipped in Syncreon's computer system, even though the corresponding inventory had not physically shipped at all.  Dyson's customers were then billed for products they never received—and that never even left Syncreon's facilities.

58.     For example, Dyson discovered multiple pallets of products that "show[ed] Ship Confirmed" in Syncreon's computer system for Amazon, Home Depot, and Lowes, even though the product was "still sitting" in Syncreon's warehouse.  This meant Dyson "would have billed Amazon almost a month ago and not delivered the inventory."

59.     As another example, Syncreon marked as shipped to Bed Bath & Beyond an entire trailer of product that instead sat loaded in the heat *outside* Syncreon's facility for more than a month.  Syncreon's recurring shipment and billing errors caused significant tensions with long-time Dyson business partners, who were charged for products they never received.

### 4.     Inadequate Staffing And Management.

60.     Syncreon's inability to execute in its role as third-party logistics provider stemmed in part from the substantial staff turnover that occurred from management to warehouse employees.  For example, in just three months, Syncreon's "Launch Team" employed no less than six different project leads.  This high turnover led to increased shipping errors and delays, and harmed to Dyson's relationships with its customers, large and small.

61.     Syncreon's staffing issues were not confined to the management level.  Syncreon also failed to hire, train, and retain warehouse employees who could reliably process, label, package, load, unload, and chart Dyson's products from Syncreon's warehouses to customers.

### 5. Other Performance Issues

62.     Syncreon's substandard performance is not limited to the examples provided above.

As additional examples (among many others), Syncreon had the following performance issues:

- Syncreon's warehouse switched labels and packaged the wrong pallet quantities;

- Pallets were left off loaded shipments planned for delivery with no notification to Dyson;

- Repeated planning and routing failures caused Dyson to miss shipping windows, cancelled orders, and carriers to be turned away;

- Overpacked boxes failed to meet size requirements;

- Refusing (with no justification) to ship Amazon products per Amazon's specifications;

- Not prioritizing Amazon shipments despite directives from both Dyson and Amazon to the contrary;

- Dyson received numerous complaints about no or incorrect information on bills of lading; and

- Dyson observed numerous direct orders that showed shipping confirmed, but the associated UPS tracking showed a status of label creation.

### H. Customers Responded To Syncreon's Poor Performance.

63.     Dyson's relationships with its customer-retailers are an essential part of Dyson's business model: they are a critical way for Dyson to get its products onto the shelves of stores, to online websites, and into the hands of consumers.

64.     As part of cultivating its relationship with retailers, Dyson strives to deliver exceptional service to them, and they, in turn, expect exceptional service in return. Dyson has worked hard to build significant trust with these customers, which has taken many years to amass.

65.     Syncreon's deficient performance has threatened to erode Dyson's hard-earned business reputation in just a few months, as a few examples show. NexWeb, which services the armed forces procurement, gave Dyson an ultimatum after Syncreon was unable to deliver

16

products to NexWeb for months—either get product into its store or NexWeb would find an alternative supplier: "We either need these goods in the store by Friday *or an alternative option* for the customer that spends the time to come in to see us to purchase and leave disappointed . . . *We have been patient, but at this point the patience has worn thin. The brand and your share of the floor is at risk*."

66.     P.C. Richard & Son, the largest regional retailer in the northeast, refused to set a meeting with Dyson to discuss their relationship until Dyson could prove shipment reliability: "*We will not even consider a meeting until Dyson proves it can deliver product on a timely basis*." Dyson asked Syncreon to shore up its deficiencies to provide P.C. Richard with the service it deserved. Syncreon, however, failed to adjust its actions to respond to such complaints.

67.     P.C. Richard's attitudes about Dyson's business reputation only further diminished, after several more weeks of not receiving its shipping orders from Dyson via Syncreon: "At this point, Dyson has lost all credibility. . . . Dyson has taken away my ability to do what we have been doing for 107 years -- taking care of our customer. . . . *Once Dyson has proven again to be a good supplier, we will set up a meeting*."

68.     Other customers suffered similar misfortunes due to Syncreon's performance issues. Rymax, one of the largest "loyalty program" servicers in the country, acknowledged to Dyson that "*Dyson is going through a logistical nightmare with your 3PL [Syncreon]*," but regardless, informed Dyson that it would be suspending all sales of Dyson products until Dyson corrected its shipping issues caused by Syncreon.

