# EXHIBIT 1

# Logistics, Warehousing and Fulfillment

# Master Services Agreement

**Between**

**Dyson, Inc.**

**and**

**syncreon Technology (America) Inc.**

# Table of Contents

1. SCOPE OF AGREEMENT (SERVICES)........................................................................1
2. TERM AND TERMINATION....................................................................................2
3. COMPENSATION AND FEES .................................................................................4
4. PAYMENT FOR SERVICES ...................................................................................5
5. COST REDUCTION OPPORTUNITIES ....................................................................6
6. INVENTORY CONTROL AND LOSS LIABILITY..........................................................6
7. VENDOR EMPLOYEES, AGENTS, AND SUBCONTRACTORS .....................................7
8. QUARTERLY BUSINESS REVIEWS AND PERFORMANCE...........................................8
9. RIGHT TO AUDIT AND PAYMENT ADJUSTMENT......................................................8
10. VENDOR OBLIGATIONS......................................................................................9
11. LIMITATION OF LIABILITY ...................................................................................9
12. INDEMNIFICATION ..........................................................................................10
13. INSURANCE ....................................................................................................10
14. CONFIDENTIAL INFORMATION ..........................................................................12
15. USE OF DYSON TRADEMARKS; INTELLECTUAL PROPERTY ..................................13
16. RECORD RETENTION AND DISPOSAL ................................................................13
17. COMPLIANCE WITH LAWS ...............................................................................14
18. DATA PROTECTION

19. NOTICES .......................................................................................................145
20. OWNERSHIP OF CAPITAL EQUIPMENT AND REAL PROPERTY ............................166
21. PRODUCTS...................................................................................................176
22. PRODUCT HANDLING ....................................................................................177
23. MISCELLANEOUS PROVISIONS .......................................................................188
24. Representations, Warranties and Covenants. ....................................................221
25. AUTHORIZATION ............................................................................................221
26. EXHIBITS......................................................................................................221

List of Exhibits:

| | |
|---|---|
| Exhibit A: | Vendor Start Up and Capital Expenses |
| Exhibit B | Dyson Owned Capital Equipment and Software |
| Exhibit C: | Rates for Distribution Center Services |
| Exhibit D: | Operations Scope of Work |
| Exhibit E: | Distribution Center Performance Measure Service Levels |
| Exhibit F: | Reporting Requirements |
| Exhibit G: | IT System and Support Requirements |
| Exhibit H: | Inventory Variance Calculations and Remuneration |
| Exhibit I: | Dyson Quality Requirements |
| Exhibit J: | Executed Warehouse Lien Waiver |
| Exhibit K: | Physical Security Standards |
| Exhibit L: | Definition of Terms |

# Logistics, Distribution and Warehousing Master Services Agreement

This logistics, distribution and warehousing master services agreement (the "Agreement") is entered into effective February 8, 2017 ("Effective Date"), by Dyson, Inc., an Illinois corporation, having offices located at 600 W. Chicago Ave, Suite 275, Chicago, IL 60654 ("Dyson") and syncreon Technology (America) Inc. with offices at 2851 High Meadow Circle, Suite 250 Auburn Hills, MI 48326 ("Vendor"). Dyson and Vendor may be referred to herein as a "party" or collectively the "parties".

**WHEREAS**, Dyson is a technology company that currently manufactures and distributes products in consumer and commercial categories;

**WHEREAS**, Vendor is a provider of logistics, distribution and warehouse services;

**WHEREAS**, Dyson is desires to obtain such services from Vendor at shared warehouse facilities (each, a "Distribution Center") located in various United States locations.

**WHEREAS**, Vendor is willing to provide such operating services for Dyson pursuant to this Agreement, which the parties' intent shall be a comprehensive contract covering all services provided by Vendor on a domestic United States basis;

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein, the parties hereby agree as follows:

## 1. SCOPE OF AGREEMENT (SERVICES)

Vendor will provide Dyson with the following logistics, distribution and warehousing services ("Services") as described below and as particularly set forth in statements of work (each a "Statement of Work" or "SOW"). Once executed by the parties, a SOW shall become part of and shall be governed by this Agreement.

1.1. Distribution Center Services: warehousing, receiving, picking, packing, labeling and shipping Dyson finished goods products to U.S. domestic locations. These Services will initially be provided using Vendor's Warehouse Management System ("WMS") through an interface to Dyson's systems.

1.2. Special Projects: From time to time, Dyson may require Vendor to provide special project support or procedures with respect to the Distribution Center Services. Dyson shall notify Vendor in writing of such requirements or procedures. Within three (3) calendar days after receipt of Dyson's requirements regarding Special Projects, Vendor will submit to Dyson a not to exceed, per unit cost estimate. After Dyson reviews the proposed project costs and provides Vendor with written acceptance (notwithstanding Section 23.10) of such proposed costs, Vendor will perform the Special Projects Services.  Unless otherwise agreed by the parties in writing, upon completion of such Special Project Services, Vendor will submit an invoice in accordance with Section 4.  Payment terms shall be in accordance with Section 4.8.1.

## 2.  TERM AND TERMINATION

2.1. Term. The term of this Agreement shall commence on the Effective Date and shall remain in effect, through October 31, 2020, unless terminated earlier as set forth herein (the "Initial Term"). At the end of the Initial Term, this Agreement shall automatically renew for additional one (1) year periods (each, an "Extension Term", and together with the Initial Term, the "Term"), provided, however that Vendor shall notify Dyson in writing at least 180 days prior to the commencement of an Extension Term of such upcoming renewal and Dyson shall have 90 days thereafter to either accept or reject any Extension Term and shall notify Vendor in writing of its decision.

2.2. Termination Without Cause

2.2.1. Vendor may terminate this Agreement without cause at any time by providing Dyson with at least three hundred and sixty (360) days' written notice before the effective date of termination.  If Vendor terminates without cause prior to the end of the Initial Term pursuant to this Section 2.2.1, Vendor waives any claim to un-recovered start-up costs, equipment and tenant improvements, including but not limited to the itemized listing in Exhibit A, "Vendor Start Up and Capital Expenses". In the event the Vendor exercises its rights under this provision, Vendor will assist Dyson in transferring the work to another distribution service provider.

2.2.2. Dyson may terminate this Agreement or any SOW without cause at any time by providing Vendor with one hundred twenty (120) days' written notice before the effective date of termination.  If Dyson terminates Services pursuant to this Section 2.2.1, Dyson shall pay for any completed Services received from Vendor before the effective date of termination as well as the Vendor Start-Up and Capital Expenses as set forth in Exhibit A. For clarity, Dyson shall not be responsible for any incidental, special, or consequential damages including without limitation, lost profits.

2.3. Termination With Cause by Dyson:

2.3.1. Dyson may terminate  this Agreement or any SOW and will have the right to take immediate possession of all Dyson owned Capital Equipment, Software  set forth in Exhibit B attached hereto and any other Dyson owned inventory that is located at Vendor facilities in the event that:

2.3.1.1. Vendor's service levels fall below the minimum thresholds established for "Threshold" performance in one or more of the Distribution Center Performance Measures detailed in Exhibit E of this Agreement and Vendor does not return to the "Threshold" rating or better, as defined within Exhibit E, within ninety 90 days of receipt of notice from Dyson demanding that Vendor cure the failure pursuant to this section.

2.3.2. Vendor files a petition in bankruptcy, or is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors, or a receiver is appointed for Vendor. Should any of the foregoing occur, Dyson shall have the right to enter the premises wherever Dyson property is located and take possession of all Dyson property without demand or notice, and with or without a court order for possession. The rights and remedies of Dyson contained herein are in addition to any other rights or remedies provided by the law.

2.3.3. In the event of a material breach of this Agreement by Vendor not specified in this Section 2.3, Dyson shall have the right to terminate this Agreement upon sixty (60) days' prior written notice unless such breach is cured within sixty (60) days from the date notice of such breach is given.

2.3.4. If Dyson terminates this Agreement for cause as specified in this section, Vendor agrees to use its best efforts to assist Dyson in transferring the work to another third party service provider.

2.4. With Cause by Vendor:

2.4.1. In the event of a material breach of this Agreement by Dyson, Vendor shall have the right to terminate this Agreement upon sixty (60) days' prior written notice unless such breach is cured within sixty (60) days from the date notice of such breach is given.

2.4.2. Notwithstanding section 2.4.1, in the event that Dyson's account with respect to undisputed invoices, or any portion thereof, becomes 120 days past due, Vendor may cease providing Services under the applicable SOW. For clarity, disputed invoices shall be subject to Dyson's dispute resolution procedures.

2.5. In the case of termination of the Services by Dyson without cause or termination by Vendor with cause prior to the end of the Initial Term, Dyson will pay Vendor for the following termination-related unrecovered expenses described below. The parties agree that payment of such expenses shall be as liquidated damages and not as a penalty.

2.5.1. A depreciation schedule shall be maintained for all documented actual start-up costs; such costs are defined in Exhibit A. Dyson will be obligated to Vendor for the balance of the unamortized costs as of the date of termination. The foregoing shall be Vendor's sole and exclusive remedy and, under no conditions will Dyson be responsible for any costs beyond the recovery of the monthly Start-Up Fee for the balance of the Agreement term.

2.6. Any equipment purchased by Dyson in accordance with Sections 2.2 or 2.5 shall become the property of Dyson.

## 3. COMPENSATION AND FEES

3.1. Vendor pricing for Services in each executed Statement of Work. Dyson is solely responsible for, and shall pay all taxes excluding taxes on Vendor's income, including personal property, inventory, gross receipts, sales and use taxes on storage or transfer of or title to the Products to its internal and external customers.

3.2. Compensation and fees shall be fixed for the Term of this Agreement, except as provided in this Section 3.3, 3.4, 3.5 and 3.7 below.

3.3. Following each one (1) year anniversary of this Agreement, for cases of documented material increases in Vendor's labor costs, Vendor may request an upward price adjustment only to its labor component of Prices for Services to meet such material increased labor costs as described herein. Increases in labor costs will be deemed "material" if they are above four percent (4%), over the prior year's labor costs as measured by the local CPI-W Index then in effect and if Vendor can demonstrate that such increases have not been offset by operating efficiencies.

3.4. In the event of a cumulative decline in the local CPI-W Index at the anniversary dates of this Agreement, labor prices shall be reviewed for downward adjustment based on identifiable changes in the cost of Vendor's labor as a component of the agreed to pricing as set forth in the applicable SOW. Any downward adjustment in wages shall be phased in with newly hired workers and shall be made at Vendor's reasonable discretion taking into account turnover, productivity loss, local law and other factors that may affect business continuity.

3.5. Should there be a material change in the scope of work or transactional volumes in a Statement of Work under this Agreement, then Vendor or Dyson shall document resulting changes in cost and Vendor or Dyson may request a change in the agreed to pricing. In this case, either party will need to fully document the request and the resulting cost impact. Under this section, if a change in cost results in a suggested change in the agreed to pricing, then both parties will review and approve this request before it can be placed in effect. Approval of pricing changes shall not be unreasonably withheld. Upon approval of pricing changes the Statement of Work will be amended.

3.6. Operational efficiencies are anticipated to result in cost reduction to be passed on to Dyson which the parties shall discuss during quarterly business reviews.

3.7. Any proposed changes to the pricing pursuant to this Section 3, must be made in writing and mutually agreed to by both parties. Any proposed price changes require a thirty (30) day written notification. The parties will review these requests within thirty (30) days. Should either party approve of a price change in these situations, written acceptance will be provided and an Amendment to this respective Pricing for Services will be duly executed by both parties.

3.8. Upon expiration of the Initial Term, Start Up Fees shall be extinguished and no longer applied to Dyson invoicing.

## 4. PAYMENT FOR SERVICES

4.1. All invoices shall be in U.S. Dollars.

4.2. All applicable prices for Services are identified and defined in Exhibit C attached hereto and incorporated herein by reference. Changes to Exhibit C shall be in accordance with Section 23.10

4.3. All actual pass-through and/or cost plus billings will be set forth in a SOW, shall require sufficient back-up documentation including original receipts to verify such direct costs incurred and provided at the time of invoicing.

4.4. Payment does not constitute acceptance of the Services. Adjustments for any overpayments may be deducted from subsequent payments due or, if mutually agreed, refunded by Vendor. Such payment adjustments or requests must be made in writing, within sixty (60) days of payment to Vendor.

4.5. All invoices will reference the Dyson purchase order number, the Dyson approving party's name and phone number.

4.6. Dyson invoices shall be billed to:

>Dyson, Inc.
>Attn: Accounts Payable
>600 W. Chicago Ave. Suite 275
>Chicago IL 60654

4.7. Dyson invoices shall be delivered to:

>Dyson, Inc.
>Attn: Accounts Payable
>600 W. Chicago Ave. Suite 275
>Chicago IL 60654 USA
>Or, sent electronically to an e-mail address to be determined by Dyson and provided to Vendor.

4.8. Payment Terms

4.8.1. Vendor's standard payment terms for Dyson will be Net 45 days from the date of undisputed invoice.

4.8.2. Invoices from Vendor should be received monthly, on the last day of the month, accurately reflect activity for the period, and be broken out in sufficient detail among all billing items.

4.8.3. Vendor should have the ability to send electronic PDF or by electronic data exchange. Dyson reserves the right to require the Vendor to submit invoicing by EDI.

4.8.4. In the event of an incorrect invoice, Dyson will pay Vendor for any undisputed portions of the invoice and will also notify Vendor of any invoice discrepancies at the time of the payment adjustment and provide details as to the disputed amount (a "Disputed Invoice"). Vendor resubmissions of Disputed Invoice amounts will be handled for payment through Dyson's normal process and paid within normal terms based on the date of the resubmission.

4.9. Contract Minimums

4.9.1. Dyson will compensate Vendor for 20% of its indirect labor costs and facility costs ($108,319 per month) along with transaction billing if transactional billing falls below eighty percent (80%) of forecasted rates for a calendar quarter period. Eighty percent transactional activity threshold will be defined as the Receiving, Storage and Order Processing activity occurring in a calendar quarter from the 2017 unit sales forecast  (as shown in following table).  Vendor and Dyson will work in good faith to determine contract minimums for Year 2 and 3.

| 2017 Q1 | 2017 Q2 | 2017 Q3 | 2017 Q4 | Total Units |
|---------|---------|---------|---------|-------------|
| 707,685 | 815,125 | 868,534 | 1,190,736 | 3,582,080 |

# 5. COST REDUCTION OPPORTUNITIES

5.1. Throughout the Term the parties will continually seek opportunities to reduce costs to Dyson.  During each QBR (as defined below) Dyson and Vendor will specifically seek cost reduction opportunities. If these changes can be implemented, Vendor and Dyson will then work together in good faith to determine how this benefit can be passed on to Dyson in the form of lower costs or pricing.   In the event Vendor reduces costs below the initial cost basis, Vendor shall receive 35% of the realized cost reduction.

# 6. INVENTORY CONTROL AND LOSS LIABILITY

6.1. Vendor shall maintain, store and handle Dyson owned inventory used to support Dyson in accordance with the key performance indicators set forth in the applicable SOW associated with this agreement, industry best practices and standards.  Risk of loss for all Products and other Dyson property which are the subject of this Agreement shall remain with Vendor while under Vendor's care, custody or control, except as set forth in section 6.3.  Vendor shall take all reasonable precautions including without limitation physical, technical and administrative safeguards to protect the Products and property against loss, damage, theft or disappearance while in its care, custody or control.

6.2. Subject to paragraph 6.1 above, Vendor is responsible for the loss and replacement of inventory per Exhibit H: "Inventory Variance Calculations and Remuneration".

6.3. Subject to paragraph 6.1 above, Vendor shall be responsible for the loss of Dyson owned inventory in excess of one percent (1%), or a Shrinkage Allowance Threshold of 99%, for the first three (3) months beginning on the Commencement of Operations. After this period, Vendor is responsible for all loss of Dyson inventory in excess of one tenth of one percent (0.1%), representing a Shrinkage Allowance of 99.9%.

6.4. Vendor's responsibility, shall commence only upon Product delivery to, and acceptance by Vendor employees, whether at the Vendor Warehouse or in preparation for transportation by Vendor, and shall cease immediately upon shipment of the Products from the Vendor Warehouse. Subject to the allowance for shrinkage in inventory described herein, in the event of Vendor's liability hereunder, Vendor's liability for damages shall be limited to two million dollars (US$2,000,000) aggregate annually. All claims for loss or damage must be submitted to Vendor in writing (i) within 30 days after shipment from the Vendor Warehouse, or (ii) within 30 days of receipt of notice of loss or damage by Dyson from Vendor, whichever time is shorter.

6.5. Vendor shall document all administrative and physical adjustments to the inventory caused by damage, loss and disposition of scrap material. Vendor and Dyson will review the status of these adjustments on an ongoing basis. At each quarterly meeting of the parties, Vendor and Dyson shall agree to the total amount of actual inventory discrepancies deemed to be the responsibility of Vendor.

