**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **DYSON, INC.** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 17-cv-6285** |
| ) | |
| **SYNCREON TECHNOLOGY (AMERICA)** ) | **Honorable Matthew F. Kennelly** |
| **INC.** ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

**PLAINTIFF DYSON, INC.'S MEMORANDUM IN SUPPORT OF ITS
<u>REQUEST FOR A PRELIMINARY INJUNCTION</u>**

Andrew A. Kassof, P.C.
Diana M. Watral
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for Plaintiff Dyson Inc.*

**TABLE OF CONTENTS**

**Page**

BACKGROUND ................................................................................................................ 2

I.     DYSON SELECTED SYNCREON AS ITS LOGISTICS PROVIDER BASED ON SYNCREON'S REPRESENTATIONS OF EXCEPTIONAL SERVICE. ....................... 2

II.    THE PARTIES' CONTRACT OBLIGATED SYNCREON TO TRANSITION DYSON'S PRODUCT TO A NEW PROVIDER UPON TERMINATION. .................... 2

III.   SYNCREON FAILS TO DELIVER ON ITS PROMISES. ............................................ 3

IV.    SYNCREON REFUSES TO GIVE DYSON ITS OWN PROPERTY. ............................ 5

V.     DYSON'S CUSTOMERS RESPOND TO SYNCREON'S ERRORS. ............................ 8

ARGUMENT .................................................................................................................... 9

I.     DYSON RAISES FAR MORE THAN "SOME LIKELIHOOD" THAT SYNCREON BREACHED THE CONTRACT AND CONVERTED DYSON'S PROPERTY. ..................................................................................................... 9

       A.    Dyson Has Established A Likelihood Of Success For Its Conversion Claim. ........................................................................................... 10

       B.    Dyson Has Established A Likelihood Of Success For Its Contract Claim. .......... 11

II.    DYSON WILL HAVE NO ADEQUATE LEGAL REMEDY AND WILL SUFFER IRREPARABLE HARM UNLESS IT RECOVERS ITS PROPERTY. .......... 12

III.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVORS DYSON. ....................................................................................................... 14

CONCLUSION ............................................................................................................... 15

CERTIFICATE OF SERVICE ......................................................................................... 17

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Abbott Labs. v. Mead Johnson & Co.*,
   971 F.2d 6 (7th Cir. 1992) ....................................................................................................9

*Am. Food & Vending Corp. v. Utd. Parcel Serv. Oasis Supply Corp.*,
   2003 WL 256865 (N.D. Ill. Jan. 31, 2003) ....................................................................13, 14

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
   809 F.3d 633 (Fed. Cir. 2015).............................................................................................15

*Arcadia Health Servs., Inc. v. A+ Health Care Inc.*,
   1997 WL 24737 (N.D. Ill. Jan. 17, 1997) ...........................................................................15

*B&F Sys., Inc. v. LeBlanc*,
   2009 WL 10674477 (M.D. Ga. Sep. 30, 2009)....................................................................10

*Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*,
   456 F. App'x 184 (3rd Cir. 2012) ........................................................................................10

*Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc.*,
   806 N.E.2d 280 (Ill. App. Ct. 2004) ....................................................................................10

*Coleman v. Madison Two Assocs.*,
   718 N.E.2d 668 (Ill. App. Ct. 1999) ....................................................................................11

*Cook Inc. v. Boston Scientific Corp.*,
   2002 WL 31236289 (N.D. Ill. Oct. 1, 2002)........................................................................15

*Foodcomm Intern. v. Barry*,
   328 F.3d 300 (7th Cir. 2003) ...............................................................................................14

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*,
   35 F.3d 1134 (7th Cir. 1994) ..........................................................................................12, 14

*Jano Justice Sys., Inc. v. Burton*,
   636 F. Supp. 2d 763 (C.D. Ill. 2009) ...................................................................................15

*Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys., LLC*,
   2003 WL 1057929 (N.D. Ill. Mar. 10, 2003)........................................................................9

*McCleary v. Wells Fargo Securities, LLC*,
   29 N.E. 2d 1087 (Ill. App. Ct. 2015) ...................................................................................12

*nClosures Inc. v. Block & Co.*,
    2013 WL 158954 (N.D. Ill. Jan. 15, 2013) ............................................................12

*New Light Cemetery Ass'n v. Baumhardt*,
    869 N.E.2d 939 (Ill. App. Ct. 2007) ....................................................................10

*Optionmonster Holdings, Inc. v. Tavant Techs., Inc.*,
    2010 WL 2639809 (N.D. Ill. Jun. 29, 2010) ........................................................12

*Reinders Bros. v. Rain Bird E. Sales Corp.*,
    627 F.2d 44 (7th Cir. 1980) ..................................................................................14