69.     Because of the magnitude of Syncreon errors, by late June 2017, three out of four of the Rewards Accounts had removed Dyson from their rewards programs altogether until Syncreon shipping errors were resolved. Dyson sales representatives have been working diligently

to minimize the harm caused by Syncreon to these accounts and to re-start Dyson shipments to them using its new logistics provider, Expeditors.

70.     Abt, another of Dyson's regional customers, experienced similar problems caused by Syncreon that resulted in late, lost, or missing Dyson shipments.  By mid-June, Dyson's account managers for Abt, despite dogged attempts to work with Syncreon to get its shipping logistics on track, were forced to acknowledge that Dyson had "eroded all previous momentum" and, most troublingly, now faced "credibility and accountability concerns" with Abt, a company who sells more Dyson products than any other brick-and-mortar store in the country.

71.     The inability to get products into customers' hands has also harmed customer trust. For example, Amazon's logistics team informed Dyson it had lost "trust in Dyson's 'shipment integrity.'"  Third-party carrier C.H. Robinson's Senior Sales Executive warned of the harm Syncreon was causing:  "By not having a good QA process this is creating a lot of extra work, shortages and confusion to put the puzzle back together. ***This is putting Dyson at risk with their customers***."

72.     Frustrated with Syncreon's performance, retailers also charged Dyson various fines and expenses.

73.     Dyson has taken significant steps over the past few months to build back the trust with its customers.  This includes providing customers rebates, renegotiating contracts, and promising customers that they will receive products on time and as expected.

74.     Dyson is now at a cross-roads: it simply cannot afford to go back on its word now with an inability to fill its customer's orders in the coming months.  The only way Dyson has made any progress with retailers is by telling them they can trust Dyson again. But if Dyson did not have sufficient inventory to fill orders, it would be directly breaking retailers' trust.

I.       **Syncreon's Actions Have Harmed Dyson.**

75.      Syncreon's deficient performance, gross negligence, willful misconduct, and bad faith has already exposed Dyson to millions of dollars in expenses and costs charged by third parties as a result of Syncreon's poor performance.

76.      All of the damages Dyson seeks are direct damages caused by Syncreon's actions. Dyson additionally seeks recovery for indirect, consequential damages, given Syncreon's deliberate, intentional, willful, arbitrary, bad faith, reckless, and grossly negligent actions.

77.      Dyson's damages include, for example:

(a)      Expenses and costs charged by retailers for violations of shipping requirements, incomplete shipments, and missing shipments;

(b)      Expenses and costs charged by shipping, freight, and trucking companies;

(c)      Expenses and costs for alternative shipping arrangements to get products more quickly in the hands of retailers and consumers; and

(d)      Expenses and costs to divert and/or transfer products to a new logistics provider.  For example, Dyson has incurred costs and expenses to divert products in route from Asia to Syncreon and to store containers that should have been stored by Syncreon. Dyson also expects to incur expenses for transitioning its remaining inventory from Syncreon's facilities to its new warehousing company, Expeditors.

78.      As a result of Syncreon's deficient performance, gross negligence, willful misconduct, and bad faith, Dyson also has lost sales to its retailers and consumers, has lost profits, has relocated several Dyson employees to the Syncreon facilities to address Syncreon's performance, and has incurred significant IT expenses, among other damages.

79.      Syncreon has also harmed Dyson's customer goodwill, reputation, and brand.

80. If Syncreon keeps hold of Dyson's remaining inventory, this would substantially damage Dyson's remaining customer goodwill, relationships, and reputation beyond repair. This issue is particularly urgent with Black Friday and Cyber Monday approaching, as retailers expect that Dyson will be able to fill their orders on this important sales day and will hold Dyson accountable if that does not happen.

**J.      The Parties Terminate The Contract And Syncreon Initially Agrees to Cooperate.**

81. To try to protect its reputation with its critical downstream business partners, Dyson attempted to work with Syncreon to correct Syncreon's errors and deficient performance.

82. Syncreon's performance only deteriorated further, to the point that the parties agreed to terminate the agreement. Syncreon's Dan Bombrys described the termination as "our mutual decision to separate ways."

83. Upon termination, Dyson contracted with a different logistics provider, Expeditors, to serve as its sole logistics provider in the United States.