6.6. Settlement of inventory discrepancies shall be made by the parties at the end of each of Dyson's fiscal quarter. If, for any fiscal quarter, Vendor fails to achieve the inventory accuracy threshold specified in 6.3 above, Dyson shall, at its election, either have Vendor make payment to Dyson or grant a credit against fees payable by Dyson for Services hereunder.

6.7. Prior to loss calculations the Vendor and Dyson inventory systems must first be reconciled. Once this has occurred, Dyson's inventory system will serve as the system of record for inventory loss and remuneration calculations. Additional details pertaining to the calculation and remuneration for inventory variances are provided in Exhibit H.

6.8. Loss Reserve: The Dyson Loss Reserve for this MSA is 0.1 %

## 7. VENDOR EMPLOYEES, AGENTS, AND SUBCONTRACTORS

7.1. "Vendor Personnel" shall mean employees, agents, or subcontractors of Vendor. Vendor shall be solely responsible for payment of wages, salaries and other amounts due to all Vendor Personnel in connection with this Agreement, and shall comply with all applicable laws with respect thereto. Vendor shall be responsible and liable for the acts and omissions of Vendor Personnel. Vendor shall ensure that its employees conduct the Services in an ethical and professional manner. Vendor agrees not to offer, provide, or arrange for any gratuity or free service to or for any Dyson employee.

7.2. Vendor and Dyson shall work together to shall appoint one Vendor qualified staff member ("Vendor Account Manager") who shall have or is hereby granted authority to (i) act as the main contact for Vendor with respect to the performance of this Agreement; (ii) submit material and information requests to Dyson; and (iii) provide access to Vendor's staff and independent advisors (including accountants) to provide information, answer questions and provide access for audit and inspections. The initial Vendor Account Manager is to be supplied by Vendor. Vendor may change an account manager with Dyson's consent upon twenty (20) calendar days' written notice.

## 8. QUARTERLY BUSINESS REVIEWS AND PERFORMANCE

8.1. Performance Measures: Dyson will measure Vendor performance based on the performance measures described in Exhibit E: "Distribution Center Performance Measures". Vendor shall have systems in place to ensure that the specified performance measures set forth in Exhibit E are reported on and met. Any additional measures shall be mutually agreed upon in writing by both parties.

8.2. Performance Review: Vendor and Dyson shall hold quarterly business reviews ("QBRs") of the appropriate personnel to review without limitation the implementation, Vendor performance of Services under this Agreement, quality, cost reduction opportunities, strategies and other items of mutual interest to improve the working relationship. Vendor will support these reviews by providing the appropriate management and operations team representatives and shall provide supporting documentation for the operating period that will be evaluated at least one (1) week in advance of the QBR.

8.3. At these reviews service levels, scorecards and any other relevant aspects of the business will be evaluated.

8.4. Additionally, on a monthly basis, Vendor will record its operational performance and volume information in the form of a monthly report card. This report card will be sent to Dyson's appointed representative for review and identification of whether continuous improvement action items are necessary. Vendor shall also provide Dyson with access to its web-based dashboard to enable real time reporting on performance and volume information.

## 9. RIGHT TO AUDIT AND PAYMENT ADJUSTMENT

9.1. Audit. Vendor agrees to maintain accurate records, as per Dyson's policies and procedures, necessary to disclose the basis for any charges billed to Dyson under this Agreement as well as those records necessary to verify compliance with the provisions of this Agreement. Vendor shall make these records available for examination and audit by Dyson and its representatives before, and for a period of one (1) year after, receipt by Vendor of final payment under this Agreement. Dyson and its representatives shall have the right to audit such records during normal business hours upon forty-eight (48) hours' notice to Vendor.

9.2. Costs and Expenses. All costs and expenses incurred by Dyson for such an audit shall be paid by Dyson, unless the inspection discloses errors or omissions more than ten (10) percent in favor of Dyson for the aggregate dollars of invoicing or transactions reviewed, in which case all reasonable costs and expenses for the audit shall be paid by Vendor. In the event that an audit discloses any overcharges, the affected invoices will be adjusted to be in accordance with the terms of this Agreement and the total amount so determined to be overcharged plus the cost of performing such audit, at Dyson's option, will promptly be credited to the account of Dyson or paid to Dyson upon demand. Vendor's obligation to pay Dyson for any overcharges shall not be Dyson's exclusive remedy and is in addition to any other rights and remedies Dyson may have as provided by law or this Agreement. In the event that an audit discloses any undercharges, the affected invoices will be adjusted to be in accordance with the terms of this Agreement and the total amount so determined to be undercharged will be payable to Vendor.

9.3. Facility Inspections. Per Section 21.1 of this Agreement, Dyson shall be entitled to make inspections of any Dyson Product or area within Distribution Center dedicated to Dyson product storage. If material discrepancies from the provisions of this Agreement are disclosed, Vendor agrees to implement agreed-upon corrective action. Nothing herein shall preclude Dyson from exercising any other rights or remedies it has under law or other provisions of this Agreement.

## 10. VENDOR OBLIGATIONS

10.1. All Services will be performed in a competent and professional manner, in accordance with industry standards, and exercised in conformance with the requirements of Exhibits D and E.

10.2. Vendor represents that they are sufficiently experienced, properly qualified, and equipped to perform the Services and will devote the time, personnel and resources necessary to perform the Services.

## 11. LIMITATION OF LIABILITY

11.1. EXCEPT FOR BREACHES OF CONFIDENTIALITY, INDEMNITY OBLIGATIONS, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 12. INDEMNIFICATION

12.1. Vendor shall defend, indemnify and hold harmless Dyson, its directors, officers, employees and agents ("Dyson Indemnitees") from and against any and all third party claims, suits, actions, damages, liabilities, costs and expenses including attorneys' fees ("Third Party Claims") to the extent arising out of or relating to (i) Vendor's breach of any representation, warranty, covenant or other obligation or (ii) Vendor's gross negligence or willful misconduct except in each instance (i) and (ii) to the extent caused by the gross negligence or willful misconduct of any of the Dyson Indemnitees. Notwithstanding the foregoing or anything in the Agreement to the contrary, Vendor shall have no indemnification obligation under this Section 12.1 or under the Agreement arising out of or in connection with Lost Products or Damaged Products, the liability for which is governed by Section 6 hereunder.

12.2. Dyson shall defend, indemnify and hold harmless Vendor, its directors, officers, employees and agents ("Vendor Indemnitees") from and against any and all Third Party Claims arising out of or relating to (i) damage or injury to property or persons caused by the Products to the extent not altered, modified, damaged, abused or neglected by Vendor; (ii) Dyson's breach of any representation, warranty, covenant or other obligation under this Agreement; or (iii) Dyson's gross negligence or willful misconduct except in each instance (i), (ii), and (iii) to the extent caused by the gross negligence or willful misconduct of any of the Vendor Indemnitees.

12.3. A party seeking indemnity ("Indemnitee") shall (i) promptly notify the party from whom it seeks indemnity ("Indemnitor") in writing of such claim or action, and (ii) give Indemnitor exclusive control and authority over the defense and settlement of such claim or action subject to the following: (ai) not admit infringement of any intellectual property right without prior written consent of Indemnitee, (b) not enter into any settlement or compromise of any Third Party Claim without Indemnitee's prior written consent, and (c) provide reasonable assistance to Indemnitor in the defense of the claim or action. Indemnitor may participate in the defense of any indemnified claim through counsel of its own choosing at its own expense.

12.4. The provisions of this Section 12 shall survive termination of the Agreement.

## 13. INSURANCE

13.1. Throughout the term of this Agreement, Vendor shall, or shall require its contractors and subcontractors, to maintain insurance coverage, including workers' compensation (or country equivalent), employer's liability, and comprehensive liability in force for all individuals performing services on behalf of Vendor under this Agreement, at Vendor sole cost and expense, and in amounts reasonably sufficient to cover any liabilities assumed by Vendor or imposed on Vendor under this Agreement or by law.

13.2. Vendor shall, or shall require its contractors and subcontractors, to secure and maintain during the term of this Agreement:

| Area | Section | Limits |
|---|---|---|
| General Liability | General aggregate | $2,000,000 |
| General Liability | Each occurrence | $1,000,000 |
| General Liability | Products completed operations aggregate | $2,000,000 |
| General Liability | Personal and advertising injury | $1,000,000 |
| General Liability | Damage to rented properties | $1,000,000 |
| General Liability | Medical expense | $10,000 |
| Automobile Liability | Non-owned and hired auto (combined single limit) | $1,000,000 |
| Workers' Compensation & Employers Liability | Workers' compensation | Statutory limits apply |
| Workers' Compensation & Employers Liability | Employer's liability – each accident | $1,000,000 |
| Workers' Compensation & Employers Liability | Employer's liability disease | $1,000,000 |
| Excess / Umbrella | Excess / Umbrella | $10,000,000 |
| Errors & Omissions and / or Professional Liability | Errors & Omissions and / or Professional Liability | $5,000,000 |
| Environmental Liability | Environmental Liability | $5,000,000 |

13.3. The amount of insurance purchased by Vendor and its contractors and subcontractors will not limit the liability of Vendor to Dyson.

13.4. A certificate of insurance evidencing such coverage must be provided to Dyson upon execution of this Agreement and subsequently Vendor will provide current certificates of insurance throughout the term of this Agreement and any extensions.  Vendor shall provide Dyson with thirty (30) days prior written notice of cancellation, non-renewal or material change in any insurance coverage.

## 14. CONFIDENTIAL INFORMATION

14.1. Confidential Information: The parties acknowledge that, by virtue of the activities to be performed and the relationships created under this Agreement, each party (the "Recipient party") may have access to information that the other party (the "Disclosing party") considers to be confidential ("Confidential Information"). Confidential Information may include, but is not be limited to, inventions, designs, formulas, algorithms, trade secrets, know-how, customer lists, cost and pricing information, business and marketing plans, and other business and financial information. During the term of this Agreement and for a period of 5 years thereafter, the Recipient party agrees on its behalf and on behalf of its Affiliates to hold the Disclosing party's Confidential Information in confidence using the degree of care that is used by the Recipient party with respect to its own Confidential Information (but no less than reasonable care). The Recipient party agrees on its behalf and on behalf of its Affiliates that the Confidential Information of the Disclosing party will be disclosed on a need to know basis to its employees and contractors under nondisclosure terms consistent with this Agreement. The Recipient party agrees on its behalf and on behalf of its Affiliates not to use the Disclosing party's Confidential Information for any purpose other than its performance of this Agreement. The Confidential Information at all times remains the property of the Disclosing party. Upon the termination or expiration of this Agreement, the Recipient party shall, upon written request of the Disclosing party, return to the Disclosing party or destroy the Confidential Information of the Disclosing party. Notwithstanding the foregoing, the Recipient party may maintain one copy of the Disclosing party's Confidential Information to be retained by the Recipient party's Legal Department for archival purposes only. In the event the Recipient party becomes aware of any unauthorized access or disclosure of the Disclosing party's Confidential Information, the Recipient party shall promptly notify the Disclosing party in writing and take steps as reasonably necessary to cure or prevent further unauthorized access or disclosure.

14.2. Exceptions. Notwithstanding any provision contained in this Agreement, neither party shall be required to maintain in confidence any of the following information: information that, (i) at the time of disclosure to the Recipient party is generally publicly known through no breach of this Agreement or another obligation of confidentiality owed to the Disclosing party or its Affiliate; (ii) after disclosure hereunder, becomes generally publicly known by publication or otherwise, except by breach of this Agreement or another obligation of confidentiality owed to the Disclosing party or its Affiliate; (ii) was in the Recipient party's possession, or the possession of Recipient party's Affiliate at the time of disclosure hereunder by the Disclosing party, unless subject to an obligation of confidentiality owed to the Disclosing party or its Affiliate; (iv) is independently developed by or for the Recipient party; or (v) the Recipient party receives from a third party where Recipient party reasonably believes such third party was under no obligation of confidentiality to the Disclosing party or its Affiliate with respect to such information.

14.3. Disclosures Required by Law. The Recipient party may disclose the Disclosing party's Confidential Information as required by court order, operation of law, or government regulation; provided that, the Recipient party promptly notifies the Disclosing party of the specifics of such requirement prior to the actual disclosure or promptly thereafter if prior disclosure is impractical under the circumstances, uses diligent efforts to limit the scope of such disclosure or obtain confidential treatment of the Confidential Information, and allows the Disclosing party to participate in the process undertaken to protect the confidentiality of the Disclosing party's Confidential Information, including without limitation, cooperating with Disclosing party in order to comply with the requirements of such order, law, or regulation in a manner that discloses the least amount, if any, of the Confidential Information of the Disclosing party.

14.4. Injunctive Relief. Each party acknowledges that any use or disclosure of the other party's Confidential Information other than in accordance with this Agreement may cause irreparable damage to the other party. Therefore, in the event of any such use or disclosure or threatened use or threatened disclosure of the Confidential Information of either party hereto, the non-breaching party shall be entitled, in addition to all other rights and remedies available at law or in equity, to injunctive relief against the breach or threatened breach of any obligations hereunder.

## 15. USE OF DYSON TRADEMARKS; INTELLECTUAL PROPERTY

15.1. Vendor shall not use the name of Dyson or any other name trademarked or licensed to Dyson, directly or indirectly, in any of Vendor advertising or publicity without the prior written consent of Dyson.

15.2. Neither party shall, acquire any ownership, licensed or any other rights in any software, documentation, or intellectual or technological property of the other party. For clarity, as between the parties, all right, title and interest in and to the Products shall remain with Dyson at all times.

## 16. RECORD RETENTION AND DISPOSAL

16.1. Vendor will store original documents when available and copies when originals are not available for a period of five (5) years from date of creation or receipt of material at Vendor. Documents to be stored are shipment packing slips, shipment bill of ladings with referenced tracking numbers, receiving bill of lading, receiving pack slips and others as determined by Dyson.

16.2. Document copies will be made available to Dyson within twenty-four 24 hours of a request to produce documents. Production of documents will be delivered by fax, email or overnight package delivery at Dyson's expense.

16.3. Dyson will determine the method of disposal to include hard copies being shipped to a specified location, documents transferred to micro fiche and provided to Dyson or documents scanned to electronic files and provided to Dyson. Vendor may not destroy documents without prior written approval from Dyson.

## 17. COMPLIANCE WITH LAWS

17.1. Vendor will comply with all applicable national and local laws and regulations in the performance of this Agreement, including but not limited to all labor, employment, health and safety and environmental laws and regulations.

## 18. DATA PROTECTION

18.1. To the extent that Vendor has access to Dyson Personal Data, Vendor shall act as a Data Processor and shall only process Personal Data it receives in carrying out the Services (the "Data") to the extent necessary to perform the Services. It shall not use the Data for any other purposes other than as described and defined in this agreement;

18.2. In Carrying out the Services the Vendor shall:

18.2.1. comply with the provisions of all applicable data protection and privacy laws, regulations and codes of practice in force from time to time anywhere in the world governing the holding and use of personal data of any kind ("Applicable DP Law") and shall not do anything that would put Dyson in breach of Applicable DP Law;

18.2.2. not transfer any Data to any country/market, other than the agreed upon country/market, without Dyson's prior consent;

18.2.3. take all reasonable technical and organizational measures against:

18.2.3.1. unauthorized or unlawful access to the Data or unauthorized or unlawful processing of the Data including ensuring access to any computer system by which the Data is stored or processed is limited to Vendor's employees for the sole purpose of carrying out the Services and is controlled by password which is kept confidential;

18.2.3.2. accidental loss, corruption or destruction of, or damage to, the Data; and

18.2.3.3. viruses being present in Vendor's servers, hardware, software or email;

18.2.4. clearly mark the Data as belonging to Dyson;

18.2.5. keep a record of any processing of Data it carries out on behalf of Dyson;

18.2.6. promptly inform Dyson at privacy@dyson.com if any Data is lost or destroyed or becomes damaged, corrupted, or unusable. The Vendor will restore such Data at its own expense;

18.2.7. at Dyson's request, provide to Dyson a copy of all Data held by it in the format and on the media reasonably specified by Dyson;

18.2.8. shall ensure that access to the Data is limited to:

18.2.8.1. those employees who need access to the Data to meet the Vendor's obligation under this Agreement; and

18.2.8.2.   in the case of any access by any employee, such part or parts of the Data as is strictly  necessary for performance of that employee's duties;

18.2.9. shall ensure that all employees:

18.2.9.1.   are informed of the confidential nature of the Data; and

18.2.9.2.   have undertaken training in the laws relating to handling personal data;

18.2.10. when transferring Data to Dyson use only secure networks previously approved in writing by Dyson (acting reasonably);

18.2.11. keep the Data, and the use to which that is put confidential and not to disclose or copy or use the same for any purpose other than as instructed by Dyson;

18.2.12. promptly remove from the Data information on any person who contacts Vendor or Dyson requesting that their details are removed or amended (provided that, where such request is not made directly to Vendor, Dyson has informed the Vendor of such a request).