*SMC Corp. v. Lockjaw, LLC*,
    481 F. Supp. 2d 918 (N.D. Ill. 2007) .............................................................13, 15

*Stuller, Inc. v. Steak N Shake Enters., Inc.*,
    695 F.3d 676 (7th Cir. 2012) ................................................................................14

*Travelport LP v. American Airlines, Inc.*,
    958 N.E.2d 1075 (Ill. App. Ct. 2011) ...................................................................14

*Ty, Inc. v. Jones Grp., Inc.*,
    237 F.3d 891 (7th Cir. 2001) ................................................................................14

*Typpi v. PNC Bank, Nat'l Assoc.*,
    2014 WL 296035 (N.D. Ill. Jan. 27, 2014) ..........................................................12

*Whitaker by Whitaker v. Kenosha Unified School Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ................................................................................9

*YourNetDating, Inc. v. Mitchell*,
    88 F. Supp. 2d 870 (N.D. Ill. 2000) ......................................................................14

Dyson seeks injunctive relief to recover its own property. Syncreon, a warehouse logistics provider, currently refuses to give Dyson control over its own products so they can be sent to Dyson's retail customers. This motion seeks full access to that inventory before Syncreon inflicts irreparable harm on Dyson's reputation, goodwill, and customer relationships.

Poor performance by Syncreon from Day 1 of the parties' contract caused Dyson massive customer problems. As one customer described it, "Dyson [was] going through a logistical nightmare" as a result of Syncreon's conduct. Ultimately, Dyson and Syncreon agreed to terminate their agreement and move all of Dyson's remaining inventory in Syncreon's possession over to a new logistics provider. Syncreon initially cooperated. But in the last two weeks, it abruptly changed course. Syncreon cancelled moving trucks, refused to permit Dyson to remove its product from Syncreon's warehouses, and now is holding Dyson's property captive—all to exert negotiating leverage as the parties finalize the details ending their relationship.

Syncreon has no legal justification for withholding Dyson's goods and should be ordered to release them. Dyson unquestionably has the sole property interest in its own inventory, and the contract requires Syncreon to use its best efforts to transition Dyson's property to its new provider. Dyson will suffer irreparable harm if it cannot recover its property. Dyson has worked hard to rebuild retailer customer relationships and trust over the past few months following Syncreon's abysmal contract performance. But if Dyson cannot fill orders *again* because it cannot access its inventory, this would harm Dyson's remaining goodwill, relationship, and reputation beyond repair. This issue is particularly urgent with Black Friday and Cyber Monday approaching, as retailers and consumers expect that Dyson will fill their orders for this important sales period, and they will hold Dyson accountable if that does not happen. Dyson thus seeks to enjoin Syncreon from refusing to allow Dyson to recover its property from Syncreon's facilities.

**BACKGROUND**

## I. DYSON SELECTED SYNCREON AS ITS LOGISTICS PROVIDER BASED ON SYNCREON'S REPRESENTATIONS OF EXCEPTIONAL SERVICE.

Dyson is a global manufacturer of vacuums, hair dryers, and other household goods. Dyson relies on a logistics provider to receive, process, and ship its products. The logistics provider is a critical link to ensure that Dyson's products reach retailers and consumers.

Syncreon is one of those providers. In October 2016, Syncreon submitted a proposal to serve as Dyson's exclusive provider in the United States. Syncreon's proposal repeatedly touted its supposed expertise and superior performance. These are just a few of many examples:

- Syncreon claimed to be a ***market leader in implementation and operational start-ups***." (Ex. 2, RFP at 45 (emphasis added).)

- Syncreon emphasized its "commitment to excellence across all facets of the organization," including "Organizational Excellence," "Customer Excellence," "Solutions & Innovation Excellence," "Launch Excellence," and "Operational Excellence." (*Id*. at 9.)

- Syncreon represented it would "provide scorecards and metrics from industry leading customers; we will jointly develop KPI's that accurately depict service quality for Dyson's business and customers. ***We operate under six sigma quality standards which will meet and surpass industry norms***." (*Id.* at 72 (emphasis added).)

There are others. Importantly, though, Syncreon also bragged about its "Core Value" of "integrity": "We do what we say we are going to do. We take responsibility for our choices. We don't make excuses." (*Id.* at 10.)

None of this was true. But Dyson took Syncreon at its word. Dyson needed a reliable and trustworthy company that would maintain Dyson's business relationships with its customers. As a result, Dyson awarded Syncreon the logistics contract over other competitive bids.