84. Syncreon agreed to work with Dyson to transition the remaining Dyson inventory from the Syncreon facilities to Expeditors' warehouse. Specifically, Syncreon agreed it would ship three truckloads of inventory per day from its Reno, Nevada facility and five truckloads per day from its Olive Branch, Tennessee facility to Dyson's new logistics provider, for a total of eight shipments per day. As one Syncreon employee put it: "Three trucks a day from Reno has always been our commitment and the agreed transition plan." Another Syncreon employee stated: "[T]he transition plan that was agreed to with dyson states that we would ship 3 per day from Reno and 5 out of OB [Olive Branch]."

85. Dyson currently is filling all of its orders out of the Expeditors warehouse.

20

86.     On August 30, 2017, Dyson sent Syncreon a letter further memorializing its bases for termination of the parties' agreement.

### K.     Syncreon Shifts From Cooperating to Blocking Dyson From Its Own Products.

87.     In mid-August 2017, Syncreon reversed course and decided to stop transferring Dyson's inventory to the new logistics provider, Expeditors.

88.     While the contract requires Syncreon to use it best efforts to assist Dyson in transferring the work to another logistics provider, Syncreon suddenly demanded that Dyson enter into a new transition agreement, rather than continue the transfer as agreed.

89.     On August 9, 2017, Syncreon's Marc Boonen expressed to Dyson that he wanted his team's "focus *to continue* on a successful transition," but that Syncreon wanted to "*amend* the existing [contract] with a transition agreement" and that Syncreon's executive team expected Dyson to prioritize Syncreon's proposed transition plan such that an agreement in principle be reached by August 14, 2017.

90.      Syncreon's proposed new contract demanded that if Dyson wanted to continue shipping eight truckloads of inventory from the Syncreon warehouses, then Dyson would need to pay millions of dollars in fees—including for items expressly precluded under the parties' original contract.  Syncreon also demanded a broad, general release of liability, meaning Dyson would have to forego millions of dollars in legitimate claims for Syncreon's admittedly poor performance under the contract.

91.     Specifically, Syncreon's proposed transition agreement required Dyson to pay over $4 million for Syncreon to transition the work to Expeditors.  Whereas the parties previously agreed the inventory would be transitioned by August 31, 2017, the proposed transition agreement included a target completion date of September 15, 2017.  Syncreon demanded that Dyson pay not

only for the transition services, but also for items preluded under their original contract, such as half of the remaining 38 months on Syncreon's leases for the Olive Branch and Reno facilities and severance for Syncreon's employees.

92.     Most egregiously, Syncreon's proposed transition amendment included a mutual release, whereby Dyson would be required to release Syncreon from "all claims, damages, losses, or injuries . . . which [Dyson] ever had, now [has] or in the future may claim to have against [Syncreon] . . . relating in any way to one or more events that occurred, or was supposed to occur but did not occur, prior to the date of this [Transition Agreement], including without limitation, Claims arising out of or related to the MSA or the services provide[d] thereunder."

93.     The reason for Syncreon's sudden change is simple:  inventory is key to Dyson's business.  Once Syncreon transitioned all of Dyson's property to Expeditors, it would no longer have any leverage to pressure Dyson into a new agreement on unfavorable terms.  But if Dyson could not deliver its products to third-party retailers on time, it would suffer business and reputational harm.  Syncreon saw a narrow window to try to avoid liability for its poor performance and extract more money from Dyson.

94.     On August 15, 2017, Dyson responded to Syncreon's unconscionable demand, requesting the parties focus on the transition of Dyson's remaining product over the next few weeks, and upon completion of the transition, discuss resolution of the other outstanding issues.

95.     On August 16, 2017, Syncreon threatened to stop the transition altogether. Syncreon's Marc Boonen informed Dyson that his "CEO [Brian Enright] [ ] had made it very clear to [him] that [Mr. Enright] will not continue the transition unless Dyson come[s] to the table to agree" to Syncreon's demands.  Dyson's James Mullen told Mr. Boonen that Dyson was not in a position to agree to Syncreon's proposed transition agreement because Dyson did not yet have

clarity on the impact of Syncreon's poor performance on its business. Mr. Mullen said the parties should instead focus on a smooth transition now and then have an informed and fair conversation later to negotiate the end of their relationship. Mr. Boonen then stated that he received instructions from Syncreon's CEO Mr. Enright "to stop further shipments and not allow Dyson to collect [its] stock from [4:00 pm] until Dyson agree[s] to come to the table to negotiate a full transition agreement." Mr. Mullen "pressed" Mr. Boonen "on whether this meant [Dyson was] locked out," as "by not shipping and not allowing Dyson to collect" its product, "it effectively would appear to be a lock out."