18.3. The Vendor shall keep detailed, accurate and up-to-date records relating to the processing of the Data.

18.4. Vendor shall permit Dyson or their representatives to inspect Vendor's systems, procedures and documentation relating directly to the provision of Services under this Agreement only for the purpose of ensuring Vendor's compliance with its obligations under this Agreement.

18.5. Vendor shall indemnify and hold harmless Dyson from and against all claims, demands, liabilities, costs (including reasonable legal costs) and expenses suffered or incurred by Dyson arising from Vendor's breach of this clause.

18.6. If the Vendor receives any complaint, notice or communication which relates directly or indirectly to the processing of Data or to Dyson and/or the Vendor's compliance with Applicable DP Law, it shall immediately notify Dyson and it shall provide Dyson with reasonable co-operation and assistance in relation to any such complaint, notice or communication

18.7. Supplier may only authorize a third party (sub-contractor) to process the Data:.

18.7.1. subject to Dyson's prior written consent;

18.7.2. provided that the sub-contractor's contract includes terms which are substantially the same as those set out in this clause; and

18.7.3. provided that the Vendor procures that the sub-contractor ceases to process and returns or destroys any Data on termination of this Agreement for any reason.

18.8. At the end of this agreement or at Dyson's request, the Vendor, and any sub-contractor, shall immediately cease to use or process any Dyson Data and, as specified in this agreement, securely return all Dyson Data in its possession to Dyson whether in written form, electronically stored or otherwise and destroy all Dyson Data in its possession and, if requested by Dyson, deliver a certificate confirming compliance with the return or destruction of Data.

## 19. NOTICES

19.1. All notices required or permitted under this Agreement will be in writing, will reference this Agreement, and will be deemed given:

19.2. When delivered personally,

19.3. When sent by confirmed facsimile,

19.4. Five (5) Business days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or

19.5. Three (3) Business days after tender to a commercial overnight carrier, with written verification of receipt.  All communications must be sent to the addresses below or any other address as may be designated by giving written notice to the other party.

| | |
|---|---|
| Dyson, Inc. | syncreon |
| 600 W. Chicago Ave, Suite 275 | 2851 High Meadow Circle, Suite 250 |
| Chicago, IL  60654 | Auburn Hills, MI 48326 |
| ATTN: Logistics Director | ATTN: Dan Bombrys |
| Tel:  312-469-5950 | Tel: 248-377-4700 |

| | |
|---|---|
| With a copy to: | |
| Dyson, Inc. | syncreon |
| 600 W. Chicago Ave, Suite 275 | 2851 High Meadow Circle, Suite 250 |
| Chicago, IL 60654 | Auburn Hills, MI 48326 |
| ATTN: Legal Department | ATTN:  Legal Department |

## 20. OWNERSHIP OF CAPITAL EQUIPMENT AND REAL PROPERTY

20.1. Unless otherwise specified, all real property, standard equipment, warehouse facilities, and computer systems used by Vendor in the performance of services in this Agreement will at all times be owned or leased by Vendor.  Costs associated with property, standard equipment, facilities and computer systems are understood to be part of Vendor's operating costs and there shall be no specific additional compensation and fees for this, unless otherwise specified and mutually agreed to by the parties.

20.2. Unless otherwise specified, specialized equipment or tooling that is specific or proprietary to Dyson parts or processes shall be provided by Dyson or procured by Vendor with Dyson' prior approval and direct billed to Dyson at the time of receipt as a non-recurring set-up (NRE) charge.  Dyson shall own such equipment or tooling.

## 21. PRODUCTS

21.1. Access to Products.  Vendor grants to Dyson full and unrestricted access to Products and the Distribution Centers by onsite or resident duly authorized personnel. Dyson will notify Vendor of any visiting Dyson personnel a minimum of twenty-four (24) hours prior to the arrival of these personnel. In any event, access shall be subject to Vendor's reasonable health, safety and security procedures.

21.2. Handling of Products by Dyson.  Should Dyson request, from time to time, permission to handle its Products within the Distribution Center, Dyson shall indemnify Vendor and hold it harmless from and against any and all claims, actions, damages, liability and expense involving the loss of life, personal injury, damage to property (personal and real), including that of its employees and its workers' compensation insurer, and loss of inventory arising from or out of Dyson's handling of such Products, except to the extent such loss of life, personal injury, damage to property and/or loss of inventory was caused by the negligence of Vendor, its agents and employees.  Any handling of goods within a Vendor owned facility shall be at Vendor's reasonable discretion.

21.3. Packaging and Labeling. Dyson shall be responsible for ensuring that the finished Products are properly packaged and labeled in accordance with Legal Requirements for storage and transportation of such Products. When Dyson is not responsible for packaging and labeling under the preceding sentence, it shall provide Vendor with all necessary information and support to allow Vendor to properly package and label such Products for storage and transportation.

21.4. Disposal of Product.  Dyson shall retain sole and exclusive authority with respect to the disposition of any damaged, expired, out-of-date Products or otherwise un-saleable items and shall direct the disposal of such Products in accordance with all applicable Legal Requirements at Dyson's expense. Vendor involvement will be to assist and comply with Dyson's requirements and to tender the materials to authorized carriers as Dyson's agent. Dyson will comply with this obligation and cause the removal of Hazardous Materials from the Distribution Center so as to prevent the requirement that the Distribution Center be licensed as a Transfer Storage and Disposal Facility (TSDF) or similar facility under applicable Legal Requirements.

## 22. PRODUCT HANDLING

22.1. Shipments.  Dyson agrees not to ship Products to Vendor as the named consignee. If, in violation of this agreement, Products are shipped to Vendor as named consignee, Dyson agrees to notify carrier in writing prior to such shipment, with copy of such notice to Vendor, that Vendor named as consignee is an agent and has no beneficial title or interest in such property and Dyson further agrees to indemnify and hold harmless Vendor from any and all claims for unpaid transportation charges, including undercharges, in connection with Products so shipped. Dyson further agrees that, if it fails to notify carrier as required by the preceding sentence, Vendor shall have the right to refuse such Products and shall not be liable or responsible for any loss, injury or damage of, any nature to, or related to, such Products.

22.1.1.    Vendor to be responsible for all demurrage, detention charges that are result of their lack of timely processing of shipments.

22.2. Tender of Products.  All Products for storage shall be delivered at the Distribution Center properly marked and packaged for handling. Dyson shall furnish at or prior to such delivery, a manifest showing marks, brands, or sizes to be kept and accounted for separately, and the class of storage and other services desired. Dyson shall require of their vendors and their vendors' transportation providers that they call the Vendor Distribution Center prior to product delivery to set up an inbound delivery appointment.

22.3. Capacity. Vendor will use commercially reasonable efforts to maintain the capability to promptly load and unload Dyson's shipments of Products daily. Dyson shall provide Vendor as much notice as possible regarding estimated monthly incoming and outgoing volumes.

22.4. Concealed Damage.  Vendor will notify Dyson upon becoming aware of Products which are received in a damaged condition. If damaged, such Products will be segregated from undamaged Products, Dyson will be notified and will provide disposition for the damaged product. .

22.5. Shipment Instructions.  No Products shall be delivered or transferred except upon receipt by Vendor of complete written instructions. Written instructions shall include, but are not limited to, FAX, EDI, or similar communication, provided Vendor has no liability for the accuracy of the information when relying on the information contained in the communication as received.

22.6. Inventory Records.  Vendor shall keep records of inventory for incoming and outgoing shipments and all adjustments of Products using Vendor's systems and procedures and electronic data processing equipment.

## 23. MISCELLANEOUS PROVISIONS

23.1. Assignment.  Upon notice, Dyson shall have the right to assign its rights under this agreement to: (1) Any Affiliate and (2) A purchaser of substantially all of the assets of Dyson. Dyson shall inform all users of the services of the terms and conditions of this Agreement.

After such assignment, assignee agrees to be bound by the terms and conditions of the Agreement and shall be solely responsible/liable for their own orders and commitments under this Agreement unless or until such time as the assignee and Vendor have entered into a new agreement.

23.2. Governing Law.  Subject to section 17 of this Agreement (Compliance with Laws,) this Agreement shall be governed and interpreted by the laws of the State of Illinois, exclusive of choice of law rules.

23.3. Change of Ownership. Vendor obligations under this contract are binding should the results of merger or acquisition activities result in a change in Vendor ownership structure. This includes all provisions regarding pricing, the location of the Distribution Center referred to within this contract, capital commitments and agreed to service levels.

23.4. Venue and Jurisdiction. The venue and jurisdiction for any action arising under this Agreement shall be in the state or federal courts of the United States of America in the State of Illinois. The parties consent to the jurisdiction and venue of the state or federal courts in Cook County in the State of Illinois and waive any objections to such jurisdiction and venue.

23.5. Dispute Resolution: In the event there exists any dispute, controversy or claim arising out of or relating to this Agreement or the breach, termination or validity thereof, the parties to such dispute will attempt to resolve it within sixty (60) days through the mechanism of discussions between one member of each of their respective management teams who did not personally and substantially participate in the events pertaining to the dispute. If such dispute cannot be timely resolved by the parties' respective management representatives, then such dispute shall be finally settled by arbitration between the parties in accordance with the rules of the American Arbitration Association ("AAA") then in force. The number of arbitrators shall be one (1).

23.6. Arbitration: If the parties cannot agree to the selection of the arbitrator within thirty (30) days of the filing of such arbitration proceeding, a single arbitrator shall be appointed by the AAA in accordance with their rules. Discovery shall be limited as agreed upon by counsel to the parties and no live testimony shall be presented. The parties agree that arbitration shall provide the exclusive remedy for resolution of all disputes under this Agreement and that neither party shall have the right to further appeal or redress in any court or tribunal except solely for the purpose of obtaining execution of the judgment rendered by the arbitrator. The costs of such arbitration shall be borne equally by Dyson and Vendor.

All arbitration proceedings, claims, actions or suits of any kind ("Claims"), whether based in law, equity, or other legal basis, must be filed or noticed, as applicable, within four (4) years of the date of the occurrence, act or omission giving rise to, or forming the basis of, the applicable Claim. In the event a Claim is not brought within four (4) years pursuant to this section, the Claim is waived.

23.7. No Publicity. Vendor agrees to keep, and cause its employees to keep, the existence of this Agreement and the nature of Vendor obligations hereunder strictly confidential and not to disclose any information with respect thereto to any third party or entity. Vendor shall not use, and shall keep its employees from using, Dyson as a reference in marketing activities without Dyson prior written consent. Notwithstanding the previous sentence, Vendor may disclose under a confidentiality agreement to customers or prospective customers the fact that Vendor is performing services for Dyson, provided the information provided shall be limited to the disclosure of such fact only.

23.8. Force Majeure. Neither party shall be liable to the other for delay in performing or failure to perform any of its obligations hereunder, excluding any obligation to pay monies owed, if and to the extent that such delay or failure to perform is due to any cause beyond its control which could not have been reasonably foreseen and avoided by the exercise of due care and diligence consistent with the exercise of reasonable business judgment, including acts of God, fire, flood, explosion, wars, riots, civil disturbances and strikes, or other work stoppages. If either party is so delayed or unable to perform its obligations as a result thereof, in whole or in part, such party shall promptly notify the other party thereof in writing, explaining the reason for such delay or inability to perform. In the event of such a force majeure, the time for performance or cure will be extended for a period equal to the duration of the force majeure, but in no event more than thirty (30) days. Any delayed performance of substantial services not resumed after thirty (30) days shall entitle the other party to terminate this Agreement subject to fulfillment of its obligation of payment for services rendered and any unpaid start-up costs.

23.9. Waiver. The failure of either party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision or the right thereafter to enforce each and every provision hereof. No waiver by either party, either express or implied, of any breach of these terms or conditions shall be construed as a waiver of any other term or condition.

23.10. Survival. The provisions of this Agreement that by their nature continue in effect shall survive the termination or expiration of this Agreement. Outstanding purchase orders shall survive the termination of this Agreement unless Dyson cancels the purchase orders.

23.11. Independent Contractor Status. This Agreement does not create a joint venture or partnership of any kind, nor shall this Agreement give rise to any fiduciary duty on the part of any party to any other party. Vendor is an independent contractor for all purposes, without express or implied authority to bind Dyson by contract or otherwise. Vendor acknowledges and agrees that neither Vendor nor Vendor employees nor contractors are agents or employees of Dyson.

23.12. Agreement, Statements of Work, and Expansion of Services

23.12.1. This Agreement, including all Exhibits, and Attachments, hereunder, constitutes the entire agreement between the parties in connection with the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, between the parties. In the event of a conflict of terms between the terms of this Agreement and the terms of a Statement of Work, this Agreement shall prevail. No amendment to or modification of this Agreement will be binding unless in writing and signed by a duly authorized representative of Dyson and Vendor.

23.12.2. It is the intent of the parties that this Agreement cover the domestic United States provision of services between the parties and their respective subsidiaries and affiliates. In the event that the parties extend the provision of services to new locations, a service schedule and/or statement of work referencing this Agreement will be prepared and executed by the parties (referred to collectively herein as "Schedule(s)"). Each Schedule may provide for pricing, standard operating procedures ("SOP"), operations locations or other terms related to the provision of services in each new location. Each such Schedule and any exhibit thereto shall be incorporated herein as part of this Agreement. In the event of a conflict between the terms of this Agreement and the terms of any Schedule, the terms of the Schedule shall control.

## 24. Representations, Warranties and Covenants.

Vendor represents, warrants, and covenants to Dyson that:

24.1. Vendor shall perform the Services with care and diligence consistent with industry standards and in a professional and workmanlike manner, with employees that have sufficient technical expertise to perform the Services;

24.2. Neither Vendor nor any owner, officer, director, employee, agent or contractor thereof, is currently or has in the past been suspended, excluded, or debarred from, or is otherwise ineligible to participate in, any Federal Health Care Program;

24.3. Vendor shall perform the Services in accordance with all applicable laws in any relevant countries, including the United States, and all federal, state, and local laws, statutes, acts, ordinances, rules, regulations, codes and other standards including; those practices and standards required to comply with all current United States governmental regulatory requirements, including, without limitation, "Good Manufacturing Practices" (e.g., 21 C.F.R. 210 and 211 et seq.).

24.4. Vendor shall perform the Services in accordance with the terms and conditions of each SOW;

24.5. Vendor will not, in the course of performing its obligations hereunder, infringe or misappropriate, and neither the Services nor any element thereof will infringe or misappropriate, any intellectual property right (as defined below) of any other person.

## 25. AUTHORIZATION

25.1. It is agreed and warranted by the parties that the individuals signing this document on behalf of the respective parties are duly authorized to execute such an Agreement. No further proof of authorization is or shall be required.

## 26. EXHIBITS

The following Exhibits are incorporated herein:

|  |  |
|---|---|
| Exhibit A: | Vendor Start Up and Capital Expenses |
| Exhibit B | Dyson Owned Capital Equipment and Software |
| Exhibit C: | Rates for Distribution Center Services |

Exhibit D:    3PL Distribution Center Scope of Work
Exhibit E:    Distribution Center Performance Measure Service Levels
Exhibit F:    Reporting Requirements
Exhibit G:    IT System and Support Requirements
Exhibit H:    Inventory Variance Calculations and Remuneration
Exhibit I:    Dyson Quality Requirements
Exhibit J:    Executed Warehouse Lien Waiver
Exhibit K:    Physical Security Requirements
Exhibit L:    Definition of Terms

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives on the date(s) shown below.

Dyson, Inc.                              syncreon Technology (America) Inc.

By: _____              By: _____

Print Name: _James Mullen___            Print Name: _Michael Fahy___

Title: _US-CFO___                       Title: _President, Technology___

Date: _2-9-17___                        Date: _2-10-17___

# Exhibit A: VENDOR START-UP AND CAPITAL EXPENSES

THIS PAGE INTENTIONALY LEFT BLANK: TO BE INCLUDED WITHIN 90 DAYS OF COMMENCEMENT DATE

# Exhibit B Dyson Owned Capital Equipment and Software

To be finalized within 90 of executed Agreement date.