## II. THE PARTIES' CONTRACT OBLIGATED SYNCREON TO TRANSITION DYSON'S PRODUCT TO A NEW PROVIDER UPON TERMINATION.

In February 2017, Dyson and Syncreon signed a Logistics, Warehousing and Fulfillment Master Services Agreement. (Ex. 3, MSA.) Syncreon contractually reaffirmed its representations

2

and warranties from the RFP process about its skills as a logistics provider and provided additional warranties:

- "All Services will be performed in a competent and professional manner, in accordance with industry standards[.]" (*Id.*, § 10.1.)

- "[Syncreon] represents that they are sufficiently experienced, properly qualified, and equipped to perform the Services and will devote the time, personnel and resources necessary to perform the Services." (*Id.*, § 10.2.)

- "[Syncreon] shall perform the Services with care and diligence consistent with industry standards and in a professional and workmanlike manner, with employees that have sufficient technical expertise to perform the Services." (*Id.*, § 24.1.)

Syncreon's representations were critical to Dyson when signing the agreement. Only then could Dyson know that it could continue to reliably sell its products to retailers and direct customers.

The contract provided Dyson broad termination rights, both with and without cause. (*Id.*, §§ 2.2, 2.3.) The parties understood that upon termination, Dyson would need to shift its inventory immediately to a different logistics provider to avoid significant business and reputational harm. They accordingly included Section 2.3.4, which requires Syncreon "to use its best efforts to assist Dyson in transferring the work to another third party service provider" following termination. (*Id.*, § 2.3.4.) The parties also included Section 21.1, which guarantees Dyson "full and unrestricted access to Products and the Distribution Centers" upon twenty-four hours' notice, and Section 21.2, which allows Dyson to handle its goods at the facilities. (*Id.*, §§ 21.1, 21.2.)

## III. SYNCREON FAILS TO DELIVER ON ITS PROMISES.

Syncreon's performance under the agreement fell well short of its contractual promises, Dyson's expectations, and minimum industry standards. From the start, Syncreon logged inventory as shipped when it never left; delayed shipments; sent retail customers wrong or incomplete shipments; and committed other major errors that severely damaged Dyson's business relationships. A few examples illustrate some of Syncreon's errors.

Inexcusable Shipping Delays: Syncreon failed to deliver Dyson's shipments on time. This was a direct result of Syncreon's inability to perform the most basic task—to document correctly which products were being loaded onto which trucks for delivery. For example, Wal-Mart, one of Dyson's biggest retail customers, was forced to hold Dyson products in its delivery garage for days because Syncreon had not provided all the Bills of Lading required to process the inventory and move it into the store. (Ex. 4, 6/14/17 A. Cohen Email.) Other shipping delays stemmed from Syncreon's IT errors. Pallets of Dyson's product sat idle in Syncreon's warehouses, even though there were outstanding orders for those exact goods. (Ex. 5, 6/28/17 A. Cohen Email.) As of June 16, 2017, according to Syncreon's own data, at least *35 percent* of Dyson's total shipments were delayed by a minimum of 15 days. (Ex. 6, 6/16/17 A. Cohen Email.)

Incorrect Shipments: Syncreon also failed to reliably deliver correct shipments. Products ordered by Wal-Mart were shipped to Costco, for instance, resulting in lost business (and frustrated customers) at both stores. (Ex. 7, 6/15/17 A. Cohen Email.) Retailers flagged Syncreon's recurring wrong deliveries. An Amazon employee, for example, asserted its carrier "believes they received an incorrect [Bill of Lading]" and was "concerned that this could be a repeat of the incorrect freight being shipped to Amazon." (Ex. 8, 7/6/17 A. Cohen Email.) Rather than immediately address the problem, Syncreon defensively requested that the carrier provide "pictures of the truck and freight inside." (*Id.*) As the Amazon employee correctly noted: "This is not [the carrier's] responsibility as Syncreon should know what is on the truck." (*Id.*)

Falsifying Shipping Records: Dyson learned that Syncreon was falsifying shipment documents. Orders had been logged as shipped in Syncreon's computer system, even though the corresponding inventory had not shipped at all. Dyson's retail customers were then billed for products they never received—and that never even left Syncreon's facilities. For example, Dyson

discovered multiple pallets that "show[ed] Ship Confirmed" in Syncreon's system for Amazon, Home Depot, and Lowes, even though the product was "still sitting" in Syncreon's warehouse. (Ex. 9, 7/1/17 A. Cohen Email.)  This meant Dyson "would have billed Amazon almost a month ago and not delivered the inventory."  (*Id.*)  As another example, Syncreon marked as shipped to Bed Bath & Beyond an entire trailer of product that instead sat loaded in the heat *outside* Syncreon's facility for over a month.  (Ex. 10, 8/9/17 A. Cohen Email.)  Such errors caused significant tensions with long-time retailers, who were charged for products they never received.