96.     That is exactly what it meant. Because Dyson would not capitulate to Syncreon's demands, Syncreon stopped all shipments from its facilities to Expeditors' warehouses as of the next day. In fact, while eight loads were scheduled to leave Syncreon's warehouses on August 17, Syncreon abruptly pulled the plug on those already-scheduled shipments: "Please cancel all shipments until further notice."

97.     Currently, approximately 150,000 units of finished goods and 56,000 accessories remain in Syncreon's warehouses.

98.     Mr. Mullen spoke with Mike Fahy, Syncreon's President of Technology on the morning of August 17. Mr. Fahy stated that Syncreon decided to perform a wall-to-wall inventory count and would not ship any product out of the facilities until the count was complete. Mr. Mullen told Mr. Fahy that they had previously discussed a full wall-to-wall inventory count and decided that it was better to count products as they were loaded onto trucks. The sudden need for a wall-to-wall count was a clear way to delay the transfer of Dyson's property to Expeditors. Mr. Fahy responded that he would go talk this over with Syncreon's CEO, Mr. Enright.

99.     Syncreon did not hide the fact that this was merely a stall tactic.  When Mr. Fahy and Mr. Mullen spoke later that same day, Mr. Fahy indicated that he spoke with Mr. Enright and would be willing to start shipping again if Dyson would come to the negotiating table.  Mr. Mullen pushed on what would happen if Dyson did not agree to negotiate, and Mr. Fahy stated that the inventory count would continue.  Mr. Mullen asked what would happen once the count was finished and whether Syncreon would re-start its shipments or allow Dyson to collect its property, and Mr. Fahy would not answer.

100.    Syncreon's inventory count began on August 17, 2017.  Whereas in June, Syncreon estimated it would take only four days to complete a stock count for over 350,000 units of inventory, Syncreon's current inventory count has taken over eight days so far for the 150,000 units currently in the facility (and is not yet completed).  The inventory count is still ongoing today, nine business days later.

101.    Throughout the inventory count, Dyson repeatedly asked Syncreon to confirm it would restart transferring Dyson's inventory or give Dyson access to its property.  Specifically, on August 21, Mr. Mullen asked Mr. Boonen to confirm that Syncreon would restart the transition: "Can you confirm that goods will start moving from tomorrow, or Wednesday at the latest"?  And then on August 23 and 24, he again emailed Mr. Boonen, asking that "Syncreon immediately allow Dyson full access, control and possession over our own product and inventory."  Syncreon never responded to these requests.

102.    Instead, on August 25, Syncreon tried a new stall tactic.  It claimed it was "forced to . . . reduc[e] the headcount" of employees and would "be unable to give you a timing on when we will finish the inventory count and reconciliation of goods" or "the time it will take us to complete the transfers."

103.    As a result, Dyson asked Syncreon point blank on August 25 whether it could remove its inventory from Syncreon's facilities the next Tuesday:

> [P]lease directly answer this question:  Will Syncreon allow Dyson full and complete access to all of our inventory starting on Tuesday of next week (August 29th)?  We have made the necessary arrangements for trucks, equipment and staff to remove all remaining stock from both facilities.  Once completed, we fully intend to address the outstanding issue of costs and fees, inclusive of those incurred by Dyson to complete this transfer.  However, right now we need to be able to move our product out of Syncreon's warehouses.  Please confirm that Syncreon will give its full cooperation to allow Dyson to move its inventory out of Syncreon starting on Tuesday.

104.    Syncreon again refused to answer Dyson's question.

105.    So on August 30, Dyson dispatched a truck to Syncreon's facility to collect its inventory.  Syncreon refused to allow Dyson to remove its own product from the Syncreon facilities.

**L.      Syncreon Ignores Dyson's Contractual Request For Documents.**

106.    On August 16, 2017, Dyson sent Syncreon a written request for copies of documents that Section 16.1 of the parties' contract requires Syncreon to retain, such as bills of lading and packing slips.  Pursuant to its rights under Section 16.2, Dyson requested that Syncreon produce the requested documents by 5 p.m. the next day.   Dyson is contractually entitled to and needs these documents to confirm and reconcile retailer disputes, inventory integrity, and missing bills of lading.

107.    Syncreon failed to produce the documents by 5 p.m. on August 17, 2017 or to respond to the written request at that time.

108.    Dyson instead received a response from Syncreon on August 21, 2017, stating that it would provide certain documents to Dyson by August 25.  Syncreon did not provide Dyson with any documents on August 25 as promised.  And since that time, Syncreon has not provided Dyson any documents or otherwise responded to its request in violation of its contractual obligations.