# Exhibit C: Rates for Distribution Center Services

VENDOR DISTRIBUTION CENTER RATES FOR SERVICES

The Vendor Service Provider Model for the Dyson Distribution Center will be implemented in conjunction with the Commencement Date for Services which shall be April 3rd, 2017

## 1. Initial Installation Costs

1.1. Dyson will pay an initial charge for Startup CapEx used for building updates or process equipment to support Dyson Distribution Center Scope of Work. This includes the pallet racking, any planned conveyor and other material handling equipment, which is incrementally required to support the Dyson business.
   - Total CapEx = $1,200,841
   - CapEx at the start of Year 1 = $864,907
   - CapEx Year 2 = $157,908
   - CapEx Year 3 = $178,027

1.2. Dyson will pay an initial charge for IT Development support for the interface between Vendor systems and Dyson's ERP system SAP. The expected list of required interfaces are provided in MSA Exhibit G. The below price includes labor and all travel costs.
   - Total IT Development = $977,646
   - IT Development at the start of Year 1 = $810,184
   - IT Development Year 2 = $80,204
   - IT Development Year 3 = $87,258

1.3. The combined price for start-up expenses as described in sections 1.1 and 1.2 will be invoiced in 3 equal increments from

   - – Year 1: April 2017 through June 2017.
   - – Year 2: April 2018 through June 2018
   - – Year 3: April 2019 through June 2019

## 2. Pre-startup Training

Prior to startup of Distribution Center services, Vendor will make available staff resources to support knowledge transfer in a "Train the Trainer" format. During or before the last week prior to start up, dry run testing of the entire Vendor process will be completed.

Projected Dates of activity: March 1st 2017 through April 3rd 2017

2.1. Expenses during the Pre-startup Training will be charged on a cost plus basis.

Price for Training period: $ 764,775.65

## 3. Ramp to Sustaining

In the Ramp to Sustaining period, Vendor Service Provider will ramp to fully support the Dyson Distribution Center business from Vendor location.

Projected Dates for Ramp to Sustaining: April 3rd 2017 through June 2nd 2017

3.1. Distribution Center Activity Charges during the Ramp to Sustaining will be charged on a cost plus basis.

Estimated Price for Ramp to Sustaining period:

- Total = $43,475
- Month 1 = $21,737
- Month 2 = $21,737

## 4. At Full Volume Pricing

Vendor charges for Full Volume fall into two categories: Recurring and Transactional.

**Dyson 3PL Distribution Center Recurring fees**:

4.1. Dedicated Dyson Organization Space: The fee to cover the space and infrastructure (power, network, access) for the Dyson Quality on site team's activities.

Monthly Dedicated Space Fee:

- – Year 1: $ 254.36
- – Year 2: $ 317.12
- – Year 3: $ 397.84

4.2. Purchased Expense Materials – For material that Vendor purchases on behalf of Dyson they may charge a Percentage Mark-up on approved material cost.

Percent Markup: 10%

**Dyson 3PL Distribution Center Transaction Rates**

The charges for the transactional activity of the Dyson Distribution Center Scope of Work is broken down into the following components: Inbound Receiving, Storage, Outbound Shipping and Special projects. Please note that for inbound and outbound activities, we are asking for economies of scale price breaks due to the significant increasing volumes forecast over the four projected years (see Appendix 3 for Forecast volumes).

4.3. Inbound Receiving – Floor loaded Container Receiving Fee

Description: Receive Finished Goods using, at a minimum, the following steps – Coordinate container delivery, hand unload container, sort by SKU, visual inspection, count, palletize, unitize load (stretch film wrap), label/identify, move to storage location and process receipt transaction. See Exhibit D section 1.11.2 for volume detail.

Rate for each UNIT received from a floor loaded container delivered in April 2017 – March 2018 meeting the SLA: $0.43

Rate for each UNIT received from a floor loaded container delivered in April 2018 March 2019 meeting the SLA: $0.40

Rate for each UNIT received from a floor loaded container delivered in April 2019-March 2020 meeting the SLA: $0.36

4.4. Inbound Receiving – Pallet Receiving Fee

Description: : Receive Finished Goods using, at a minimum, the following steps - Visual inspection, count, label/identify, move to storage location and process receipt transaction. See Exhibit D section1.11.2 . for volume detail.

Rate for each UNIT received on a palletized shipment received in April 2017 – March 2018 meeting the SLA: $0.30

Rate for each UNIT received on a palletized shipment received in April 2018 – March 2019 meeting the SLA: $0.29

Rate for each UNIT received on a palletized shipment received in April 2019 – March 2020 meeting the SLA: $0.28

4.5. Inbound Receiving – Inbound Receiving Unit/Carton receiving fee

Description: : Receive Dyson material using, at a minimum, the following steps - Sort, visual inspection, count, label/identify, move to storage location and process receipt transaction. See Exhibit D section1.11.2 . for volume detail.

Rate for each UNIT received on a loose loaded receipt in April 2017- March 2018 meeting the SLA: $2.13

Rate for each UNIT received on a loose loaded receipt in April 2018 – March 2019 meeting the SLA: $2.12

Rate for each UNIT received on a loose loaded receipt in April 2019 – March 2020 meeting the SLA: $2.09

4.6. Storage Fees

Description: The cost to store and maintain control of Dyson inventory when not involved in receiving or shipping processes.  This includes cycle counting, location consolidation, re-slotting and forward stocking location replenishment. See Exhibit D section 1.11.3 for details.

Rate per equivalent pallet for highest quantity of pallets held during April 2017 – March 2018 month: $10.35

Rate per equivalent pallet for highest quantity of pallets held during April 2018 – March 2019 month: $10.21

Rate per equivalent pallet for highest quantity of pallets held during April 2019 – March 2020 month: $10.08

4.7. Order Processing Fee – Outbound Per Unit/Carton Fee:

Description: Prepare and ship Dyson orders regardless of order line quantity or unit quantity using, at a minimum, the following steps – electronically receive orders from Dyson, sort/coordinate/print order documents, pick unit(s)/carton(s), prep per customer packaging/labeling requirements (if required), verify & inspect, stage for shipment, coordinate with carrier/customer for pick up and process shipment transaction.  See Exhibit D section1.11.4 .

Rate for each UNIT on an outbound shipment in April 2017 – March 2018 meeting the SLA: $1.39

Rate for each UNIT on an outbound shipment in April 2018 – March 2019 meeting the SLA: $1.20

Rate for each UNIT on an outbound shipment in April 2019 – March 2020 meeting the SLA: $0.94

4.8. Order Processing Fee – Outbound Per Unit Fee for Pallet Shipments:

Description: Prepare and ship Dyson orders regardless of order line quantity or unit quantity using, at a minimum, the following steps – electronically receive orders from Dyson, sort/coordinate/print order documents, pick pallet of Dyson product, prep per customer packaging/labeling requirements (if required), verify & inspect, stage for shipment, coordinate with carrier/customer for pick up and process shipment transaction. See Exhibit D section 2.4.4.

Rate for each UNIT on an outbound shipment picked as a pallet in April 2017 – March2018 meeting the SLA: $0.39

Rate for each UNIT on an outbound shipment picked as a pallet in April 2018 – March 2019 meeting the SLA: $0.37

Rate for each UNIT on an outbound shipment picked as a pallet in April 2019 – March 2020 meeting the SLA: $0.34

4.9. Special Project charge – Per Unit Fee for performing warehouse projects

Description: To support ad hoc warehouse special projects (example project descriptions provided) at a per unit rate shall be defined prior to start of projects that leverages an hourly labor rate. See Exhibit D section 1.19 for additional description and project frequency.

Special Project Labor Rate used in Per Unit Fee for Regular Hours in the period of April 2017 – March 2018: $22.23
Special Project Labor Rate used in Per Unit Fee for Regular Hours in the period of April 2018 – March 2019: $22.67
Special Project Labor Rate used in Per Unit Fee for Regular Hours in the period of April 2019 – March 2020: $23.13

Special Project Labor Rate used in Per Unit Fee for Non-Regular Hours in the period of April 2017 – March 2018: $33.35
Special Project Labor Rate used in Per Unit Fee for Non-Regular Hours in the period of April 2018 – March 2019: $34.01
Special Project Labor Rate used in Per Unit Fee for Non-Regular Hours in the period of April 2019 – March 2020: $34.69

4.10. Inbound Receiving on Saturday – Floor loaded Container Receiving Fee

Description: Receive Finished Goods using, at a minimum, the following steps – Coordinate container delivery, hand unload container, sort by SKU, visual inspection, count, palletize, unitize load (stretch film wrap), label/identify, move to storage location and process receipt transaction.

Saturday rate for each UNIT received from a floor loaded container:

- Delivered in April 2017 - March 2018 meeting the SLA: $0.43
- Delivered in April 2018 - March 2019 meeting the SLA: $0.40
- Delivered in April 2019 - March 2020 meeting the SLA: $0.36

4.11. Direct to Consumer Saturday Order Processing Fee – Outbound Per Unit/Carton Fee:

Description: Prepare and ship Dyson orders regardless of order line quantity or unit quantity using, at a minimum, the following steps – electronically receive orders from Dyson, sort/coordinate/print order documents, pick unit(s)/carton(s), prep per customer packaging/labeling requirements (if required), verify & inspect, stage for shipment, coordinate with carrier/customer for pick up and process shipment transaction.

Saturday rate for each UNIT on an outbound shipment:

- Shipping in April 2017 - March 2018 meeting the SLA: $1.39

- Shipping in April 2018 - March 2019 meeting the SLA: $1.20
- Shipping in April 2019 - March 2020 meeting the SLA: $0.94

# EXHIBIT D: DISTRIBUTION CENTER SCOPE OF WORK

# Dyson's Third Party Distribution Center

## 1. General Requirements

### 1.1. General Description of Services

Vendor will be responsible for inbound receipts, inventory management, storage, picking, packing, order fulfillment and outbound shipments of Dyson products and material to Dyson's United States customers. All of the activities performed on behalf of Dyson must be in accordance with ISO 9001, Sarbanes–Oxley Act (SOX), and import/export regulations.

### 1.2. Transition Plan Overview

| Date | Event Description |
|------|-------------------|
| January of 2017 | MSA Contract signed |
| Middle of January 2017 | Initiate IT system interface development |
| Beginning of April 2017 | Start receiving and storing inventory in the new warehouses |
| Last week of April 2017 | Start of Dyson Order Fulfillment (picking, packing, & shipping) from new warehouses |
| 31st of May 2017 | New warehouses operating at full volume |

#### 1.2.1. Inventory related transition activities

At the time of moving inventory from the existing warehouses to the new warehouses, the vendor shall count all inventory at the point of responsible hand-off. Once all inventories have been moved, the vendor will perform a wall-to-wall physical inventory with full reconciliation to Dyson's SAP system.

#### 1.2.2. Shipping related transition activities

During the transition phase shipping will begin with the low volume products, such as lighting, and move to the high volume products such as vacuums.

### 1.3. Forecasting and Planning

Dyson will provide Vendor with a quarterly forecast of weekly units to be shipped over the next 12 months (i.e. rolling forecast).

1.4. Communication

Vendor will respond to Dyson email or phone requests the same day and not later than 5:00 PM local time.

1.5. Transportation/Freight Services

Dyson's preferred transportation partners will be responsible for all inbound and outbound transportation from and to Vendor's operation. Vendor must coordinate with Dyson's preferred transportation partners to streamline fulfillment of the Dyson scope of work.

1.6. Documentation

The Vendor will have all processes supporting Dyson covered by documented Work Instructions. Dyson will require Work Instructions be approved in advance of commencement of service.

1.7. Hazardous Materials

No hazardous material processes, directions, requirements, or documents are required. Lithium-ion Batteries are packaged inside of products.

## 2. Operational Requirements

2.1. Operational calendar

2.1.1. Dyson uses the standard January to December calendar.

2.1.2. Vendor will operate the United States distribution facilities Monday through Saturday except on Dyson observed United States holidays.

2.1.3. Vendor should assume the distribution center activity/volume is spread across a standard 5-day work week PLUS Saturday work at 67% of weekday volumes.

2.2. Vendor will manage inventory ranging in value from $106M to $200M with an average of $150M.

2.3. Sales Forecast

1. The below Sales Forecast is in units with:
2. DRP = Distributors, Retailers, Professionals shipments
3. D2C = Direct to Consumer shipments

| Products | | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| **Vacuums** (Floor care, Full Size, Uprights, Canisters) | Total | 928,436 | 882,014 | 882,014 | 882,014 |
| | D2C | 104,000 | 134,000 | 171,000 | 214,000 |
| | DRP | 824,436 | 748,014 | 711,014 | 668,014 |
| **Vacuums** (Cordless, Handheld, Stick, Robots) | Total | 1,834,472 | 2,293,091 | 2,751,709 | 3,302,050 |
| | D2C | 148,000 | 233,000 | 404,000 | 563,000 |
| | DRP | 1,686,472 | 2,060,091 | 2,347,709 | 2,739,050 |
| **Air Treatment** (Environmental Controls, Fans, Air Multipliers, Heaters, Purifiers, Humidifiers) | Total | 478,617 | 646,133 | 904,586 | 1,175,962 |
| | D2C | 31,000 | 44,000 | 71,000 | 109,000 |
| | DRP | 447,617 | 602,133 | 833,586 | 1,066,962 |
| **Hand Dryers** (Air Blades, Professional, Commercial) | Total | 37,000 | 41,000 | 45,000 | 49,000 |
| | D2C | 2,960 | 4,100 | 5,400 | 6,860 |
| | DRP | 34,040 | 36,900 | 39,600 | 42,140 |
| **Hair Care** (Hair Dryers) | Total | 298,554 | 597,108 | 1,074,795 | 1,719,672 |
| | D2C | 62,000 | 123,000 | 224,000 | 337,000 |
| | DRP | 236,554 | 474,108 | 850,795 | 1,382,672 |
| **Lighting** | Total | 5,000 | 10,000 | 11,000 | 12,000 |
| | D2C | 230 | 240 | 280 | 320 |
| | DRP | 2,070 | 2,760 | 3,220 | 3,680 |
| **Totals** | Total | 3,582,080 | 4,469,346 | 5,669,104 | 7,140,699 |
| | D2C | 348,190 | 538,340 | 875,680 | 1,230,180 |
| | DRP | 3,231,190 | 3,924,006 | 4,785,924 | 5,902,519 |

2.4. Volumes

2.4.1. There are 839 unique stock keeping units (SKUs), across 8 product groups. The following table shows the breakdown of SKUs across the product groups.

| Products | # of Unique SKUs | Quantity of Inventory Units On Hand as of June 2016 | |
|---|---|---|---|
| | | Eastern WH | Western WH |
| **Floorcare Vacuums** (Full Size, Uprights, Canisters, Accessories) | 348 (includes 113 ACC) | 285,308 | 127,898 |
| **Cordless Vacuums** (Handheld, Stick) | 94 | 153,374 | 93,925 |
| **Robot Vacuums** (Robots) | 1 | New | New |
| **Air Treatment** (Environmental Controls, Fans, Air Multipliers, Heaters, Purifiers, Humidifiers) | 94 | 60,767 | 30,826 |
| **Hand Dryers** (Air Blades, Professional, Commercial) | 48 | 7,166 | 4,029 |
| **Hair Dryers** (Hair Care) | New | New | New |
| **Lighting** | 21 | 335 | 0 |
| **Other** (Boxes, Stickers) | 233 | 68 | 20 |
| **Totals** | 839 | 507,018 63% | 305,920 37% |

2.4.2. Inbound

The following tables show the monthly averages of Dyson Distribution Warehouse inbound receiving activities over the last 12 months:

Inbound Container Receipts:

| Products | Eastern Warehouse | | | Western Warehouse | | |
|---|---|---|---|---|---|---|
| | Container Receipts / Month | SKUs per Container | Units per Container | Container Receipts / Month | SKUs per Container | Units per Container |
| **Floorcare Vacuums** (Full Size, Uprights, Canisters, Accessories) | 62 | 1.3 | 1,030 | 31 | 1.3 | 930 |
| **Cordless Vacuums** (Handheld, Stick, Robots) | 35 | 1.0 | 2,329 | 17 | 1.0 | 2,367 |
| **Air Treatment** (Environmental Controls, Fans, Air Multipliers, Heaters, Purifiers, Humidifiers) | 10 | 1.3 | 1,724 | 5 | 1.4 | 1,577 |
| **Hand Dryers** (Air Blades, Professional, Commercial) | 2 | 2.4 | 984 | .6 | 2.0 | 958 |
| **Hair Dryers** (Hair Care) | New | New | New | New | New | New |
| **Lighting** | New | New | New | New | New | New |
| **Totals** | 109 | | | 53.6 | | |

Inbound Pallet Receipts:

| Products | Eastern Warehouse | | | Western Warehouse | | |
|---|---|---|---|---|---|---|
| | Receipts per Month | SKU #s per Receipt | Units per Receipt | Receipts per Month | SKU #s per Receipt | Units per Receipt |
| **Floorcare Vacuums** (Full Size, Uprights, Canisters, Accessories) | 16 | 2.1 | 260 | 5 | 1.5 | 128 |
| **Cordless Vacuums** (Handheld, Stick, Robots) | 12 | 1.7 | 225 | 3 | 1.5 | 119 |
| **Air Treatment** (Environmental Controls, Fans, Air Multipliers, Heaters, Purifiers, Humidifiers) | 9 | 1.8 | 210 | 3 | 1.3 | 234 |
| **Hand Dryers** (Air Blades, Professional, Commercial) | 2 | 1.4 | 63 | .083 | 1.0 | 18 |
| **Hair Dryers** (Hair Care) | New | New | New | New | New | New |
| **Lighting** | New | New | New | New | New | New |
| **Totals** | 39 | | | 11 | | |

Inbound Unit Receipts

| oducts | Eastern Warehouse | | | Western Warehouse | | |
|---|---|---|---|---|---|---|
| | Receipts per Month | SKU #s per Receipt | Units per Receipt | Receipts per Month | SKU #s per Receipt | Units per Receipt |
| **Floorcare Vacuums** (Full Size, Uprights, Canisters, Accessories) | 7 | 3.4 | 8.2 | 14 | 1.3 | 1.6 |
| **Cordless Vacuums** (Handheld, Stick, Robots) | 5 | 2.6 | 6.6 | 10 | 1.1 | 1.5 |
| **Air Treatment** (Environmental Controls, Fans, Air Multipliers, Heaters, Purifiers, Humidifiers) | 3 | 3.1 | 4.9 | 5 | 1.1 | 1.4 |
| **Hand Dryers** (Air Blades, Professional, Commercial) | 7 | 1.0 | 1.9 | 0.5 | 1.0 | 2.7 |
| **Hair Dryers** (Hair Care) | New | New | New | New | New | New |
| **Lighting** | New | New | New | New | New | New |
| **Totals** | 22 | | | 29.5 | | |

### 2.4.3. Storage Requirement

The storage requirement for Dyson is expressed in equivalent pallets as shown in the table below.  Vendor should utilize appropriate storage solutions (floor stack, pallet racks, shelves, or flow rack) that will optimize the process across the product categories.