## IV.     SYNCREON REFUSES TO GIVE DYSON ITS OWN PROPERTY.

Dyson tried for months to work with Syncreon to correct Syncreon's errors and deficiencies.  But Syncreon's performance only deteriorated further, to the point that the parties agreed to terminate the agreement.  Syncreon's Vice President of Business Development and Account Management, Dan Bombrys, described the termination as "our mutual decision to separate ways."  (Ex. 11, 8/9/17 D. Bombrys Email.)  Upon termination, Dyson contracted with a different logistics provider, Expeditors, to serve as its sole logistics provider in the United States.

Following termination, Dyson needed to move its remaining inventory from Syncreon's facilities (Reno, Nevada and Olive Branch, Tennessee) to Expeditors.  Syncreon initially agreed to transition the remaining inventory to Expeditors' warehouse.  Specifically, Syncreon agreed to ship three truckloads per day from its Reno facility and five truckloads per day from Olive Branch, for a total of eight daily shipments.  (Ex. 12, 8/11/17 M. Carver Email ("[T]he transition plan that was agreed to with dyson states that we would ship 3 per day from Reno and 5 out of OB [Olive Branch].").)  As one Syncreon employee put it:  "Three trucks a day from Reno has always been our commitment and the agreed transition plan."  (Ex. 12, 8/11/17 T. Hendrickson Email.)

Recently, however, Syncreon reneged on its commitment.  Syncreon suddenly demanded that Dyson enter a new transition agreement, rather than continue the agreed transfer.  Syncreon's

proposed contract demanded that if Dyson wanted to continue eight shipments per day, then Dyson would need to pay millions of dollars in fees—including for items expressly precluded under the parties' original contract. (Ex. 11, 8/9/17 D. Bombrys Email; Ex. 13, Draft Transition Agreement.) Syncreon also demanded a broad, general release of liability, meaning Dyson would forego millions of dollars in legitimate claims against Syncreon. (Ex. 13, Draft Transition Agreement.)

The reason for Syncreon's sudden change is simple: inventory is key to Dyson's business. Once Syncreon transitioned all of Dyson's property to Expeditors, it would no longer have any leverage in negotiations. But if Dyson could not deliver its products to its retail customers on time, it would suffer devastating business and reputational harm. Syncreon saw a narrow window to try to avoid liability for its poor performance and to extract money from Dyson.

So on August 16, 2017, Syncreon threatened to stop the transition altogether. Syncreon's Marc Boonen told Dyson that his "CEO [Brian Enright] [ ] had made it very clear to [him] that [the CEO] will not continue the transition unless Dyson come[s] to the table to agree" to Syncreon's demands. (Ex. 14, 8/16/17 J. Mullen Email; Ex. 1, J. Mullen Decl. ¶ 17.) Mr. Enright also instructed his employees "to stop further shipments and not allow Dyson to collect [its] stock from [4:00 pm] until Dyson agree[s] to come to the table to negotiate a full transition agreement." (Ex. 14, 8/16/17 J. Mullen Email; Ex. 1, J. Mullen Decl. ¶ 17.) Dyson's James Mullen pressed Mr. Boonen "on whether this meant [Dyson was] locked out," as "by not shipping and not allowing Dyson to collect" its product, "it effectively would appear to be a lock out." (Ex. 14, 8/16/17 J. Mullen Email; Ex. 1, J. Mullen Decl. ¶ 17.)

That is exactly what it meant. Because Dyson would not capitulate to Syncreon's demands, Syncreon stopped all shipments to Expeditors' warehouses as of the next day. (Ex. 1, J. Mullen Decl. ¶ 18.) In fact, while eight loads were scheduled to leave Syncreon's warehouses on

August 17, Syncreon abruptly pulled the plug on those shipments: "Please cancel all shipments until further notice." (Ex. 15, 8/16/17 R. Vallejo Email; Ex. 16, 8/17/17 T. Hendrickson Email.)

Syncreon has transitioned no inventory since then. Approximately 154,000 units of finished goods and 59,000 spares and accessories remain in its warehouses. (Ex. 1, J. Mullen Decl. ¶ 10.) Syncreon claimed it needed to perform a wall-to-wall inventory count of these goods. (Ex. 17, 8/21/17 J. Mullen Email; Ex. 1, J. Mullen Decl. ¶ 19.) Syncreon did not hide that this was merely another stall tactic; it offered to immediately stop its count and restart shipments if Dyson would agree to negotiate; but if it did not, the count would continue. (Ex. 1, J. Mullen Decl. ¶ 20.)