25

## COUNT I: BREACH OF CONTRACT

109.    Dyson re-alleges and incorporates each and every allegation of Paragraphs 1–108 of this Complaint as if set forth herein.

110.    Dyson and Syncreon are parties to the MSA, which is a valid, binding, and enforceable contract.

111.    Dyson has performed all of its obligations under the MSA.

112.    Syncreon has breached the parties' contract because Syncreon has (a) committed multiple, significant errors in performing its services under the contract; (b) not performed its services in a competent and professional manner, in accordance with industry standards; (c) not devoted the time, personnel, and resources necessary to perform its services; (d) not performed its services with care and diligence consistent with industry standards, with employees that are sufficiently experienced, properly qualified, and equipped to perform the services; (e) not used its best efforts to assist Dyson in transferring the work to Expeditors; (f) not permitted Dyson to remove its own inventory from the Syncreon facilities; and (g) not produced copies of certain important records within twenty-four hours of Dyson's request.

113.    Moreover, Syncreon's willful, arbitrary, and bad faith conduct, as described herein, further constitutes a breach of the implied covenant of good faith and fair dealing.

114.    As a direct result of Syncreon's breaches and its deliberate, intentional, willful, arbitrary, bad faith, reckless and grossly negligent actions, Dyson has suffered and will continue to suffer significant damages and/or harm, including but not limited to (a) payment for re-performance and corrective work; (b) damages, costs, and expenses incurred by Dyson due to Syncreon's late, incomplete, and incorrect shipments to third parties; (c) damages due to business disruption; (d) lost profits; (e) harm to Dyson's reputation, goodwill, and customer relationships;

and (f) additional damages to be proven at trial. Such damages are natural, highly probable consequences of Syncreon's breaches of the parties' contract.

115.    As supported by Dyson's request for a preliminary injunction, Dyson also seeks immediate interim relief to prevent irreparable harm. Unless Syncreon is enjoined from preventing Dyson from removing its own remaining product within Syncreon's possession, custody, and/or control, Dyson will continue to suffer incalculable harm, including to its reputation, good will, and customer relationships for which there is no adequate remedy at law.

## COUNT II: CONVERSION

116.    Dyson re-alleges and incorporates each and every allegation of Paragraphs 1–115 of this Complaint as if set forth herein.

117.    Despite Dyson's absolute and unconditional ownership and possessory rights to and demand for the return of its inventory, Syncreon has refused to return Dyson's inventory.

118.    Dyson has suffered damages from Syncreon's conduct.

119.    Additionally, as supported by Dyson's request for a preliminary injunction, Dyson also seeks immediate interim relief to prevent irreparable harm. Unless Syncreon is enjoined from preventing Dyson from removing its own remaining product within Syncreon's possession, custody, and/or control, Dyson will continue to suffer incalculable harm, including to its reputation, good will, and customer relationships for which there is no adequate remedy at law.

120.    Syncreon has willfully and wantonly retained Syncreon's inventory in bad faith. Syncreon's actions, which have deprived Dyson of its ownership right and interest in its own inventory, constitutes an unlawful conversion of Dyson's property, for which an award of punitive damages is warranted.

## PRAYER FOR INJUNCTIVE RELIEF

WHEREFORE, Dyson prays for the following injunctive relief to remedy incalculable harm caused by Syncreon, including to Dyson's reputation, goodwill, and customer relationships:

   (a)  This Court enter an injunction requiring Syncreon to stop preventing Dyson from removing its own remaining product within Syncreon's possession, custody, and/or control.

   (b)  All such other relief as may be appropriate.

## PRAYER FOR MONETARY RELIEF

WHEREFORE, Dyson prays for the following monetary relief:

   (a)  On Count I, judgment in favor of Syncreon and an award of monetary damages in an amount to be determined, together with pre-judgment and post-judgment interest on such amount;

   (b)  On Count II, judgment in favor of Syncreon and an award of monetary damages in an amount to be determined, together with pre-judgment and post-judgment interest on such amount, as well as punitive damages; and

   (c)  All such other relief as may be appropriate.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Dyson, Inc. respectfully demands a trial by jury of all issues triable by a jury in its Complaint.

Dated:  August 30, 2017

*/s/ Diana Watral*
Andrew A. Kassof, P.C.
Diana M. Watral
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

*Attorneys for Plaintiff Dyson Inc.*