- Equivalent Pallet Size = 48" x 48" x 60"
- Pallet Stack Limit = 2 preferred, 3 to 4 if alternative storage methods are used
- Storage Capacity = 10 Weeks of Inventory

| Products | Average Units per Pallet | Eastern Warehouse | Western Warehouse | Total Warehouse |
|---|---|---|---|---|
| **Floorcare Vacuums** (Full Size, Uprights, Canisters, Accessories) | 15 | 4,798 | 2,260 | 7,058 |
| **Cordless Vacuums** (Handheld, Stick, Robots) | 35 | 4,320 | 2,631 | 6,951 |
| **Air Treatment** (Environmental Controls, Fans, Air Multipliers, Heaters, Purifiers, Humidifiers) | 41 | 929 | 598 | 1,527 |
| **Hand Dryers** (Air Blades, Professional, Commercial) | 25 | 122 | 85 | 207 |
| **Hair Care** (Hair Care) | New | New | New | |
| **Lighting** | 26 | 12 | 0 | 12 |
| **Other** (Accessories, Boxes, Stickers) | 411 | 883 | 318 | 1,201 |
| **Totals** | | 11,063 | 5,893 | 16,956 |

### 2.4.4. Outbound

The following table shows the monthly averages of Dyson Distribution Warehouse outbound shipping activities from 7/1/15 to 6/30/16 (12 months):

Sales Order Shipments:

P = Pallets

C = Carton

| Products | | Eastern Warehouse | | | Western Warehouse | | |
|---|---|---|---|---|---|---|---|
| | | Shipments Per Month | SKU #s Per Shipment | Units Per Shipment | Shipments Per Month | SKU #s Per Shipment | Units Per Shipment |
| **Floorcare Vacuums** (Full Size, Uprights, Canisters, Accessories) | P | 2,113 | 1.6 | 31.5 | 1,086 | 1.6 | 28.7 |
| | C | 4,373 | 1.2 | 1.3 | 1,311 | 1.1 | 1.1 |
| **Cordless Vacuums** (Handheld, Stick, Robots) | P | 1,996 | 1.5 | 37.5 | 1,021 | 1.4 | 35.8 |
| | C | 3,540 | 1.0 | 1.1 | 1,074 | 1.0 | 1.0 |
| **Air Treatment** (Environmental Controls, Fans, Air Multipliers, Heaters, Purifiers, Humidifiers) | P | 589 | 1.6 | 38.5 | 384 | 1.4 | 25.3 |
| | C | 1,185 | 1.1 | 1.2 | 510 | 1.0 | 1.0 |
| **Hand Dryers** (Air Blades, Professional, Commercial) | P | 58 | 1.8 | 34.9 | 46 | 1.2 | 11.6 |
| | C | 171 | 1.1 | 2.2 | 33 | 1.0 | 1.1 |
| **Hair Dryers** (Hair Care) | P | New | New | New | New | New | New |
| | C | New | New | New | New | New | New |
| **Lighting** | P | New | New | New | New | New | New |
| | C | New | New | New | New | New | New |
| **Other** (Non-Stock, Boxes, Stickers) | P | | | | | | |
| | C | 1.5 | 2.5 | 3.0 | .083 | 1.0 | 1.0 |
| **Totals** | P | 4,755 | | | 2,536 | | |
| | C | 9,290 | | | 2,927 | | |

2.5. Receiving and Put-away Process

2.5.1. Dyson will provide Vendor visibility to incoming shipments by providing Advance Shipping Notification (ASN) via EDI. Dyson shall use reasonable efforts to ensure that information from suppliers includes PO numbers, SKU numbers, quantities, shipper, carriers, port of entry, estimated time of arrival, and more.

2.5.2. Vendor will coordinate inbound deliveries in a timely manner as to assist in preventing additional charges to Dyson by carriers and freight forwarders.

2.5.3. Vendor can require delivery/pick-up carriers call 24 hours in advance for a delivery appointment, unless operating on scheduled basis.

2.5.4. Vendor will receive and put-away per the following:

2.5.4.1. All palletized, loose carton product delivered prior to 1400 local time shall be received and put-away by Vendor within 4 normal business hours. Product delivered after 1400 local time will be received and put-away within 4 normal business hours the next day.

2.5.4.2. If product is delivered in an ocean container, Vendor will receive and put-away items within 24 hours (i.e. before 24 hours has elapsed after delivery which will fall on the next business day).

2.5.5. Vendor will perform system transactions at two major milestones/events in the receiving process: 1) Receive to Dock; 2) Dock to Stock

2.5.5.1. Upon carrier arrival (and before carrier departure) the Vendor will:

2.5.5.1.1. Maintain a traffic log of arrivals and departures;

2.5.5.1.2. Inspect seals and verify shipping documents;

2.5.5.1.3. Check for valid Purchase Orders, Return Orders, etc. and reject if appropriate

2.5.5.1.4. Open container and conduct cursory check for damage and discrepancies;

2.5.5.1.5. Complete, sign and file delivery receipt;

2.5.5.1.6. Request carrier to haul away an empty container when appropriate;

2.5.5.1.7. Perform PO receipt transaction to receiving dock.

2.5.5.2. Vendor will perform the following activities after completing the initial "Receive to Dock" process:

2.5.5.2.1. Unload container and separate products by PO and SKU;

2.5.5.2.2. Verify SKU number/description and quantities; record shortages and overages;

2.5.5.2.3. Check for product condition and record damages;

2.5.5.2.4.     Palletize products according to SKU #;

2.5.5.2.5.     Create pallet identification; scan and assign serial numbers to the pallet ID.

2.5.5.2.6.     Disposition and put away items into a storage location or a location that is available for orders (Dock to Stock).

2.5.5.2.7.     Perform a PO receipt transaction from Dock to Stock

2.5.6. Vendor will maintain clear, written records of receipts and will provide to Dyson, on an ongoing basis, a list of discrepancies that occur in the receiving process that impact a rapid receipt and put-away, including causes of delays and corrective actions.  Vendor will verify all Products 100% against the delivery receipt, packing slip or manifest.

2.5.6.1.     Vendor will maintain receiving records for a period of five years.

2.5.7. Vendor will record any count discrepancies or damage per Dyson's documented requirements. Dyson will review as needed and contact suppliers directly for information. Damaged product is to be segregated.

2.5.8. Dyson will advise Vendor, in writing or email, of any "hold restrictions" or other special requirements on incoming material.


2.6. Storage

2.6.1. Vendor will manage Dyson products by utilizing, at the minimum, product group, SKU number, and unit of measure per the Dyson item master attributes.

2.6.2. Vendor will store Dyson products in a physical location that is clearly named, labeled and configured in the system supporting the operation. The locations, such as warehouse and sub-inventories (e.g. FGI, IQA, but not row, rack, and bin) will need to be created and maintained in Dyson's SAP system so as to have parallel systems at that level.

2.6.3. Vendor will store inventory in two methods:

2.6.3.1.     Bulk Storage

Distributors / Retailers / Professionals (DRP) – The DRP channel products are a palletized/bulk type inventory which can be stored on pallet racks (preferred) or floor stacked, with the preferred stacking high of no more than two pallets high.  If alternative storage methods are used, 3 and 4 pallets stack heights can be used.

2.6.3.2.    Pick Face

Direct to Consumers (D2C) – The D2C channel supports individual consumers who order products directly through the Dyson website.  Usually these orders have only one line with a SKU number, and a quantity of one.  The space/storage should be a pick face and/or flow rack configuration which is frequently replenished from the bulk area.

2.6.4. Vendor will physically and systematically segregate inventory requiring further disposition such as discrepant products/materials and special projects as well as products designated for scrap and return to vendor.  Dyson will not allow "discrepant or potentially discrepant" product among 'good' product.

2.6.5. Commercially acceptable product storage and protection systems will be used to store Product.  All products will be stored at humidity and temperature ranges as reasonable for warehouse personnel (e.g. 55°F to 85°F). All storage areas will be secure and protected from variations in climate and moisture that could damage the packaging or the internal contents.

2.6.6. Vendor will continuously optimize pallet utilization using systemic and manual processes.  Within a product group, Vendor may store more than one SKU on a pallet.  The pallet optimization process must be reviewed and approved by Dyson.

2.6.7. Pallets used for storage will be on acceptable 48"x40" or 48"x42", 4-way entry of wooden board and stringer design, or appropriate for various geographic locales.  Pallets can be loaded 60" high including the pallet height itself. Preferred pallet stack height is two pallets. If alternative storage methods are used, 3 and 4 pallets stack heights can be used.

2.6.8. Vendor will maintain a clean, neat, and safe warehouse in accordance with the 5S methodology.  The 5S's, when translated from Japanese, stand for "sort", "set in order", "shine", "standardize", and "sustain".  The clean warehouse is paramount for product in boxes with high graphics.

2.7. Cycle Counting and Physical Inventory

2.7.1. Vendor will perform cycle counts in accordance with the table below to ensure inventory accuracy. Vendor will provide Dyson with cycle count results as they are completed and summarize on a monthly basis in a format to be agreed on mutually.  In the event of a discrepancy, Vendor will determine cause and/or nature of the discrepancy, obtain approval, from Dyson, to make the adjustment, and adjust the inventory physically and systematically as necessary to be accurate.

| Group | Description | Percentage of Total SKU's | Counts of each SKU per Year |
|-------|-------------|---------------------------|-----------------------------|
| A | Critical | 5-10% | 12 |
| B | Significant | 20% | 4 |

| C | Other | 70-75% | 1 |

2.7.2. Dyson will provide detailed cycle count parameters on a quarterly basis to Vendor.

2.7.3. Vendor will complete all monthly cycle counts in the first 3 weeks of the month.

2.7.4. Vendor will complete all quarterly cycle counts in the first 12 weeks of the quarter.

2.7.5. If Vendor fails to meet any of the following criteria for 2 consecutive quarters based on cycle count results, Vendor will perform a physical inventory at their own expense:

- Gross (first) inventory accuracy based on units > 99.4%
- Net (reconciled) inventory accuracy based on units > 99.7%
- Location accuracy based > 98.5 %

2.7.6. Vendor will conduct an annual physical inventory each year in accordance with national/international recognized financial accounting standards.  The timing and parameters will be determined by Dyson (e.g. Wall-to-Wall or Specific SKU's).

If the results do not meet any of the following conditions, Vendor will be responsible for the expense of the physical inventory:
- Gross inventory accuracy based on units > 99.4%
- Net inventory accuracy based on units > 99.7%
- Location accuracy > 98.5%

2.7.7. Any inventory adjustments for Cycle Counts or Physical Inventory must flow electronically between Vendor and Dyson SAP system on a daily basis.

2.7.8. Vendor will retain and store all original count and recount sheets for five years.

2.8. Inventory and Transaction Reconciliation

2.8.1. Vendor will provide daily transaction summary and detail reports to be run after normal business hours.  Dyson will look for discrepancies between Vendor and Dyson's systems.

2.8.2. Vendor will provide a daily stock status report to be run after normal business hours. Dyson will look for discrepancies between Vendor and Dyson's systems.

2.8.3. Each business day, Dyson will perform inventory and transaction reconciliations. Resulting variances will be identified and worked by Dyson and Vendor within the following business day. Vendor will provide assigned resources to support Dyson in providing the research required by Dyson to reconcile the discrepancies. As needed, Vendor will immediately cycle count across the distribution center for any items that cannot be reconciled through supporting research. This research and, as required cycle counts, will be completed by the Vendor and reported to Dyson within one business day of notification by Dyson.

2.8.4. Vendor will submit an Inventory Adjustment Request Form to Dyson for approval prior to performing any system transactions. Upon approval, Vendor will perform system transactions within one business day.

2.8.5. The negative and positive adjustments to inventory, as well as the associated reason codes, will be recorded by both Dyson and Vendor and support reporting required for the determination of inventory accuracy performance and possible remuneration by Vendor.

2.8.6. At each quarterly meeting of the parties, Vendor and Dyson shall agree to the total amount of actual inventory discrepancies deemed to be the responsibility of Vendor.

2.8.7. Settlement of inventory discrepancies shall be made by the parties at the end of each of Dyson's fiscal quarters. If, for any fiscal quarter, Vendor fails to achieve the net inventory accuracy threshold specified in Section 6.3 of MSA. , Dyson shall, at its election, either have Vendor make payment to Dyson or grant a credit against fees payable by Dyson for Services.

2.8.8. Prior to final loss calculations, the Vendor and Dyson inventory systems must first be reconciled. Once this has occurred, Dyson's system will serve as the system of record for inventory loss and remuneration calculations as defined in Dyson Logistics, Warehousing and Fulfillment Master Services Agreement Exhibit H.

2.9. Non-conforming product

2.9.1. On a daily basis, Vendor will identify and record material that does not conform to Dyson specifications per the written guide lines provided by Dyson. Nonconforming materials include damaged products, products with damaged packaging, or other defects as identified by quality inspections or notification from Dyson.

2.9.2. Vendor will segregate and store Nonconforming Material from all other inventory in a secure area.

2.9.3. Vendor will process Nonconforming Material in accordance with mutually agreed upon MRB procedure(s) or other written direction provided by Dyson.

2.9.4. Vendor will prepare for shipment or scrap of Nonconforming Material as mutually agreed upon. Vendor is not responsible for the transportation and disposal of the nonconforming material.

2.10. Order Fulfillment

Dyson will not send delivery orders through the interface which cannot be fulfilled.

Dyson will only create SAP delivery orders, to the Vendor, when the following criteria are met in the Dyson SAP system: items are available, no product/customer holds, and inventory is allocated (reserved) to sales order.

2.10.1. Order Management

2.10.1.1.  Vendor will receive delivery order information through an electronic data interface (EDI).  Minimum information includes Customer, Ship-to Address, Item, Quantity, Customer Request Ship Date (*which is determined from the Customer Requested Delivery Date and Available to Promise Date*), Hold Status, and Special Instructions for handling, packaging, shipping, routing or other requirements.

2.10.1.1.1.  Once a delivery order has been created, no changes will be made to the sales order.  The order will need to be cancelled and a new order created.

2.10.1.2.  Vendor will acknowledge order within 1 hour of receipt of order using EDI.

2.10.1.3.  Vendor will review delivery order for completeness, accuracy, priority, availability and allocate items to order.  If there are issues, the Vendor will escalate issues to Dyson immediately, identify cause and take corrective action.

2.10.1.3.1.  If item is not available (backordered, past due), Vendor will provide a scheduled ship date by reviewing the inbound PO receipts estimated time of arrival and allowing one business day for receipt and put away.

2.10.1.4.  Vendor will consolidate orders for a single customer, scheduled to be shipped the same day, into one shipment when possible.

2.10.1.5.  Vendor will split orders, when necessary, as communicated by Dyson via e-mail.

2.10.1.6.  Vendor will ship DRP Orders (ZOR, ZEDI) per the retailer's instructions.

2.10.1.7.  Vendor will ship Direct Orders (ZCRM, ZWEB) received by 12 PM (noon) local time the same day. These orders are usually one or two SKU numbers with a quantity of one.  Direct Orders received after 12 PM (noon) will be scheduled to ship by the next business day.

2.10.1.8.  Priority Orders, as communicated by Dyson via e-mail, received four hours in advance of carrier pickup time will be scheduled to ship the same day.  Dyson will use reasonable effort to communicate priority orders well in advance of the carrier pickup time.