The inventory count is still ongoing today. Throughout the count, Dyson repeatedly asked Syncreon to confirm it would restart transferring Dyson's inventory or give Dyson access. (Ex. 18, 8/17/17 J. Mullen Email; Ex. 19, 8/23/17 J. Mullen Email; Ex. 20, 8/24/17 J. Mullen Email; Ex. 1, J. Mullen Decl. ¶¶ 21–24.) Syncreon never answered this question. (Ex. 1, J. Mullen Decl. ¶¶ 21–24.) Instead, on August 25, Syncreon tried a new stall tactic. It claimed it needed to reduce its staff and would "be unable to give you a timing on when we will finish the inventory count and reconciliation of goods" or "the time it will take us to complete the transfers." (Ex. 21, 8/25/17 M. Boonen Email; Ex. 1, J. Mullen Decl. ¶ 25.) Dyson then asked Syncreon point blank:

> [P]lease directly answer this question: Will Syncreon allow Dyson full and complete access to all of our inventory starting on Tuesday of next week (August 29th)? We have made the necessary arrangements for trucks, equipment and staff to remove all remaining stock from both facilities. Once completed, we fully intend to address the outstanding issue of costs and fees, inclusive of those incurred by Dyson to complete this transfer. However, right now we need to be able to move our product out of Syncreon's warehouses. Please confirm that Syncreon will give its full cooperation to allow Dyson to move its inventory out of Syncreon starting on Tuesday.

(Ex. 21, 8/25/17 J. Mullen Email; Ex. 1, J. Mullen Decl. ¶ 26.) Syncreon again refused to answer. So on August 30, Dyson dispatched a truck to Syncreon's facility to collect its inventory. (*Id.* ¶ 27.) Syncreon refused to allow Dyson to remove its own product. (*Id.*)

## V.    DYSON'S CUSTOMERS RESPOND TO SYNCREON'S ERRORS.

Dyson's relationships with retailers are key: they are a critical way to get products onto the physical and virtual shelves of stores and into the hands of consumers.  (Ex. 1, J. Mullen Decl. ¶ 4.)  Dyson has focused its efforts on "building strong customer relationships and a strong brand" and has "worked hard to build significant trust" with customers.  (*Id*. ¶ 5.)

Syncreon has already hurt these hard-earned relationships.  NexWeb, which services armed forces procurement, for example, gave Dyson an ultimatum—either get product into its store or it would find an alternative supplier:  "We either need these goods in the store by Friday ***or an alternative option*** for the customer that spends the time to come in to see us to purchase and leave disappointed . . . ***The brand and your share of the floor is at risk***."  (Ex. 22, 7/21/17 C. Shoen Email.)    P.C. Richard & Son, a large regional retailer, refused to set a meeting with Dyson to discuss their relationship until Dyson could prove shipment reliability:  "***We will not even consider a meeting until Dyson proves it can deliver product on a timely basis***."  (Ex. 23, 6/1/17 C. Quinn Email.)  It further explained:  "Dyson has lost all credibility. . . . Dyson has taken away my ability to do what we have been doing for 107 years -- taking care of our customer. . . . ***Once Dyson has proven again to be a good supplier, we will set up a meeting***."  (*Id*.)  And Rymax, a company that designs and administers corporate rewards, stated that "Dyson [was] going through a ***logistical nightmare***" and suspended all sales of Dyson products.  (Ex. 24, 7/11/17 K. Fishman Email.)

Retailer trust has also suffered.  For example, Amazon asserted it had lost "trust in Dyson's 'shipment integrity.'"  (Ex. 8, 7/6/17 A. Cohen Email.)  Dyson also lost momentum building its relationship with Abt, the country's largest non-franchise box store: "we've eroded all previous momentum but more discouraging, we now face credibility and accountability concerns as a company with Abt."  (Ex. 25, 6/28/17 D. Christian Email.)  Third-party carrier C.H. Robinson's Senior Sales Executive warned of the harm Syncreon was causing:  "By not having a good QA

process this is creating a lot of extra work, shortages and confusion to put the puzzle back together. ***This is putting Dyson at risk with their customers***." (Ex. 26, 6/9/17 A. Cohen Email.)

Dyson has taken significant steps to build back retailers' trust. (Ex. 1, J. Mullen Decl. ¶ 9.) This includes providing rebates, renegotiating contracts, and promising retailers they will receive products on time and as expected. (*Id*.) Dyson cannot afford to go back on its word now with an inability *again* to fill its customer's orders in the coming months. (Ex. 1, J. Mullen Decl. ¶ 11.) That would irreparably harm Dyson's relationships and reputation, particularly as Black Friday and Cyber Monday approaches. (Ex. 1, J. Mullen Decl. ¶¶ 11-13.)