2.10.2. Picking

2.10.2.1.  Dyson products, as stored in Vendor warehouse, are ship ready.

2.10.2.2.  Vendor will use "best effort" to pick items on a first in, first out (FIFO) basis (e.g. oldest serial number first).  With pallet identification implemented, whereby the serial number is assigned to the pallet, the Vendor should be able to select the oldest pallet to pick from first.

2.10.2.3.  Vendor will generate a pick list from its own system.

2.10.2.3.1.  DRP orders will be picked from "bulk" storage.

2.10.2.3.2.   Direct orders will be picked from a "pick face / gravity flow" storage area.  Inventory in the pick face can be replenished from the bulk warehouse.

2.10.2.4.   Vendor will perform pick confirm (SKU#s, Quantity, Serial #s) and system transactions.  Any questions related to quantity pack sizes will be directed to Dyson

2.10.2.5.   Vendor will scan picked serial numbers to the order, decrementing it from the pallet ID.

2.10.2.6.   If the picker is unable to locate an item or the correct quantity and after further investigation, the Product still cannot be located, the item in question will be included in the next cycle count process.

2.10.3. Shipping

2.10.3.1.   Vendor will ship domestic orders as specified by the Dyson routing guide/instructions which include Parcel, Less Than Truck Load (LTL), and Full Truck Load (FTL), 2-day air, and customer specified methods.  Exceptions must be approved by Dyson.  The routing guide is used to obtain carrier assignments and rules for shipments tendered on Dyson's behalf

2.10.3.2.   Vendor will update and generate shipping documents such as Packing List and Bill of Lading.

2.10.3.3.   Vendor will pack and stage order.

2.10.3.4.   Shipment palletization

For palletized shipments, all products will ship on a standard 48"x40" or 48"x42", 4-way entry of wooden board and stringer design.

Pallets to be shipped should not exceed 60" in height unless approved in writing by Dyson.

All palletized shipments require stretch wrap that secures the Product onto the approved pallets.

2.10.3.5.   Vendor will contact and coordinate with the carriers for warehouse pickups (e.g. Parcel, LTL, and FTL).  Carriers will provide tracking numbers upon pick-up.

2.10.3.6.   Vendor will perform ship confirm and system transactions.  The order will be reviewed by Vendor staff for special requirements for shipment labeling, stacking, or other requirements as well as accuracy of serial number assignments.

2.10.3.7.   Vendor will provide an electronic Advanced Shipping Notification (ASN) to Dyson customers.

2.10.3.8. Dyson will provide a detailed listing of specific customer shipping and labeling requirements (e.g. QVC, Costco, and Walmart). All exceptions must be provided in writing and mutually agreed upon.

2.10.3.9. Although rare, Vendor will ship international orders. Export orders will be picked, verified and held for specific shipping instructions from Dyson. Shipment specifics for weights, dimensions or any other special markings will be documented by Vendor. Vendor personnel will also contact the freight forwarder who will assign a booking number for each shipment.

2.10.3.9.1. Dyson will coordinate with Vendor in the shipment of International orders by producing all of the necessary documentation. Vendor will pick, pack, weigh and then stage all products on an order. Vendor will then communicate the completed order specifications to Dyson. Dyson will complete and send electronic copies of completed EEI (formally SED) and any other required documents to Vendor. Vendor will marry the documentation with the appropriate packaged order and contact the Dyson designated freight forwarder for pick up.

2.11. Returned Orders

2.11.1. Vendor will accept goods at dock and complete, sign and file delivery receipt.

2.11.1.1. The reasons for returns include: customer/receiver refused delivery; product damaged upon delivery; terms of customer agreement (e.g. seasonality).

2.11.2. Vendor will check for Return Order (RO) authorization:

2.11.2.1. If RO doesn't exist, Vendor will place goods in temporary hold location and gather information on the returned material to send to Dyson which Dyson will use to create an RO. Dyson will process an RO ASAP. If appropriate.

2.11.2.2. If RO does exist, the process is similar to standard inbound receipt process whereby Vendor will perform an RO Receipt transaction to Dock, visually inspect item(s), disposition and put away item(s) to FGI, IQA, etc. and perform another RO Receipt transaction from dock to stock.

2.11.3. Receiving records will be maintained on file for a period of five years.

2.11.4. Vendor will charge in accordance with standard inbound receiving rates for pallets and units.

2.12. Standard and Special (one-time) Projects

2.12.1. Vendor will execute projects as requested by Dyson and charge Dyson on a standard cost per unit basis using a standard labor rate.

2.12.2. Standard projects which occur most months, and perhaps several times per month, are:

2.12.2.1. Re-Boxing – whereby the packaging is damaged or the graphic quality is diminished.

2.12.2.2. Re-Kitting – whereby the customer (e.g. retailer) has requested a change to the accessories contained in the box.

2.12.2.3. Re-Labeling / Re-Stickering – whereby the customer has unique requirements

2.12.2.4. Order Cancellations – whereby product will be returned to storage locations

2.12.3. Special projects are unique one-time efforts which can be categorized as follows:

2.12.3.1. Rework (Light) – whereby it's too costly to ship product back to the manufacturer.

2.12.3.2. Displays – whereby the Marketing group requests special packaging configurations

## 3. Facilities and Infrastructure

3.1. Warehouse and Logistics Facilities

3.1.1. Vendor will provide the required facilities and equipment to support Dyson's logistics requirements, for all Dyson products, at locations in the Eastern and Western regions of the United States.

3.1.1.1. Vendor may locate the Dyson business in a multi-tenant building as to leverage shared services and optimize costs.

3.1.1.2. Vendor will locate the eastern facility in proximity to Memphis, TN

3.1.1.3. Vendor will locate the western facility in proximity to Reno, NV

3.1.1.4. Alternatives to the locations cited above, though not preferred, may be suggested by Vendor

3.1.2. Vendor facilities will have the flexibility to expand to support Dyson's growing volumes and logistics requirements.

3.1.3. If at any time Dyson reasonably determines that the conditions of the facilities do not conform to Dyson's requirements, Vendor shall use reasonable commercial efforts to immediately make such changes/alterations at a cost to be mutually decided and agreed in writing.

3.1.4. Vendor will not move its logistics services and Dyson products to other facilities without written consent from Dyson.

3.1.5. Should Vendor merge or be acquired by another entity, Dyson shall have the right to discontinue the agreement without penalty.

3.2. Warehouse Management

3.2.1. Vendor may mix Dyson's products with other products stored by Vendor for other parties.

## 4. Quality Management System

4.1. Vendor will operate in accordance with ISO 9001.

4.2. Vendor will maintain an organized and clean facility in accordance with 5S methodology.

4.3. Vendor will document and test a Business Continuity Plan (BCP) in accordance with ISO 22301 to mitigate risk to Dyson.

4.4. Vendor will compile and report Performance Measures on a weekly/monthly/quarterly basis in accordance with Dyson Logistics, Warehousing and Fulfillment Master Services Agreement Exhibit E, and conduct a Quarterly Business Review (QBR) meeting with Dyson.

4.4.1. Vendor will provide and maintain an issues log with the description of the issue, root cause, corrective action, dates, and status.

4.5. Quality and Reliability Requirements are provided in more detail in Dyson Logistics, Warehousing and Fulfillment Master Services Agreement Exhibit I.

## 5. Information Technology

5.1. Vendor will provide the IT infrastructure to support Dyson's logistics requirements at Vendor facilities which include, but are not limited to, hardware, networks, telecommunications, software, and security.

5.2. Vendor will set-up, configure, and maintain local software business applications to support Dyson's logistics requirements and interface to Dyson's SAP system.

5.3. Vendor will develop, implement, and maintain electronic data interfaces (EDI) to support Dyson's logistics requirements and Dyson's SAP system requirements.

5.4. Vendor will document and test IT Disaster Recovery Plan in accordance with ISO 27031.

5.5. IT System and Support Requirements are provided in more detail in Dyson Logistics, Warehousing and Fulfillment Master Services Agreement Exhibit G.

# Exhibit E: Distribution Center Performance Measure Service Levels

| DISTRIBUTION CENTER SERVICE LEVELS | | | | |
|---|---|---|---|---|
| Name | Method | Frequency | Measure | Rating |
| Receiving - Ocean Containers | Number of ocean container delivered units put away within 24 hours (i.e. next business day) / total number of delivered ocean container units that day | Weekly | 100% >=99.5% <99.5% | Target Threshold Corrective Action |
| Receiving – Non-Ocean Containers | Number of non-ocean container delivered units put away within 4 working hours of delivery / total number of non-ocean container units received before 14:00 that same day | Weekly | 100% >=99.5% <99.5% | Target Threshold Corrective Action |
| Order Fulfillment Rate – Direct to Consumer | Total number of clean orders (available inventory) received by 12:00 noon DC time by Vendor and total orders not shipped **that** day, shipment hours may extend at month end or quarter end week | Daily | 100% >=99.5% <98.5% | Target Threshold Corrective Action |
| Order Fulfillment Rate - Distribution | Total number of clean orders (available inventory) received by 12:00 noon DC time by Vendor and total orders not shipped the **next** day, shipment hours may extend at month end or quarter end week | Daily | 100% >=99.5% <98.5% | Target Threshold Corrective Action |
| Cycle Counting | Number of parts counted and net variance by SKU: Net Accuracy >= 99.70% with Gross Accuracy of greater than 99.40% | Weekly | 100% >=99.7% <99.7% | Target Threshold Corrective Action |
| Out of box audit (OOBA) | Total defective parts vs total produced where ratio is multiplied up to equate to defects per million | Quarterly | 0 DPPM < 500 DPPM > 500 DPPM | Target Threshold Corrective Action |
| Order Accuracy Pick & Pack Quality | Picking Discrepancies/ Total Orders Picked | Weekly | 0% < 0.2% > 0.2% | Target Threshold Corrective Action |
| ASNs sent to Customer | Total number of order ASNs sent same day for Dyson specified customers divided by the total orders for those customers on that day | Daily | 100% >=99.5% <98.5% | Target Threshold Corrective Action |

| Data Interface Availability | The up-time the Vendor is available to exchange data between the hours of 8 am and 6 pm DC time. | Weekly | 100%<br>>=99.8%<br><99.8% | Target<br>Threshold<br>Corrective Action |
|---|---|---|---|---|
| Communication Response | Vendor will respond to email and phone requests same day and by not later than 5:00pm PT | Weekly | 100%<br>>=95%<br><95% | Target<br>Threshold<br>Corrective Action |
| Communication Response | Vendor will respond to escalation requests within 4 hours same day and by not later than 5:00pm PT | Weekly | 100%<br>>=98%<br><98% | Target<br>Threshold<br>Corrective Action |
| Communication Response | Vendor will respond to corrective action request within 1 day with full response completed in less than 30 days | As required | 1 day response in 8 hours<br>Resolution and implementation of corrective action in 30 days | Target |

# Exhibit F: REPORTING REQUIREMENTS

The following reports are required to be provided by Vendor to Dyson throughout the term of this Agreement:

| # | Report type | Frequency |
|---|---|---|
| 1 | Number of units received | Weekly |
| 2 | Number of pallets received | Weekly |
| 3 | Number of  floor loaded receipts (# of trucks/containers) | Weekly |
| 4 | Number of pallet loaded receipts (# of trucks/containers) | Weekly |
| 5 | Number of units stored at end of month | Monthly |
| 6 | Number of pallets in inventory at  the end of the month | Monthly |
| 7 | Headcount at the end of the month | Monthly |
| 8 | Units shipped | Weekly |
| 9 | Full pallets shipped (1 SKU full pallet quantity) | Weekly |
| 10 | Mixed pallets shipped (more than 1 SKU or less than a full pallet quantity) | Weekly |
| 11 | Full cartons shipped | Weekly |
| 12 | Eaches shipped (less than a full carton quantity) | Weekly |
| 13 | Inventory accuracy- Based on Cycle counts | Weekly |
| 14 | Net inventory accuracy | Weekly |
| 15 | Absolute (Gross) inventory accuracy Cycle count results | Weekly |
| 16 | CYCC (system to system inventory snap shot analysis) results | Weekly |
| 17 | ABC Cycle count completion | Weekly |
| 18 | Loose eaches (out of case pack quantities) shipped | Future use |
| 19 | Cartons shipped via small parcel | Weekly |
| 20 | Average number of cartons per small parcel order | Weekly |
| 21 | Pallets shipped broken down by full pallets versus mixed pallets | Weekly |
| 22 | Average number of cartons per pallet shipped | Weekly |
| 23 | Orders shipped (total ,parcel and Truck load +LTL) | Weekly |
| 24 | Line items | Weekly |
| 25 | Shipping  exception report the day after the order is late | Daily |
| 26 | Number of containers received (Floor loaded vs palletized) | Weekly |
| 27 | Number of pallets/units put away | Weekly |
| 28 | Refused shipment receipts | Weekly |
| 29 | Discrepancies identified by PO between receipts and actual Product received | Daily |
| 30 | RMA receiving report | Weekly |
| 31 | Nonconforming products in MRB location- Defined as Unsaleable | Weekly |
| 32 | Total pallets and units on hand at the end of the week of MRB product | Weekly |
| 33 | Corrective actions, number received, open and closed per month | Monthly |

# EXHIBIT G: I.T. SYSTEM AND SUPPORT REQUIREMENTS

## 1. General

1.1. Dyson requires that the Vendor operated information system will be available 99.8% of the time and the Vendor operated network will be available 99.8% of the time to support Dyson's business. The measurement of this performance will exclude mutually agreed to scheduled down time and be reviewed during Quarterly Business Reviews.

1.2. Vendor will have an I.T. test environment that replicates the production environment and will utilize to validate new processes prior to those processes being implemented in their production environment.

1.3. Vendor will provide Business Resumption/Disaster Recovery plan as relates to IT systems, including hardware and OS failures and regular testing of these plans.

1.4. Standby support outside normal operating hours:

>  Dyson:
>  1st and 2nd level support available (pager, mobile, etc.) outside Normal Office Hours: 17:00 – 23:30 Central Time
>  Month end support available from 23:30 to 8:00 Central Time
>  Vendor:
>  1st and 2nd level support available (pager, mobile, etc.) outside Normal Office Hours: 17:00 – 23:30 Central Time
>  Month end support available from 23:30 to 8:00 Central Time

## 2. Severity Levels

Definition of incident severity levels:

Severity 1 – Service is lost by the business unit and no workarounds or critical work stoppage during on-line hours affecting an application or multiple applications and no workarounds

Severity 2 – Service is lost at one business unit and agreed to workaround is available or service is seriously degraded across a business unit and agreed workaround is available

Severity 3 – Service is lost by a single or small number of users, service is seriously degraded for a small number of users, or problem with an application no work stoppage, workaround is available, system function degraded or limited

Severity 4 – Service is degraded reducing user's efficiency or calls seeking general information

## 3. Response Time:

Dyson
Severity 1 and 2 incidents responded to within 30-minutes, and actively seeking correction
Severity 3 within 1 hour
Severity 4 within mutually agreed time

Vendor
Severity 1 and 2 incidents responded to within 30-minutes, and actively seeking correction
Severity 3 within 1 hour
Severity 4 within mutually agreed time

Requests for weekend support must be notified with at least three (3) Normal Working Days lead-time. Where notice is not given, Dyson will give best efforts to support the request. In case of conflict, the Dyson IT manager will prioritize.

## 4. Sustaining Requirements

4.1. System of Record

4.1.1. During the life of this Statement of Work, Dyson's system will be the System of Record.

4.2. Business Data Exchange

4.2.1. Vendor's system will be communicating with Dyson's SAP system almost at times at a real time basis for certain business critical transactions such as receiving purchase orders and acting upon them. Any exception to use of this required systems architecture will be mutually agreed upon by Vendor and Dyson.

4.2.2. Vendor's information systems will have the ability to exchange business data with Dyson systems in order to automate the order fulfillment process. The objective is to have adequate electronic data exchanges necessary to support the business operations with minimal manual intervention. Any future changes in scope need to be mutually agreed to by Dyson and Vendor.

4.2.3. The frequency and timing of the exchange of data under the required schemas is to be mutually determined between Dyson and Vendor. See section 4.9 in this Exhibit G (below) for the list of transactions.

4.2.4. Vendor will make best efforts in working with Dyson IT and business teams to implement the necessary system integration and enhancements to enable secured electronic exchange of information to support the Services to be performed under the Agreement.

4.2.4.1. Vendor to ensure that they have the technical capabilities to work with, and communicate with a 3rd party SaaS solution to access API that will be utilized to perform operational tasks (i.e. print labels, print manifests)

4.2.5. On a quarterly basis, Dyson may propose to Vendor plans for further automation of information system processes. The parties will discuss such proposed plans in good faith, and Vendor will make reasonable efforts to implement agreed-upon plans.