**ARGUMENT**

This Court should issue a preliminary injunction ordering Syncreon to allow Dyson to remove its remaining products from Syncreon's warehouses. Dyson easily meets the prerequisites for a preliminary injunction: (1) Dyson has demonstrated "some likelihood of succeeding on the merits" of its claims; (2) Dyson will suffer "irreparable harm" to its business reputation without an injunction and has no adequate remedy at law; (3) the balance of equities tips decisively in favor of granting an injunction; and (4) the public interest weighs strongly in favor of an injunction. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992).

## I. DYSON RAISES FAR MORE THAN "SOME LIKELIHOOD" THAT SYNCREON BREACHED THE CONTRACT AND CONVERTED DYSON'S PROPERTY.

"[T]he threshold" for a preliminary injunction is establishing "some likelihood" of success on the merits. *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys., LLC*, 2003 WL 1057929, at *18 (N.D. Ill. Mar. 10, 2003). The moving party "need . . . only show that his chances to succeed on his claims are 'better than negligible.'" *Whitaker by Whitaker v. Kenosha Unified School Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017). Dyson far exceeds this standard for its conversion and breach of contract claims.

## A.    Dyson Has Established A Likelihood Of Success For Its Conversion Claim.

In Illinois, conversion is "any unauthorized act, which deprives a man of his property permanently or for an indefinite time." *Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc.*, 806 N.E.2d 280, 285 (Ill. App. Ct. 2004). "To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *New Light Cemetery Ass'n v. Baumhardt*, 869 N.E.2d 939, 944 (Ill. App. Ct. 2007).

These elements are all present here. Dyson is the sole owner of its property, and has an absolute and unconditional right to possess it. Syncreon cannot seriously dispute this. Syncreon has no contract or other interest in Dyson's property; nor does it have a contract right to prevent Dyson from removing its property. And while Dyson has repeatedly demanded possession, Syncreon wrongfully continues to maintain control today. (Ex. 17, 8/21/17 J. Mullen Email; Ex. 19, 8/23/17 J. Mullen Email; Ex. 20, 8/24/17 J. Mullen Email; Ex. 1, J. Mullen Decl. ¶¶ 20–27.)

This more than meets the "low threshold" for demonstrating a "better than negligible" likelihood of success. *See, e.g.*, *Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*, 456 F. App'x 184, 188 (3rd Cir. 2012) (affirming grant of preliminary injunction for conversion claim where plaintiff sought "return [of its] property, including books and records, still in [defendant's] possession"); *B&F Sys., Inc. v. LeBlanc*, 2009 WL 10674477, at *7 (M.D. Ga. Sep. 30, 2009) (granting preliminary injunction for conversion claim where "[c]opies of the list are allegedly in Defendants' possession, and despite demand for return of the list by Plaintiff, Defendants have allegedly refused"); *New Light Cemetery*, 869 N.E.2d at 944 (court erred in denying preliminary injunction, where defendant withheld only set of records about cemetery).

**B.      Dyson Has Established A Likelihood Of Success For Its Contract Claim.**

By preventing Dyson from removing its own property, Syncreon is in breach of several contract provisions as well.  This, too, supports injunctive relief.

*First*, Syncreon is in breach of Section 2.3.4, which requires "its best efforts to assist Dyson in transferring the work to another third party service provider" following termination.  (Ex. 3, at § 2.3.4.)  Consistent with this provision, Syncreon initially agreed to transfer all remaining inventory to Expeditors.  (Ex. 12, 8/11/17 M. Carver Email.)  But once Syncreon feared it would lose leverage, it ***stopped*** its transition efforts and refused to allow Dyson to remove the inventory itself.  (Ex. 1, J. Mullen Decl. ¶¶ 17–18.)  This is anything but "best efforts," which at a minimum requires good faith.  *See Coleman v. Madison Two Assocs.*, 718 N.E.2d 668, 674 (Ill. App. Ct. 1999) ("best efforts" are "similar to the exercise of good faith implied in all contracts").

*Second*, Syncreon is breaching Sections 10.2 and 24.1, in which Syncreon represents it will "devote the time, personnel and resources necessary to perform the Services" and "perform the Services with care and diligence consistent with industry standards and in a professional and workmanlike manner."  (Ex. 3, at §§ 10.2, 24.1.)  Syncreon is not devoting the "time, personnel, and resources" needed to transfer Dyson's inventory to Expeditors as it agreed—when it refuses to ship any product at all.  Nor is it performing work in a "professional and workmanlike manner" by refusing to allow Dyson to remove its own property.