4.3. Connectivity

4.3.1. Dyson has the capability can handle AS2, FTP, SFTP and VAN connections. The preferred option to establish the connection to Vendor would to be to implement an AS2 connection.

4.3.2. The connectivity to exchange business data between Vendor's information systems and Dyson's information systems is expected to be operational 24/7 for Vendor-managed equipment and circuits and be of adequate speed and volume for the business data communication required.

4.3.3. A single point of presence will be established between Dyson and the selected Vendor, the location and configuration of which to be mutually agreed to by Dyson and Vendor.

4.3.4. Dyson will require Vendor to create and transmit ASN messages to customers at the time of shipment from Vendor facilities. Dyson will define which customers and their points of contact with which to develop the ASN data exchange.

4.3.5. Vendor will manage and optimize LAN/WAN routes between their locations and up to the single point of presence for Dyson.

4.4. Network Security

4.4.1. Vendor will complete an IT Security Non-Disclosure Agreement and must comply with the terms of any third party software license or usage agreements.

4.4.2. Applicable firewall security rules, filters and management at Vendor WAN single point of presence will be mutually agreed to by Dyson and Vendor.

4.4.3. Vendor must provide continual security of any Dyson data received via these business processes or systems – no access to Dyson data is allowed by any other Vendor customers, non-essential Vendor employees or agents, etc. Any breach of Vendor security to Dyson data must be reported to Dyson within one business day.

4.5. Scheduled Maintenance

4.5.1. The information systems at Dyson have a weekly maintenance shutdown from Sunday noon to Sunday 5:00pm Central Time. The business system communication between Vendor and Dyson will respect the maintenance shutdown. Upon advanced notice, Dyson may require continued system access and connectivity to address certain peak period processing needs.

4.6. Support and Disaster Recovery

    4.6.1. For on-going support and maintenance activities, both Vendor and Dyson will have a mutual agreement that includes appropriate contact information and escalation procedures.

    4.6.2. For operation system or hardware-related disasters, both Vendor and Dyson will have a mutually agreed upon disaster recovery procedure to resume normal operations.

4.7. Information Technology Operations

    4.7.1. Schedule and Performance

        4.7.1.1.    Vendor will provide and maintain its own Warehouse Management System, shipping system and B2B/interface application.

        4.7.1.2.    Vendor will use best efforts to ensure the daily activities of (specify systems as named above). It is expected that transaction latency will be under 10 minutes under normal circumstances across all Vendor systems. It is expected that transaction latency between Vendor and Dyson will not exceed 10 minutes under normal operating conditions.

        4.7.1.3.    Vendor will publish standard operating hours for all systems and ensure all systems and services are operational during agreed upon operating hours with maintenance scheduled in advance and performed during hours outside of the normal operating hours. It is expected that uptime performance for Vendor-managed equipment and circuits will be at 99% of scheduled availability as calculated on a monthly basis. A mechanism will be put in place by which the appropriate Dyson business and IT personnel are notified of scheduled down time expected to be over 12 hours at least seventy-two (72) hours before downtime occurs.

        4.7.1.4.    Vendor will make available data for Dyson's online queries and reporting consistent with normal business operational hours. Data will be archived and purged only according to specifications approved by Dyson business and IT management. Likewise, retention of archived/historical data will be determined by Dyson business and IT management to ensure conformity to its internal business requirements

    4.7.2. Measurement of Availability

        4.7.2.1.    Monthly reporting on systems availability and performance shall be provided electronically within 10 business days of the end of every month. The following specific items will be reported to the extent available:

        4.7.2.2.    Number and duration of unique system outages by system for reporting month including root cause analysis

        4.7.2.3.    Number of transaction errors encountered by system for reporting month including root cause analysis

4.7.2.4.    Number of transaction failures.

4.7.2.5.    Number of security breaches that violate any Network Security requirements.

4.7.2.6.    Average response time per transaction type from Vendor's host server.

4.7.3. Loss of Information

4.7.3.1.    Vendor's systems accept data transmitted by Dyson for processing and transmission to customers/ Vendors where appropriate.  Vendor shall maintain the safe keeping of such data once it has been accepted. Vendor's responsibility for safekeeping starts when an acknowledgement is issued to the host (Dyson).

4.7.3.2.    Dyson systems accept data transmitted by Vendor for processing back to the host application (SAP). Dyson takes responsibility for the safe keeping of such data once it has been accepted. Dyson's responsibility for safekeeping starts when an acknowledgement is issued to the Alliance Manager (Vendor).

4.7.4. Fault Handling and Reporting

4.7.4.1.    All Vendor system emergencies/outages will be reported to and coordinated with the designated Dyson technical contact within 1 hour of incident occurrence.  Follow-up contact during emergency actions will continue each hour (or as agreed upon) for the duration of said incident.

4.7.4.2.    Vendor shall publish procedures for fault reporting and shall organize a sufficient set of mechanisms to respond to faults and for escalation in response to continuing problems. These procedures shall take account of the need for Dyson business management and IT to be kept aware of progress and status during periods of disruption.

4.7.4.3.    Vendor shall provide in-sequence (First In First Out) transaction replay capability. Such capability could be needed in the event of transaction loss or data loss.  Vendor will make reasonable efforts to accommodate such requests from Dyson and in working with Dyson IT and business teams to resolve the underlying issue. In order to facilitate such replay, Vendor shall maintain information about individual transactions for up to 90 days.

4.7.4.4.    Vendor shall provide in-sequence (First In First Out) transaction queuing capability. Such capability could be needed in the event of major system outages.  Vendor will make reasonable efforts to accommodate such requests from Dyson and in working with Dyson IT and business teams to resolve the underlying issue.

4.7.5. Supporting Infrastructure Services.

4.7.5.1.  Vendor will maintain network connectivity consistent with enabling transaction flow between Dyson and Vendor per agreed upon operating hours.

4.7.5.2.  Vendor will maintain a test and development environments for any enhancements or fixes deemed necessary by both Dyson and Vendor.

4.7.5.3.  In the event of any development activities, Vendor will provide the appropriate IT resources and infrastructure to support such activities. If the development activity is driven by requirements unique to Dyson, Vendor should be shall be eligible to be reimbursed for such expense subject to notification to Dyson of the anticipated expenses and Dyson's advance approval of these expenses in writing.

### 4.7.6. Administrative Services

4.7.6.1.  Vendor will provide training to its internal resources as well as Dyson resources that will be using any of Vendor applications (example: Vendor web tools).

4.7.6.2.  Vendor will provide any technical and operational documentation deemed appropriate by both Dyson and Vendor.

### 4.7.7. Security

4.7.7.1.  Vendor will set up procedures to prevent unauthorized access to applications in so far as it relates to Dyson processes and data.  Dyson may audit such procedures at any time with reasonable notice and at Dyson's expense.

4.7.7.2.  Vendor will coordinate any request for access by Dyson with appropriate Dyson business management.

4.7.7.3.  Vendor will never use Dyson data for any other purpose other than what has been agreed upon and will never make data available to any third party without Dyson's prior acknowledgement and written approval.

4.7.7.4.  Vendor will make regular backups and contingency plans to prevent data loss consistent with agreed upon disaster recovery/business continuity plans.

4.7.7.5.  Vendor and Dyson will jointly develop (and maintain) a documented disaster recovery plan(s) to include RTO and RPO standards for all systems and business process & procedures involved with supporting Dyson.  This plan will be reviewed on an annual basis (or as/when changes are proposed/made) by Dyson Business and IT representatives.

### 4.8. Systems Improvements and Maintenance

4.8.1. Vendor shall bear the costs of any and all system requirements and improvements necessary to meet Vendor's obligations defined herein. If Dyson makes a written request for Vendor to provide services in addition to those defined herein which additional services would require Vendor to change or enhance its systems capability then the parties will mutually agree as to how such costs will be apportioned in advance of the development of the new systems.

4.8.2. Vendor will have an I.T. test environment that replicates the production environment and is available to validate new infrastructure, applications, custom code and processes prior to changes being implemented in production.

4.8.3. Three (3) week written notification of scheduled system down-time (e.g. for system tuning and maintenance) to be agreed with Dyson and Vendor management during normal office hours. Written response within one week between Dyson and Vendor

4.8.4. An eight (8) weeks written notification of system upgrades to be agreed with Dyson.

4.8.5. Vendor management is required before such upgrades are implemented in production. Written response within one (1) week between Dyson and Vendor is required.

4.9. Data exchange transaction sets

The following are, but not limited, to the transactions that will make up the data exchange between Dyson and the Vendor. The ANSI and EDIFACT standards cited are only for reference.

| Business Requirements | ANSI EDIFACT | Dyson SAP Direction | Frequency |
|---|---|---|---|
| **Inventory Transactions:** | | | |
| Send updated item master | 888 PRICAT | Out | Daily |
| Receive inventory activity information & adjustments (Non-PO receipts & Non-SO issues, Sub-Inventory Transfers, CC/PI, Misc. Rec/Issues, Scrap, RTV | 947 / 852 INVRPT | In | As required (many times a day) |
| Nightly Transaction / Inventory Reconciliation | 846 INVRPT | In | Nightly |
| **PO Receipt Transactions:** | | | |
| Send PO shipment (ASN) information for coordinating receipt | 850 DESADV | Out | 3 Times a day |

| Receive PO Status Update: Dock to Stock Receipt | 944 / 861 INVRPT | In | As required (Many Times a day) |
|---|---|---|---|
| **SO Issue Transactions:** | | | |
| Send SO information for shipping all Order Types including Transfer Orders (TO) (Add/Change/Delete) | 940 INSDES | Out | As required (many times a day) |
| Receive SO Status Update: "Release to Pick" Information | 866 RESADV | In | As required (many times a day) |
| Receive SO Status Update: Outbound SO shipment confirmation | 945 DESADV | In | As required (Many Times a day) |
| Receive SO Status Update: Proof of Delivery (POD) From Carrier | 214 RECADV | In | Over night |
| **Returns Receipt Transactions:** | | | |
| Send RO information for receiving (Add/Change/Delete) | 940 INSDES | Out | Several times a day |
| Receive RO Status Update: Inbound RO receipt confirmation | 945 DESADV | In | Several times a day |
| **Acknowledgements:** | | | |
| Send & Receive acknowledgements to indicate the results of the data transfer | 997 CONTRL | Both | Every time an interface is sent |

# EXHIBIT H: INVENTORY VARIANCE CALCULATIONS and REMUNERATION

**Definitions**

The following terms and their definitions are used throughout Exhibit H to provide mutual understanding and agreement for measuring Inventory Variance and providing Remuneration to Dyson, for Dyson-owned inventory, when applicable:

Remuneration:  Payment made by Vendor to Dyson for inventory losses that exceed the Limit of Liability Threshold.

System of Record: Prior to loss calculations for the purpose of remuneration, the Vendor and Dyson inventory systems must first be reconciled. The Dyson system will serve as the system of record for inventory accuracy calculations.  The Vendor system maintains inventory quantities, receiving, shipping, adjustment and item master information.  Remuneration, if applicable, shall be determined by comparing the items for which Vendor has responsibility to compensate Dyson pursuant to the Agreement with the individual cost of such items as provided herein.

Book Inventory Value: The cost of Dyson individual product(s) or units. The total inventory value is the quantity of individual units multiplied by the individual cost of applicable units.  In this context, the book and total inventory value is for Dyson inventory held in Vendor facilities and covered by this Agreement. Inventory accuracy and remuneration will be calculated based on Dyson's established standard costs for inventory.   These standard costs will be provided to Vendor by Dyson. The standard costs provided to Vendor will reflect item values used by Dyson as their book value of this inventory under GAAP accounting practices and for all internal and external reporting purposes. These standard costs are fully auditable.

Net Variance Amount: Net variance is the sum of all positive inventory adjustments (at Book Inventory Value) minus the sum of all negative inventory adjustments (at Book Inventory Value) made to the Dyson inventory by Vendor, on behalf of Vendor, on the Vendor System of Record. If this equation results in a positive dollar number, the variance is called a Net Positive variance. If the equation results in a negative dollar number, the variance is called a Net Negative variance.  Positive and negative adjustments are made by Vendor to the Vendor System of Record when inventory variances are discovered through periodic cycle counts, other counts requested by Dyson, and upon discovery during the normal course of operations.

Average On-hand Inventory Value: The Average On-hand Inventory Value of all product stored by Vendor on the System of Record during a quarter shall be calculated by averaging the on-hand cumulative value of the inventory stored in the Warehouse as of each Friday of each full week of the quarter.  Example: The sum of on-hand cumulative inventory value as of Friday for each full week in a quarter, divided by the number of Friday(s) for each full week in a quarter, equals the Average On-hand Inventory Value.  The result is expressed in dollars. The inventory value calculation will be made using unit costs provided by Dyson at the beginning of each quarter.  For this calculation, the unit costs will not change during the quarter in order to provide consistency in the valuation calculation.

Inventory Accuracy Percentage: Inventory accuracy is expressed as the Average On-hand Inventory value minus the Net Variance Amount divided by the Average On-hand Inventory Value. The quotient shall be expressed as a percentage less than or equal to 100%.

Limit of Liability Threshold: The mutually agreed percentage level (s) at or above which no Remuneration is paid by Vendor for variances, and below which Vendor is responsible to Dyson for Remuneration either in whole or in part, subject to the limits established in Section 6.3 of the Agreement.

Reconciliation Period, Reconciliation Activity, and Calculations: Reconciliation Period, Reconciliation Activity, and Calculations refer to the period of time and research activity conducted by Vendor through the usage of System of Record audit trail reports and supporting transactional documentation provided by Vendor to Dyson for the determination of the cause of variances in the inventory. Inventory adjustments will be made periodically to the System of Record but the Inventory Accuracy Percentage will be calculated only at the conclusion of each fiscal quarter. Remuneration to Dyson will be made at the end of Dyson's fiscal years.

**Calculating Inventory Accuracy Performance**

Vendor will make Remuneration to Dyson in the event that the Inventory Accuracy Percentage is below the mutually agreed Limit of Liability Threshold(s). The calculation (as described above) of Inventory Accuracy Percentage for Remuneration purposes will be made at end of Dyson's fiscal quarters, but Remuneration will be paid at the end of Dyson's fiscal years.

During the reporting period, cycle counting will be performed in accordance with Exhibit D, section 2.7.of this agreement.

The following guidelines will apply:

There will be a Reconciliation Period until the 15th or next business day thereafter, of the month following the end of the quarterly measurement period. During this time variances may be reconciled by Vendor for use in determining the Net Variance Amount and subsequently the Inventory Accuracy Percentage.

Dyson and Vendor agree that certain types of inventory adjustments, which result in variances, but not actual losses of Dyson Inventory, that are discovered during any reconciliation effort will not be counted against Vendor for purposes of determining the Net Variance Amount. The following Inventory adjustments will not be used when calculating Net Inventory Variance:

1. Adjustments made due to Dyson or Dyson vendor errors
2. Transportation carrier errors (must be documented in advance)
3. Clerical errors that adjust Inventory quantities on Vendor's System of Record, but do not affect the physical or financial status of Dyson Inventory in Vendor's possession.

At the end of the Reconciliation Period, Vendor will provide to Dyson the results of the Reconciliation Activity and Calculations.

Example Remuneration Calculations

Assume that Dyson and Vendor agree that the quarterly Limit of Liability Threshold (s) for Inventory losses is as follows: At inventory accuracy of 99.70% and above there will be no remuneration to Dyson. For inventory accuracy of less than the 99.70 threshold, Vendor is required to compensate Dyson for the loss.

Example 1:

| | |
|---|---|
| Dyson Average On-hand Inventory Value: | $5,000,000 |
| Negative Net Variance Amount: | - $2,250 |
| Net Inventory Value | $4,997,750 |

Net Inventory Value ($4,997,750) divided by Dyson Average On-hand Inventory Value ($5,000,000) = Inventory Accuracy Percentage (99.96%)

In example 1 Vendor's Inventory Accuracy Percentage (99.96%) exceeds the quarterly Limit of Liability Threshold (99.9 0%); therefore; no Remuneration is due to Dyson.

Example 2:

| | |
|---|---|
| Dyson Average On-Hand Inventory Value: | $5,000,000 |
| Negative Net Variance Amount: | - $100,000 |
| Net Inventory Value: | $4,900,000 |

Net Inventory Value ($4,900,000) divided by Dyson On-hand Average Inventory Value ($5,000,000) equals (=) Inventory Accuracy Percentage of 98.00%.

In example 2 Vendor's quarterly Inventory Accuracy Percentage (98.00%) falls below the quarterly Limit of Liability Threshold (s) of 99.9%, therefore Remuneration is due to Dyson.

In example 2 Remuneration would be calculated thus:

100.00% of Net Variance is at Vendor's expense = $100,000.

$5 million average inventory value X 0.3% loss reserve = ($15,000)

Remuneration due Dyson = $85,000

Therefore, total Remuneration of $85,000 is due by Vendor to Dyson.