*Third*, Syncreon is breaching Sections 21.1 and 21.2—which gives Dyson "full and unrestricted access to Products and the Distribution Centers" and allows Dyson to handle its products (*Id*. at §§ 21.1., 21.2.)—when Syncreon refuses to allow Dyson to remove its own products from the facilities.

*Third*, Syncreon is breaching the implied duty of good faith and fair dealing inherent in the contract under Illinois law.  The implied duty "requires that [ ] discretion be exercised 'reasonably

and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *McCleary v. Wells Fargo Securities, LLC*, 29 N.E.3d 1087, 1093 (Ill. App. Ct. 2015). The implied duty "ensure[s] that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.'" *Id.*

Syncreon is doing the exact opposite of what the implied duty requires. Rather than acting "reasonably and with proper motive," Syncreon is holding Dyson's inventory hostage, with the improper motive of trying to gain leverage in the parties' final negotiations. Syncreon's actions are not only flatly inconsistent with Dyson's reasonable expectations under the agreement, but also those of any reasonable counter-party. *E.g., Typpi v. PNC Bank, Nat'l Assoc.*, 2014 WL 296035, at *3 (N.D. Ill. Jan. 27, 2014) (where plaintiff claimed defendant "acted 'arbitrarily and unfairly,'" in mismanaging plaintiff's escrow money, "his breach of the implied covenant [claim] survives").

Dyson has established a high likelihood of success on each of its claims for breach of contract, any one of which would suffice to support an injunction. Indeed, each of these breaches establishes that success on the merits is *probable*. This provides strong grounds to grant Dyson's injunction request. *See, e.g., nClosures Inc. v. Block & Co.*, 2013 WL 158954, at *3-4 (N.D. Ill. Jan. 15, 2013) (granting preliminary injunction for breach of contract claim); *Optionmonster Holdings, Inc. v. Tavant Techs., Inc.*, 2010 WL 2639809, at *6 (N.D. Ill. Jun. 29, 2010) (same).

## II. DYSON WILL HAVE NO ADEQUATE LEGAL REMEDY AND WILL SUFFER IRREPARABLE HARM UNLESS IT RECOVERS ITS PROPERTY.

Dyson has no adequate legal remedy and will suffer irreparable harm to its business reputation and retailer customer goodwill unless the Court issues an injunction. In the Seventh Circuit, "showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages." *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134,

1140 (7th Cir. 1994). In other words, because "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill," such "injuries are presumed irreparable." *SMC Corp. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 928 (N.D. Ill. 2007); *see Am. Food & Vending Corp. v. Utd. Parcel Serv. Oasis Supply Corp.*, 2003 WL 256865, at *2 (N.D. Ill. Jan. 31, 2003) ("Because of the difficulty in assessing the damages associated with a loss of company's goodwill, such damages to goodwill can constitute an inadequate remedy at law" and "qualifies as irreparable harm.").

Dyson's retail customer relationships are "an essential part of [its] business" and a "critical way to get products onto the shelves of stores and into the hands of consumers." (Ex. 1, J. Mullen Decl. ¶ 4.) Retailers have already spoken about harm to Dyson's goodwill, brand, and reputation:

- NexWeb made clear that Dyson's brand and floor space was at risk from Syncreon's errors: "***The brand and your share of the floor is at risk***." (Ex. 22, 7/21/17 C. Shoen Email.)

- PC Richards refused to even meet with Dyson until it could reliably receive products: "***We will not even consider a meeting until Dyson proves it can deliver product on a timely basis***." (Ex. 23, 6/1/17 C. Quinn Email.)

- Amazon made clear it was losing trust in Dyson: "Amazon's centralized scheduling team is ***losing trust in our shipment integrity***." (Ex. 8, 7/6/17 A. Cohen Email.)

- Third party C.H. Robinson employee explained the consequences of Syncreon's poor performance: "By [Syncreon] not having a good QA process this is creating a lot of extra work, shortages and confusion to put the puzzle back together. ***This is putting Dyson at risk with their customers***." (Ex. 26, 6/9/17 A. Cohen Email.)

- Dyson lost momentum building a relationship with Abt: "[W]e've eroded all previous momentum but more discouraging, ***we now face credibility and accountability concerns as a company with Abt.***" (Ex. 25, 6/28/17 D. Christian Email.)

Dyson has devoted the last few months to rehabilitating those critical relationships. (Ex. 1, J. Mullen Decl. ¶ 9.) If Dyson now has to tell retailers that it *again* cannot fill orders, this would "be directly breaking their trust," and "would substantially damage [Dyson's] remaining customer goodwill, relationships, and reputation beyond repair." (Ex. 1, J. Mullen Decl. ¶¶ 11–12.)