Rounding Rules:

- Percents will be rounded to the nearest .01% (e. g. 98.88%)

- 98.885% rounds up to 98.89%; 98.884% rounds down to 98.88%

# Exhibit I: DYSON QUALITY REQUIREMENTS

1. Quality Management System

   1.1. Vendor will document and audit there quality management system in accordance with ISO 9001.

   1.2. Vendor will maintain an organized and clean facility in accordance with 5S methodology.

   1.3. Vendor will document and periodically test a Business Continuity Plan (BCP) in accordance with ISO 22301 to mitigate risk to Dyson.

   1.4. Vendor will compile and report Performance Measures on a weekly/monthly/quarterly basis in accordance with Exhibit E, and conduct a Quarterly Business Review (QBR) meeting with Dyson.

      1.4.1. Vendor will provide and maintain an issues log with the description of the issue, root cause, corrective action, dates, and status.

2. Quality Facilities and Equipment Accommodations

   2.1. Vendor will provide a dedicated space of approximately 300 square feet (*in the eastern facility only*) for Dyson's Quality and Reliability team members to perform first article audits, failure analysis, and rework. The area will contain three workbenches/desks, cabinets for supplies and spare parts, power tools, test equipment, and space for several incoming and outgoing pallets. Equipment will be provided by Dyson.

   2.2. Vendor will provide building access along with Internet and cell phone access (*in the eastern facility only*) for Dyson team members who will be on-site approximately 10% of the time.

   2.3. Vendor will have an area available (*and screened off from view by others customers in the warehouse when used for Dyson*) for special projects performed by Vendor/Dyson personnel such as, but not limited to:

      2.3.1.1. Re-Boxing – whereby the packaging is damaged or the graphic quality is diminished.

      2.3.1.2. Re-Kitting – whereby the customer (e.g. retailer) has requested a change to the accessories contained in the box.

      2.3.1.3. Re-Labeling / Re-Stickering – whereby the customer has unique requirements or there is a legal/regulatory requirement.

      2.3.1.4. Rework (Light) – whereby it's too costly to ship product back to the manufacturer.

      2.3.1.5. First Article Audits – whereby the Dyson team is inspecting and testing new products first arriving

2.3.1.6. Order Cancellations – whereby product will be returned to storage locations.

2.3.1.7. Displays – whereby the Marketing group requests special packaging configurations.

## 2.4. Product Traceability

2.4.1. Vendor will have the ability to locate serialized items in the warehouse, using the local warehouse management software application, for recall, rework, and failure analysis efforts.

2.4.1.1. Vendor will palletize product at receiving, create a pallet identification number, assign the serials numbers to the pallet ID #, and put away the pallet in a designated row, rack, and bin.

2.4.1.2. Vendor will re-assign the item serial #, attached to the pallet ID #, to the customer delivery order # at the time of picking. When picking items, the Vendor will use best effort to pick from the oldest pallet ID # first (FIFO) as the 'system' should suggest. At ship confirm, the Vendor will verify the serial numbers with the customer delivery order number.

2.4.2. Vendor will provide and maintain a serial number list with SKU numbers, SKU descriptions, pallet identification numbers (or customer names and delivery order numbers), and location details.

## 2.5. Material Handling

2.5.1. Vendor will not exceed a pallet height of 60" (including pallet height itself) unless approved in writing by Dyson.

2.5.2. Vendor will wrap pallets for storage and shipping to secure the product to the pallet and protect the high graphics boxes.

2.5.3. Vendor stack pallets in the preferred configuration of no more than 2 pallets high in accordance with the load specifications unless approved in writing by Dyson. If alternative storage methods are used, stacking of up to 4 pallets.

## 2.6. Notifications / Alerts

2.6.1. Vendor will develop and maintain a process for notifying Dyson of discrepant or potentially discrepant items which will be physically and systematically separate from 'good/available' items. This includes first article items as well.

# EXHIBIT J: Executed Warehouse Lien Waiver

To be included within 90 days of commencement date

# EXHIBIT K: PHYSICAL SECURITY REQUIREMENTS

## 1. Objective:

Vendor will recognize and employ these handling and transport standards designed for the protection of Dyson's Product while in the Vendor's care and custody. If, for any reason, any of these standards are not immediately achievable, it is understood that the Vendor maintains full responsibility for developing a written security action plan articulating the steps necessary to place them in full compliance with these standards. This action plan will include an implementation schedule, which shall be provided to Dyson for review within fifteen (15) days following the execution of the Agreement.

## 2. General:

2.1. Vendor will submit their security and response plans to Dyson for peer review by Dyson Group Security. All information exchanged will be treated in strictest confidence with an information classification of 'Internal In confidence' applied.

2.2. Vendor will continue to abide by its own internal security procedures as they relate to the handling, storage and transport of Dyson Product.

2.3. Should, as a part of its business model, the Vendor utilize for Dyson's business any warehouse space other than the Vendor Facility, the 3PL Vendor shall obtain prior written approval of Dyson for the use of a specific expansion storage site and the appropriate security standards to which any applicable 3rd party shall be subject. A formal security risk assessment should be completed on any additional 3PL expansion storage and made available to Dyson

2.4. Vendor facility must be C-TPAT compliant.

2.5. Vendor agrees to employ a management-level security professional, reasonably acceptable to Dyson, to oversee the security function of their facilities. This individual will act as the security interface for all Dyson freight business, and will be available for reasonable periods of time to coordinate the Vendor's security efforts with Dyson Group Security management. Such person will, on a weekly basis, report on security activity for the previous week. Each security incident report will be forwarded to Dyson Group Security representative on the same day as the incident occurs.

## 3. 3PL Vendor's Premises Protection:

3.1. At locations where Product will be stored in excess of six (6) hours, Vendor will provide and maintain, at all times, adequate security systems and handling practices to allow continuous monitoring and protection of Dyson Product against fire, damage, and theft. Whenever practical, monitored systems should include a perimeter intrusion detection system and a security camera system (CCTV). Components of these systems should contain by way of example:

3.1.1. Facility intrusion detection device for each point of entry, with 24 hour monitoring and response.

3.1.2. High-quality commercial lock and key hardware on perimeter doors and internal Product storage doors with a suitable key control and inventory system.

3.1.3. Overhead doors are to be closed and locked when not in use.

3.1.4. Dock areas and locations where high value Product is securely stored will have motion detection devices with direct connection to a staffed monitoring station.

3.1.5. Adequate interior and exterior dock and premises lighting.

3.1.6. Camera system with sufficient coverage of the facility and Dyson Product, with a 24 hour recording system. Tapes to be retained for a minimum of thirty (60) days. Tapes involving theft of Dyson product, should be forwarded to Dyson Group Security or Dyson US representative.

3.1.7. Documentation and control of personnel's use and possession of intrusion detection system alarm codes and access codes.

3.1.8. Alarm code access / egress activity is to be regularly reviewed and updated monthly.

3.1.9. System integrity should to be inspected and tested on a monthly basis.

3.2. Vendor will make every reasonable effort to ensure that all vehicle and pedestrian access to its premises is controlled to prevent unauthorized casual and intentional intrusion. Details of measures shall be included in the Vendor's security procedures.

3.3. Prior to releasing a load containing Dyson Product, Vendor will require truck drivers to submit government recognized and accredited identification, such as a valid driver's license. Driver's name and signature, along with trailer I.D. number and industry accepted seal number, shall be entered into a paper log that is controlled by on site security and subject to review by 3PL Vendor's management. This log should be subject to audit on a regular cadence. Copies of identification are to be kept onsite.

3.4. Vendor will have a visual process in place that easily distinguishes employees from visitors, guests, drivers and unauthorized personnel.

3.5. Vendor shall be in compliant with all National Fire Protection Association (NFPA) and/ or local applicable fire codes. Fire detection and suppression systems must meet the insurance requirements mutually agreed upon between Dyson and Vendor.

## 4. **Handling Guidelines:**

4.1. Vendor is to provide a secure storage area for Dyson Product. This area will be designed to deter and prevent unauthorized access as well as protect the Product from crushing and water damage.

4.1.1. For the purpose of this action, examples of a secure storage area may include sealed or locked containers, locked cage, locked hard-wall areas, or cargo storage racks at a sufficient height to prevent access by unauthorized persons.

4.1.2. Entry to the secure area is to be controlled by on-site security manager and limited to only those personnel directly involved in shipping and receiving of Dyson Product.

4.1.3. Any loose Dyson Product staged over six (6) hours must be stored in a secure area.

4.2. Vendor is to not open individual boxes unless directed by an authorized Dyson representative or customs official; or if an inspection is necessary to determine (1) the adequacy of packing, (2) the existence and/or extent of damage, (3) the accuracy of the description of contents, (4) the acceptability of the shipment for transportation.

4.2.1. Any freight or individual Product boxes showing evidence of being opened, tampered with or suggesting pilferage, must be reported to the Dyson Group security manager immediately.

4.2.2. A written notification is to be produced within one business day following the discovery.

4.2.3. Vendor will make every reasonable attempt to hold such Product in a secure area for inspection and photograph (digital camera) if deemed necessary by Dyson Security personnel.

4.3. Vendor will avoid exposing Dyson Product to conditions that may cause crushing or damage to the Product. Vendor must implement procedures for communicating incidents of damaged cartons to Dyson within 24 hours of each occurrence.

4.3.1. Vendor shall limit or appropriately protect the Product from environmental conditions that may cause damage or defect.

4.4. No pre-loading of Dyson Product is permitted on trailers or vehicles intended for later collection or shipment unless prior authorization is given and Dyson Logistics or Security representative is notified.

4.5. In the event Dyson authorizes Product to be stored in trailers parked within a facility's enclosed, secured truck/trailer yard. Examples of security precautions to be taken for such freight include:

4.5.1. Secured perimeter fence with security system CCTV coverage

4.5.2. Pin locks controlled by on-site security manager, who shall also maintain a sign-in / sign-out log

4.5.3. Padlocks on container or trailer doors

4.5.4. Numbered, logged, and inspected seals

4.5.5. Containers or trailers backed up against each other or against a structure so that the unit's cargo doors cannot be opened.

4.5.6. Removal and storage of unit's ignition and cargo door keys in a secure location

5. **Control of Dyson freight information:**

   5.1. Vendor agrees to provide the following precautions for the protection of records involving Dyson and Dyson freight; to include load contents, customers' identity, the times and dates of shipments, destinations, and shipping routes.

      5.1.1. Restrict access to freight handling information exclusively to those employees, agents, sub-3PL Vendors and consultants with a legitimate need to know.

      5.1.2. Keep shipping records in secured, locked and restricted locations.

      5.1.3. Maintain secure computer databases containing Dyson account information.

      5.1.4. Provide unique operator passwords to computer systems, which contain Dyson shipment records and enforcing the use of those passwords. Operators should be required to use their unique password when logging into a computer system containing Dyson shipment or freight information.

      5.1.5. Require Vendor's employees to "log-out" of computer-based records handling applications when not being used.

      5.1.6. Provide training and security orientation to employees on the protection of Dyson's freight and shipment information. Evidence must be provided to Dyson management of the training, cadence and content of the course

6. **Hiring / Supervising / Training of Employees and Vendor's Sub-contractors**

   6.1. Vendor will ensure that comprehensive background checks are conducted on all Vendors' employees involved with handling or transportation of Dyson Products to confirm that such employees are free from records of felony criminal convictions involving drugs, theft, or dishonesty. Furthermore, Vendor will take commercially reasonable efforts to confirm that all subcontracted personnel involved in the handling or transportation of Dyson Products on Vendor's behalf are free from record of felony criminal convictions involving drugs, theft, or dishonesty. Background checks will contain at least the following components, depending on local laws and availability:

      6.1.1. 7 Year criminal history for all areas of residence

      6.1.2. Prior employment reference check for previous 7 years

      6.1.3. Drug testing through a recognized medical laboratory

   6.2. If requested, Vendor will make documentation available to Dyson security personnel confirming that the appropriate background checks had been completed (specific information excluded).

   6.3. Vendor agrees to provide a reasonable and customary level of supervision to its employees handling Dyson Product.

   6.4. Vendor agrees to provide security awareness orientation and training to all employees handling or transporting Dyson Product within thirty (30) days of hiring. Such training will include these components:

6.4.1. An Acceptable Use Policy for all IT equipment that supports managing the Dyson account. This policy will seek to highlight the controls required to secure Dyson proprietary information

6.4.2. Applicable internal security procedures of Vendor.

6.4.3. Loss and damage reporting requirements.

6.4.4. Protection of Dyson proprietary shipping information

7. **Audits:**

7.1. Dyson Security personnel and representatives of Dyson's insurance carriers reserve the right to conduct security audits of the Vendor's premises and/or transit locations containing Dyson Product, and will report audit results and proposed corrections within thirty (30) days of the completed audit.  Likewise, Vendor will make every effort to ensure that its third party warehouse 3PL Subcontractor that handle or store Dyson Product consent to these audit terms.

7.1.1. Dyson will provide Vendor a 3 day advance written notice of scheduled audit dates.

7.1.2. Dyson will provide Vendor a document detailing the intent and scope of the audit.

7.2. Vendor agrees to make management-level representatives and/or security representatives with operational decision making authority available at least twice annually, for the purposes of discussing overall security and loss / damage mitigation efforts.

7.3. Vendor will perform an annual self-audit of facilities through which Dyson freight is moved.  If vulnerabilities are identified which place Dyson Products at risk, reasonable efforts will be made to mitigate these risks.  Results of the self-audit and mitigation steps will be reported to Dyson in writing.

7.4. In addition to formal audits, Dyson Security personnel may, upon at least 24-hour notice to the 3PL Vendor whenever possible, conduct informal site visits of Vendor's facilities.

8. **General Security Responsibilities:**

8.1. Vendor will report immediately to Dyson any loss or theft and promptly complete loss / theft / damage investigations as such incidents are reported or made known.  Results and/or conclusions are to be forwarded to the local Dyson security contact as this information is made available. Dyson security management shall be invited to participate in any investigation involving the loss of Dyson Product.

8.2. Vendor will maintain written security operating procedures for Dyson Products and will ensure that those procedures are (1) consistent with these guidelines, (2) well communicated to 3PL Vendor's employees and 3rd party 3PL Vendors, and (3) updated as needed.

As requested, Vendor will provide Dyson with a full report on all known losses and thefts at specific facilities for a stated period of time not to exceed two years, in accordance with commercially reasonable business practices for reporting losses

# EXHIBIT L: DEFINITION of TERMS

| Term | Definitions |
|---|---|
| 3PL | Third Party Logistics Provider |
| AES | Automated Export System |
| Affiliate | Any party or an organization controlled by, controlling, or under common control with such party. |
| Agreement | Contract executed between Vendor and Dyson, Inc. for services. |
| Authorized Person | Authorized Vendor representative, with authority to sign on behalf of Vendor. |
| Backorder | Orders that cannot be fulfilled due to a lack of available inventory |
| CAPA | Corrective And Preventive Action |
| CAR | Corrective Action Request / Response |
| CC | Cycle Count |
| Commencement Date | Date on which both parties have signed the Agreement |
| Customer | An entity that can place an order for products from Dyson, Inc. For purposes of this RFQ, Dyson, Inc. Customers include end-purchase. |
| Customer Service Escalations | Dyson Customer Service contact to Vendor to take action. Examples would be stopping, prioritizing orders |
| Each | Unit of measure for product quantity of one |
| EDI | Electronic Data Interface - Inter-organizational, computer-to-computer exchange of structured information in a standard, machine process able format |
| EMS | Export Management System |
| ERP | Enterprise Resource Planning same as Order Management System below. In DYSON's Case is SAP. |
| FIFO | First In, First Out |
| FSE | Field Service Engineer |
| FTE | Full Time Employee |
| IATA | International Air Transport Association |
| IOR | Importer of Record |
| ITAR | International Traffic in Arms Regulations |
| KPI | Key Performance Indicator |
| Master Data | Master file containing key data elements used to execute transactions |

| On-hold | Status keeping the advancement or use of a certain item or order |
|---|---|
| Quarantine | Item that is segregated and requires approval prior to be used or released |
| Outbound Transportation | Finished goods shipments from distribution center to customer or from Manufacturing to distribution center |
| Pallet | Platform which cartons are stacked upon and then used for shipment or movement as a group |
| POD | Proof of Delivery |
| PQ | Performance Qualification |
| QA | Quality Assurance |
| QBR | Quarterly Business Review |
| RA | Risk Assessment |
| SCAR | Supplier Corrective Action Request |
| SKU | Stock Keeping Unit or part number |
| SLA | Service Level Agreement, agreed to performance metrics, measures and reporting cycles |
| SOFT | Standard Order Fulfillment Time |
| Vendor | Corporate entity responding to this RFQ and any affiliates thereof |
| WERC | Warehousing Education and Research Council |
| WMS | Warehouse Management System or Vendor's technology platform to track inventory within Vendor's care, custody, and control |