An injunction is now the only way to make Dyson whole and maintain its reputation and business. *See, e.g., Am. Food & Vending*, 2003 WL 256865, at *2 (plaintiff adequately pled irreparable harm and inadequate remedy where it "alleges [ ] breach of contract and violation of the implied covenant of good faith and fair dealing will cause irreparable harm to [its] business reputation, i.e ., goodwill"); *Reinders Bros. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 53 (7th Cir. 1980) (affirming preliminary injunction; "[i]nterruption" of supply chain "clearly interfere[s] with plaintiff's efficient servicing of a valuable segment of its clientele"); *Gateway*, 35 F.3d at 1140 (irreparable harm where defendant "would injure the goodwill [plaintiff] had acquired"); *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (granting preliminary injunction to prevent new corporate pricing policy where it "would be difficult to reestablish its previous business model without a loss of goodwill and reputation"); *YourNetDating, Inc. v. Mitchell*, 88 F. Supp. 2d 870, 872 (N.D. Ill. 2000) (granting temporary restraining order: "damage to the good will of its [business] services" is sufficient for irreparable harm).[1]

## III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVORS DYSON.

The third factor for injunctive relief—the balance of equities—tips decisively in Dyson's favor.  The court "must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). Courts use a "sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Id.*; *Foodcomm Intern. v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).  That is, where the plaintiff's "likelihood of success on

---

[1]    *See also Travelport LP v. American Airlines, Inc.*, 958 N.E.2d 1075, 1085 (Ill. App. Ct. 2011) (finding irreparable harm where plaintiff "could not reasonably calculate the resulting loss of current and prospective customers and all of their bookings due to the damage to [plaintiff's] reputation and goodwill").

the merits is quite high . . . an injunction will be proper unless the injunction would inflict a much greater harm on the [defendant] than the denial of the injunction would inflict on [the plaintiff]." *Jano Justice Sys., Inc. v. Burton*, 636 F. Supp. 2d 763, 768 (C.D. Ill. 2009).

The contrast in harms is stark. Without an injunction, Dyson will lose goodwill and suffer reputational harm. If an injunction issues, Syncreon, by contrast, will just need to comply with the parties' contract and allow Dyson to remove its own products. This is no harm at all—and cannot (and does not) tip the balance of hardships in Syncreon's favor. *See, e.g., Arcadia Health Servs., Inc. v. A+ Health Care Inc.*, 1997 WL 24737, at *5 (N.D. Ill. Jan. 17, 1997) ("There is no harm to [defendant] by forcing her to comply with the terms of her contract with [plaintiff]. She is simply getting that for which she bargained."). In addition, Dyson's strong probability of success on the merits further supports an injunction at the balancing phase. *See Jano*, 636 F. Supp. 2d at 768.

The public interest strongly favors Dyson as well. An injunction will ensure that Dyson's retailers and consumers—all third parties—have their orders for Dyson products filled. More generally, "courts in this District have recognized that the public interest is served by enforcing valid contracts." *SMC Corp.,* 481 F. Supp. 2d at 929; *Cook Inc. v. Boston Scientific Corp.*, 2002 WL 31236289, at *6 (N.D. Ill. Oct. 1, 2002) ("We must [ ] strive to ensure that the public has confidence in our willingness to enforce contractual obligations."). Ending Syncreon's ongoing conversion will also support the public interest in protection of property rights. *See, e.g., Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 647 (Fed. Cir. 2015) ("[T]he public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors.").

## CONCLUSION

For the foregoing reasons, Dyson respectfully requests that the Court issue a preliminary injunction requiring Syncreon to allow Dyson to remove all remaining Dyson inventory currently within Syncreon's possession, custody, and/or control.

Dated:  August 30, 2017

*s/ Diana Watral*

Andrew A. Kassof, P.C.
Diana M. Watral
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

*Attorneys for Plaintiff Dyson Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2017, the foregoing document was filed electronically through the Court's Electronic Case Filing System. I further certify that a true and correct copy of the foregoing document also was served by U.S. postal mail this date on:

Syncreon
2851 High Meadow Circle, Suite 250
Auburn Hills, MI 48326
ATTN: Dan Bombrys

Syncreon
2851 High Meadow Circle, Suite 250
Auburn Hills, MI 48326
ATTN: Legal Department


Dated:  August 30, 2017                        *s/ Diana Watral*
                                                Andrew A. Kassof, P.C.
                                                  Diana M. Watral
                                                  KIRKLAND & ELLIS LLP
                                                  300 North LaSalle Street
                                                  Chicago, Illinois  60654
                                                  (312) 862-2000 (tel)
                                                  (312) 862-2200 (fax)
                                                  Firm ID 108900

                                                  *Counsel for Plaintiff Dyson Inc.*