IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DYSON, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CaseNo.: 1:17-cv-06285 |
| SYNCREON TECHNOLOGY (AMERICA) | ) | Hon. Matthew F. Kennelly |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## SYNCREON TECHNOLOGY (AMERICA), INC.'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendant syncreon Technology (America) Inc. ("syncreon" or "Defendant"), through

counsel, answers Plaintiff Dyson, Inc.'s Complaint as follows:

1.  This is a breach of contract and conversion action arising out of Syncreon's complete failure to honor its obligations under a logistics, warehousing, and fulfillment contract with Dyson and its refusal to allow Dyson to repossess its own products and inventory following contract termination.

**ANSWER:**

Defendant admits only that Plaintiff's Complaint includes counts titled "breach of contract"

and "conversion."  Further answering, denied.

2.  In 2016, Dyson began to search for a new logistics provider. A logistics provider is critical to Dyson's business: it is responsible for crucial aspects of the supply-chain processes that move Dyson's inventory into the hands of retailers and consumers around the country.

**ANSWER:**

Defendant admits only that in 2016 Dyson began to search for a new logistics provider.

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 2 and therefore denies the same.

3.     Syncreon, a logistics provider, represented to Dyson that it had the expertise and resources necessary to serve as Dyson's sole logistics provider in the United States. Syncreon represented it would "operate under six sigma quality standards which will meet and surpass industry norms"; its "extensive experience in high-technology logistics is leveraged to deliver on every aspect of Dyson's requirements"; and it had "developed over the years a best in class project management approach." Syncreon also told Dyson that it could back up its promises with action, and that its "Core Value" was "integrity": "We do what we say we are going to do. We take responsibility for our choices. We don't make excuses."

**ANSWER:**

Defendant admits that it submitted a response to an RFP issued by Dyson.  syncreon's RFP

response speaks for itself.  Further answering, syncreon denies all allegations inconsistent with its

RFP response which was based on the information made available by Dyson at that time.

4.     Relying on these and other promises, Dyson awarded the logistics contract to Syncreon. The parties' contract contained additional representations about Syncreon's supposed "competent," "professional," and "industry standard" services.

**ANSWER:**

Defendant admits that it entered into a contract with Plaintiff.  That contract speaks for

itself.  Further answering, Defendant denies the remaining allegations.

5.     Unfortunately, it took no time for Syncreon to renege on its promises and representations and fail to live up to its end of the bargain. Although Dyson signed its contract with Syncreon just six months ago, Syncreon has already breached the agreement repeatedly.

**ANSWER:**

Denied.

6.     Syncreon failed to properly staff and manage its warehouses; logged inventory as shipped when it never left; fell behind on shipping and order delays; sent customers wrong or incomplete shipments; had a lack of adequate inventory IT systems; and committed other major errors. Syncreon either did not have the level of expertise and experience it claimed, or it did not intend to allocate that expertise and experience to the Dyson project.

**ANSWER:**

Denied.

4852-7000-2254, v. 4

7.     One of Dyson's customers called Syncreon's performance a "*logistical nightmare*." And one of Syncreon's own employees candidly admitted the Syncreon facility was "*hopeless*."

**ANSWER:**

Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 7 and therefore denies the same.

8.     Due to Syncreon's abysmal performance, the parties recently agreed to terminate the agreement. Syncreon's Vice President for Business Development and Account Management, Dan Bombrys, described the termination as "our mutual decision to separate ways." A different logistics provider, Expeditors, has since begun to process all of Dyson's new orders to retailers and customers.

**ANSWER:**

Defendant denies that "the parties recently agreed to terminate the agreement." Defendant admits that Plaintiff prematurely pulled all business from Defendant and that "Expeditors, has since begun to process all of Dyson's new orders to retailers and customers." Further answering, denied.

9.     Syncreon initially agreed that it would transfer Dyson's remaining inventory from its facilities to Expeditors' warehouse at a rate of eight trucks per day. But in the last two weeks, Syncreon abruptly changed course. To drum up negotiating leverage as the parties move toward finalizing the details ending their relationship, Syncreon cancelled previously scheduled moving trucks and has chosen to hold Dyson's inventory captive unless Dyson succumbs to Syncreon's demands. In fact, Syncreon has even refused to allow Dyson's own trucks to remove the remaining inventory.

**ANSWER:**

Denied.

10.     Dyson seeks to recover monetary damages owed to Dyson under the parties' contract for Syncreon's woefully deficient performance, and, in the interim, seeks injunctive relief to regain possession of its remaining inventory in Syncreon's warehouses.

**ANSWER:**

Defendant denies that Dyson is entitled to any relief.

<strong>"THE PARTIES"</strong>

11.     Dyson, an Illinois corporation with its principal place of business in Chicago, Illinois, is a technology company that designs and manufactures vacuum cleaners, hand dryers, and other household products.

**ANSWER:**

Admit.

12.     Syncreon, a Michigan corporation with its principal place of business in Auburn Hills, Michigan, is a provider of logistics, distribution, and warehouse services. Syncreon is doing business in Cook County, Illinois with an office located at 1460 Thorndale Avenue, Elk Grove Village, Illinois, 60007. Syncreon has other offices in the State of Illinois, including in Itasca and Belvidere.

**ANSWER:**

Admit.

<strong>"JURISDICTION AND VENUE"</strong>

13.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 by virtue of diversity of citizenship and an amount in controversy in excess of $75,000.00, exclusive of interest and costs.

**ANSWER:**

Admit.

14.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 and because the parties' contract requires venue and jurisdiction to be in court in the State of Illinois. (Ex. 1, MSA, § 23.4 ("Venue and Jurisdiction. The venue and jurisdiction for any action arising under this Agreement shall be in the state or federal courts of the United States of America in the State of Illinois. The parties consent to the jurisdiction and venue of the state or federal courts in Cook County in the State of Illinois and waive any objections to such jurisdiction and venue.").)

**ANSWER:**

Admit.

<strong>"FACTUAL ALLEGATIONS"</strong>

**"A.     Dyson Depends On A Logistics Provider To Deliver Its Products."**

15.     As part of its distribution channel, Dyson relies on a logistics provider to receive, process, and ship its products to commercial retail customers throughout the country.

**ANSWER:**

      Admit.

      16.    Once Dyson manufactures a product, it is critical for the product to get on the physical and virtual shelves of retailers and into the hands of consumers. A logistics provider facilitates this process by receiving Dyson's container shipments, processing them, palletizing them, preparing them for shipment, and sending them to Dyson's retailers and e-commerce companies, as well as to consumers directly.

**ANSWER:**

      Defendant admits that a "logistics provider facilitates this process by receiving Dyson's

container shipments, processing them, palletizing them, preparing them for shipment, and sending

them to Dyson's retailers and e-commerce companies, as well as to consumers directly."

Defendant is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 16 and therefore denies the same.

      17.    With the explosion of e-commerce and competition among manufacturers of household goods, customers and retailers have exceedingly high expectations for timely delivery of products. Dyson's business thus depends on a reliable logistics provider that can deliver on its promises and meet the challenges of a highly competitive marketplace.

**ANSWER:**

      Defendant is without knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 17 and therefore denies the same.

      **"B.    Dyson Searches For A New Logistics Provider."**

      18.    In February 2016, Dyson initiated a formal request for proposal (RFP) process for a third-party consulting firm to assist Dyson in facilitating a logistics network study and identifying potential logistics providers. Dyson retained Cascade Business Group to lead the RFP process.

**ANSWER:**

      Admit.

      19.    In September 2016, Cascade began the process to identify a logistics provider for Dyson. Cascade distributed RFPs to ten different companies.

**ANSWER:**

Defendant admits that it received a RFP for "US Logistics 3PL Selection" from Dyson in September 2016. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 19 and therefore denies the same.

20.     Six logistics providers, including Syncreon, submitted RFP responses in October 2016.

**ANSWER:**

Defendant admits that it submitted a response to the Dyson RFP. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 20 and therefore denies the same.

>    **"C.     To Win The Contract, Syncreon Claims To Be A 'Market Leader In Implementation And Operational Start-Ups.'"**

21.     Syncreon's RFP response promised its "innovative and comprehensive service solution exceed[s] all assessment criteria." Specifically, Syncreon represented it would exceed Dyson's expectations in the following areas: facilities; ability to support Dyson's growth; technology, systems, and processes; project management and personnel; and inventory control.

**ANSWER:**

Defendant admits that it submitted a response to the Dyson RFP. syncreon's RFP response speaks for itself. Further answering, syncreon denies all allegations inconsistent with its RFP response which was based on the information made available by Dyson at that time.

22.     Syncreon filled pages of its proposal explaining the suitability of its plants in Sparks, Nevada (near Reno) and Olive Branch, Mississippi (near Memphis). The proposal provided detailed results of logistical models and expected shipping volumes for both sites, as well as warehouse specifications and features. Syncreon also provided an "opportunity summary" detailing in flowcharts the expected gross material flows (in pallets) on a daily basis in both locations. In response to Dyson's request for Syncreon to describe the locations' performance, Syncreon represented it would "provide scorecards and metrics from industry leading customers; we will jointly develop KPI's that accurately depict service quality for Dyson's business and customers. We operate under six sigma quality standards which will ***meet and surpass industry norms***."

**ANSWER:**

Defendant admits that it submitted a response to the Dyson RFP. syncreon's RFP response speaks for itself. Further answering, syncreon denies all allegations inconsistent with its RFP response which was based on the information made available by Dyson at that time.

23.     Syncreon knew that Dyson planned to continue growing its business in North America, and emphasized its supposed commitment to helping Dyson reach its goals. In its RFP, Dyson asked vendors how they would "ensure alignments with Dyson's planned growth." Syncreon's response represented it would "assign a dedicated Account Manager [AM] to Dyson. AM is responsible for understanding and internally conveying Dyson's strategy, timing, direction. The AM is the voice of Dyson within the organization. This position is also responsible to bring Dyson best practices and opportunities for mutual benefit. In addition, we will engage in Quarterly Business Reviews. This is including executive interlock to ensure that every level of our organization is aware of Dyson's direction and resource requirements."

**ANSWER:**

Defendant admits that it submitted a response to the Dyson RFP. syncreon's RFP response speaks for itself. Further answering, syncreon denies all allegations inconsistent with its RFP response which was based on the information made available by Dyson at that time.

24.     The demands of modern logistics, and the scale of Dyson's operations, require distributors to operate using sophisticated and reliable information technology. Syncreon's RFP response detailed the alleged cutting-edge nature of its IT functions and the thorough and accurate visibility they could provide to Dyson, including access to its "300+ IT professionals." "[S]yncreon's application suite and B2B systems integration are designed, developed and supported in-house by a team of dedicated IT professionals; we believe that by having full control of our Information Technology applications portfolio provides us with the know-how, capability and necessary agility to tailor solutions to our client's requirements."

**ANSWER:**

Defendant admits that it submitted a response to the Dyson RFP. syncreon's RFP response speaks for itself. Further answering, syncreon denies all allegations inconsistent with its RFP response which was based on the information made available by Dyson at that time.

25.     Syncreon's proposal touted its warehouse management system, which it calls Warehouse in a Box, or WiaB. WiaB allegedly "enables syncreon to offer full 'end to end' traceability and maximize operator productivity in a real-time environment," as well as "inventory reporting & visibility." Using WiaB, Dyson was supposed to be able to use a "Gateway web portal" for "real-time visibility" to its inventory and transactions, as well as orders and order statuses. Syncreon represented that these real-time balances are updated "every minute 24 x 7 x 365," and

offers "100% accurate retrospective snapshot[s] of any SKU inventory balance for any chosen minute historically." In sum, Syncreon asserted that its IT department could provide "an unrivalled level of traceability of Inventory."

**ANSWER:**

Defendant admits that it submitted a response to the Dyson RFP. syncreon's RFP response speaks for itself. Further answering, syncreon denies all allegations inconsistent with its RFP response which was based on the information made available by Dyson at that time.

26. Syncreon also boasted about its ability to craft "tailor-made solutions to provide competitive advantage for Dyson," including using "highly efficient processes based on Dyson's product profile to receive, store, retrieve and ship product with minimal handling and capital expenditures."

**ANSWER:**

Defendant admits that it submitted a response to the Dyson RFP. syncreon's RFP response speaks for itself. Further answering, syncreon denies all allegations inconsistent with its RFP response which was based on the information made available by Dyson at that time.

27. Syncreon's proposal is rife with promotion of its general ability to complete its obligations to Dyson's satisfaction, emphasizing its experience and the custom service it promised it could provide, "syncreon's extensive experience in high-technology logistics is leveraged to deliver on every aspect of Dyson's requirements. ... syncreon's proposed processes are specifically tailored for Dyson using technologies and methods that are industry tested; we never force a 'one size fits all' solution on a business."

**ANSWER:**

Defendant admits that it submitted a response to the Dyson RFP. syncreon's RFP response speaks for itself. Further answering, syncreon denies all allegations inconsistent with its RFP response which was based on the information made available by Dyson at that time.

28. The proposal also specifically touts Syncreon's project management ability as "a core strength and differentiator." The proposal represented that "syncreon has developed over the years a best in class project management approach that is proven through an extensive list of successful facility transitions and new business start-up projects." Syncreon also represented it had a "strong focus on understanding key customer requirements" and that its start-up team would "ensure alignment between Dyson and syncreon while building strong working relationships with Dyson to create a collaborative environment for success."

8

**ANSWER:**

Defendant admits that it submitted a response to the Dyson RFP. syncreon's RFP response speaks for itself. Further answering, syncreon denies all allegations inconsistent with its RFP response which was based on the information made available by Dyson at that time.

29. To ensure that its vendor would be able to successfully support its business goals and requirements, Dyson asked candidates to respond to 56 questions regarding their abilities, experience, and commitments. In its answers to these questions, Syncreon represented it would be able to meet Dyson's requirements and emphasized its alleged competence and excellence. For example, Syncreon represented it "will provide [a] dedicated Project Launch Team. Our team is an experienced group of professionals that includes PM, Engineering, HR, Operations, IT resources, Security. These SME's stay on task until all processes and systems are stable and processing significant operational volumes. All planning is done in concert with Dyson to ensure complete accountability, predictability and shared information."

**ANSWER:**

Defendant admits that it submitted a response to the Dyson RFP. syncreon's RFP response speaks for itself. Further answering, syncreon denies all allegations inconsistent with its RFP response which was based on the information made available by Dyson at that time.

30. Proper inventory control is also a fundamental requirement of a successful distribution relationship. Syncreon represented to specifically support "high technology customers" with inventory worth multiple billions of dollars. "We control multi-thousands of high velocity SKU's into multiple channels. We have the obligation, systems, methodologies and expertise to control inventory accuracy to 99.99% based on gross, net, and location." Moreover, Syncreon asserted that "Dyson's SKU count is, by comparison, is very minimal in relative to most of our clients."

**ANSWER:**

Defendant admits that it submitted a response to the Dyson RFP. syncreon's RFP response speaks for itself. Further answering, syncreon denies all allegations inconsistent with its RFP response which was based on the information made available by Dyson at that time.

**"D. Dyson And Syncreon Enter The Master Services Agreement."**

31. Taking Syncreon's representations at face value, Dyson awarded Syncreon the logistics provider contract over other providers. Unbeknownst to Dyson, however, in reality

Syncreon either lacked the experience or capability it claimed in its RFP response or never intended to allocate that experience or capability to the warehouses containing Dyson's product.

**ANSWER:**

Defendant admits that Dyson awarded syncreon the logistics provider contract. Further answering, Denied.

32.    In February 2017, Dyson and Syncreon entered into a Logistics, Warehousing and Fulfillment Master Services Agreement ("MSA"). (Ex. 1, MSA.)

**ANSWER:**

Admit.

33.    The MSA required Syncreon to provide "warehousing, receiving, picking, packing, labeling and shipping" services for "Dyson finished goods products to U.S. domestic locations." (*Id.* at § 1.1.) In particular, Syncreon was "responsible for inbound receipts, inventory management, storage, picking, packing, order fulfillment and outbound shipments of Dyson products and material to Dyson's United States customers." (*Id.* at Ex. D, § 1.1.)

**ANSWER:**

The MSA speaks for itself. Defendant admits to those obligations imposed by the MSA but denies breach or violation of those obligations.

34.    The contract outlined Syncreon's specific responsibilities—all critical to the effective operation of Dyson's business. They included:

(a)    Facilities and Infrastructure: Syncreon was required to "provide the required facilities and equipment to support Dyson's logistics requirements, for all Dyson products, at locations in the Eastern and Western regions of the United States." (*Id.* at Ex. D, § 3.1.1.)

(b)    Quality Management System: Syncreon was required to adhere to "Quality and Reliability Requirements" and "compile and report Performance Measures on a weekly/monthly/quarterly basis." (*Id.* at Ex. D, §§ 4.4-4.5; *id.* at Ex. I, § 1.4.) Syncreon was also required to maintain an "issues log with the description of the issue, root cause, corrective action, dates, and status." (*Id.* at Ex. I, § 1.4.1.)

(c)    Information Technology: Syncreon was required to "provide the IT infrastructure to support Dyson's logistics requirements," including "hardware, networks, telecommunications, software, and security." (*Id.* at Ex. D, § 5.1.)

(d)    Product Traceability: Syncreon was required to "have the ability to locate serialized items in the warehouse, using the local warehouse management software application, for recall, rework, and failure analysis efforts." (*Id.* at Ex. I, § 2.4.1.)

(e)    Documentation: Dyson's products must be shipped timely and in accordance with customer specifications. Syncreon was required to, among other

things, "update and generate shipping documents such as Packing List and Bill of Lading" (*Id.* at Ex. D, § 2.10.3.2); "perform ship confirm and system transactions," including reviewing "the order ... for special requirements for shipment labeling, stacking, or other requirements as well as accuracy of serial number assignment" (*Id.* at Ex. D, § 2.10.3.6.); and "provide an electronic Advanced Shipping Notification (ASN) to Dyson customers" (*Id.* at Ex. D, § 2.10.3.7).

(f)    Supervision: To ensure that Syncreon's employees properly executed its contractual requirements, Syncreon agreed to "provide a reasonable and customary level of supervision to its employees handling Dyson Product." (*Id.* at Ex. K, § 6.3.)

**ANSWER:**

The MSA speaks for itself. Defendant admits to those obligations imposed by the MSA but denies breach or violation of those obligations.

35.    To ensure that Syncreon provided top-quality service, the parties agreed that Syncreon's work would be governed by performance metrics. Exhibit E to the MSA created measurable expectations for Syncreon's receiving of containers, order fulfillment rate, order accuracy, and communication response. (*Id.* at Ex. E.) For example, each day, Syncreon was required to assess whether it created Advanced Shipping Notifications (ASNs) for all orders, as required by the contract, by calculating the "[t]otal number of order ASNs sent same day for Dyson specified customers divided by the total orders for those customers on that day," with a "target" of "100%." (*Id.*) Syncreon was also required to assess its ability to exchange data, respond by email and phone, and respond to escalation requests each week, again with a "target" of "100%." (*Id.*)

**ANSWER:**

The MSA speaks for itself. Defendant admits to those obligations imposed by the MSA but denies breach or violation of those obligations.

**"E.    Syncreon Makes Multiple Express Representations and Warranties About Its Superior Qualifications and Promised Performance."**

36.    Critically, Syncreon also made numerous express representations and warranties to Dyson in the contract, as it had during the RFP process. For example, in Section 10.1, Syncreon agreed to provide "competent," "professional," and "industry standard" services. (*Id.* at § 10.1.) Syncreon repeated that warranty in Section 24.1. There, Syncreon warranted that it "shall perform the Services with care and diligence consistent with industry standards and in a professional and workmanlike manner, with employees that have sufficient technical expertise to perform the Services." (*Id.* at § 24.1.)

**ANSWER:**

The MSA speaks for itself. Defendant admits to those obligations imposed by the MSA but denies breach or violation of those obligations.

11

37. Syncreon further guaranteed that its personnel were "sufficiently experienced, properly qualified, and equipped to perform the Services" and that they would "devote the time, personnel and resources necessary to perform the Services." (*Id.* at § 10.2.)

**ANSWER:**

The MSA speaks for itself. Defendant admits to those obligations imposed by the MSA but denies breach or violation of those obligations.

38. And in Section 7.1, Syncreon represented that it would "ensure that its employees conduct the Services in an ethical and professional manner." (*Id.* at § 7.1.)

**ANSWER:**

The MSA speaks for itself. Defendant admits to those obligations imposed by the MSA but denies breach or violation of those obligations.

39. Dyson required each of these representations from Syncreon before it would agree to award Syncreon the contract because each was critical to Dyson to ensure that Dyson could reliably sell its products to third-party retailers.

**ANSWER:**

Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 and therefore denies the same.

**"F. The Parties Negotiated Other Contract Protections."**

40. The parties also negotiated several provisions giving Dyson broad rights to terminate the agreement with Syncreon, both with and without cause. (*Id.* at §§ 2.2, 2.3.) Pursuant to Section 2.2.2, Dyson had the right to terminate the contract without cause at any time by providing 120 days' notice to Syncreon. (*Id.* at § 2.2.2.) And in Section 2.3, Dyson had the right to terminate the contract with cause in the event that Syncreon (a) failed to meet minimum threshold measurements within 90 days of notice from Dyson to cure the failure; (b) failed to cure a material breach of the contract within 60 days of notice from Dyson; and (c) filed for bankruptcy. (*Id.* at § 2.3.)

**ANSWER:**

The MSA speaks for itself. Defendant admits to those obligations imposed by the MSA but denies breach or violation of those obligations. Further answering, Dyson breached the MSA by pulling all business from syncreon without satisfying the obligations in section 2 of the MSA.

41.     The parties understood that if Dyson terminated the agreement, it would also need to shift all of its inventory immediately to a different logistics provider to avoid significant harm to its business, reputation, and customer goodwill. Section 2.3.4, therefore, requires Syncreon "to use its best efforts to assist Dyson in transferring the work to another third party service provider" following termination. (*Id.* at § 2.3.4.) Section 21.1, in turn, guaranteed Dyson that it would have "full and unrestricted access to Products and the Distribution Centers" upon twenty-four hours' notice. (*Id.* at § 21.1.) And Section 21.2 contemplated that Dyson would "request, from time to time, permission to handle its Products within the Distribution Center." (*Id.* at § 21.2.)

**ANSWER:**

The MSA speaks for itself. Defendant admits to those obligations imposed by the MSA but denies breach or violation of those obligations. Further answering, denied.

42.     In addition, Syncreon agreed to retain copies of "shipping packing slips, shipment bill of ladings with referenced tracking numbers, receiving bill of lading, receiving pack slips and others as determined by Dyson," and to make copies of such documents available to Dyson upon twenty-four hours' notice. (*Id.* at §§ 16.1, 16.2.)

**ANSWER:**

The MSA speaks for itself. Defendant admits to those obligations imposed by the MSA but denies breach or violation of those obligations.

43.     Syncreon also agreed to indemnify Dyson "from and against any and all third party claims, suits, actions, damages, liabilities, costs and expenses including attorneys' fees" due to Syncreon's "breach of any representation, warranty, covenant, or other obligation" or "gross negligence or willful misconduct." (*Id.* at § 12.1.)

**ANSWER:**

The MSA speaks for itself. Defendant admits to those obligations imposed by the MSA but denies breach or violation of those obligations.

**"G.     Syncreon Fails to Deliver On Its Contractual Promises."**

44.     Syncreon's performance under the contract fell well short of Syncreon's promises, Dyson's expectations, and minimum industry standards. From the start, Syncreon failed to properly staff and manage its warehouses; logged inventory as shipped when it never left; fell behind on shipping and order delays; sent customers wrong or incomplete shipments; had a lack of adequate inventory IT systems; and committed other major errors that severely damaged Dyson's business relationships and caused it to suffer substantial damages.

**ANSWER:**

Denied.

45.     Syncreon's performance was so underwhelming and inconsistent with its contractual obligations and warranties that its own employees have repeatedly acknowledged Syncreon's failings to Dyson. Jaco Knetemann, one of Syncreon's senior operations directors, even characterized the Syncreon facility as "hopeless." Additionally, Stefan de Laat, a Syncreon senior transport planner who worked at one of the Syncreon facilities that serviced Dyson, stated the following in an email to Dyson: "I hope operation is running better than when I left. I might have mentioned it before, but I saw it as a big challenge to contribute in such an [sic] hectic organization [sic], I hope they are able to build up a team and get it working."

**ANSWER:**

Defendant is without knowledge or information sufficient to form a belief as to the truth or

context of the alleged statements or characterizations made by Jaco Knetemann or Stefan De Laat.

Further answering, denied.

46.     Dyson lodged numerous Corrective Action Requests ("CARs") with Syncreon due to its substandard performance. CARs are formal notifications requesting that non-conforming products or services be remedied and not reoccur.

**ANSWER:**

Defendant admits that Dyson "lodged" Corrective Action Requests.  Defendant denies that

Corrective Action Requests were "due to" syncreon's substandard performance.

47.     Syncreon's errors fall into several broad categories including shipping delays, incorrect shipping deliveries, incorrect billing to customers, and insufficient resources, in addition to other major errors not expected from a logistics provider.

**ANSWER:**

Denied.

**"1.     Inexcusable Shipping Delays"**

48.     Syncreon consistently failed to deliver Dyson's shipments on time. These delays were a direct result of Syncreon's inability to perform the most basic task of a logistics provider—to document correctly which products were being loaded onto which trucks for delivery.

**ANSWER:**

Denied.

49.     For example, on June 8, 2017, Dyson informed Syncreon that Dyson had "many Best Buy shipments that show as leaving but are not moving due to missing paperwork" and that Syncreon needed to prioritize this issue of missing paperwork "as the customer has already been invoiced based on the ship confirm date."

**ANSWER:**

Defendant is without knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 49 and therefore denies the same.

50.     In fact, one of Dyson's primary carriers, C.H. Robinson, became so frustrated with Syncreon's lack of adequate documentation that it advised Dyson that it would "no longer dispatch a driver to pick up a loaded drop trailer in [Syncreon's warehouse facility] until Syncreon scans ALL the [Bills of Lading] loaded on that trailer."

**ANSWER:**

Defendant is without knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 50 and therefore denies the same.

51.     Other customers suffered similar problems. Wal-Mart, one of Dyson's biggest customers, was forced to hold Dyson products in its delivery garage for days because Syncreon had not provided all the Bills of Lading required to process the inventory and move it into the store. Syncreon's inability to generate adequate documents for Dyson's products was "systematic," and the Dyson team dispatched to Syncreon's warehouses soon discovered that Syncreon was not using Bills of Lading as a matter of course. Syncreon's conduct here is a straightforward (and damaging) breach of the shipping specifications the parties negotiated in the MSA. (*See* Ex. 1 at Ex. D, § 2.10.3.2 ("Vendor will update and generate shipping documents such as Packing List and Bill of Lading.").)

**ANSWER:**

Denied.

52.     Another cause of Syncreon's shipping delays stemmed from errors in its IT system. Pallets of Dyson's product had to sit idle in Syncreon's warehouses, even though there were outstanding orders for those exact goods.

**ANSWER:**

Denied.

53.     As of June 16, 2017, according to Syncreon's own data, at least 35 percent of Dyson's total shipments were delayed by a minimum of 15 days.

**ANSWER:**

Denied.

### "2.    Incorrect Shipping Deliveries"

54.    Syncreon failed to reliably deliver correct shipments to Dyson's customers.

**ANSWER:**

Denied.

55.    Products ordered by Wal-Mart would be shipped to Costco, for instance, resulting in lost business (and frustrated customers) at both stores.

**ANSWER:**

Denied.

56.    Customers flagged Syncreon's recurring wrong deliveries. An Amazon employee, for example, asserted its carrier "believes they received an incorrect [Bill of Lading]" and was "concerned that this could be a repeat of the incorrect freight being shipped to Amazon." Rather than immediately address the problem, Syncreon defensively requested that the carrier provide "pictures of the truck and freight inside" before it would take any further action. As the Amazon employee correctly noted: "This is not [the carrier's] responsibility as Syncreon should know what is on the truck."

**ANSWER:**

Defendant is without knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 56 and therefore denies the same.

### "3.    Logging Shipments That Were Never Sent"

57.    Dyson later learned that Syncreon employees were falsifying shipment documents. Orders had been logged as shipped in Syncreon's computer system, even though the corresponding inventory had not physically shipped at all. Dyson's customers were then billed for products they never received—and that never even left Syncreon's facilities.

**ANSWER:**

Defendant denies that its employees "were falsifying shipment documents." Defendant is

without knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 57 and therefore denies the same.

58. For example, Dyson discovered multiple pallets of products that "show[ed] Ship Confirmed" in Syncreon's computer system for Amazon, Home Depot, and Lowes, even though the product was "still sitting" in Syncreon's warehouse. This meant Dyson "would have billed Amazon almost a month ago and not delivered the inventory."

**ANSWER**:

Defendant is without knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 58 and therefore denies the same.

59. As another example, Syncreon marked as shipped to Bed Bath & Beyond an entire trailer of product that instead sat loaded in the heat outside Syncreon's facility for more than a month. Syncreon's recurring shipment and billing errors caused significant tensions with long-time Dyson business partners, who were charged for products they never received.

**ANSWER**:

Defendant admits that certain Bed Bath & Beyond product sat in a trailer outside

syncreon's facility for a period of time. Further answering, denied.

### "4.    Inadequate Staffing And Management."

60. Syncreon's inability to execute in its role as third-party logistics provider stemmed in part from the substantial staff turnover that occurred from management to warehouse employees. For example, in just three months, Syncreon's "Launch Team" employed no less than six different project leads. This high turnover led to increased shipping errors and delays, and harmed to Dyson's relationships with its customers, large and small.

**ANSWER**:

Denied.

61. Syncreon's staffing issues were not confined to the management level. Syncreon also failed to hire, train, and retain warehouse employees who could reliably process, label, package, load, unload, and chart Dyson's products from Syncreon's warehouses to customers.

**ANSWER**:

Denied.

### "5.    Other Performance Issues"

62. Syncreon's substandard performance is not limited to the examples provided above. As additional examples (among many others), Syncreon had the following performance issues:

- Syncreon's warehouse switched labels and packaged the wrong pallet quantities;
- Pallets were left off loaded shipments planned for delivery with no notification to Dyson;
- Repeated planning and routing failures caused Dyson to miss shipping windows, cancelled orders, and carriers to be turned away;
- Overpacked boxes failed to meet size requirements;
- Refusing (with no justification) to ship Amazon products per Amazon's specifications;
- Not prioritizing Amazon shipments despite directives from both Dyson and Amazon to the contrary;
- Dyson received numerous complaints about no or incorrect information on bills of lading; and
- Dyson observed numerous direct orders that showed shipping confirmed, but the associated UPS tracking showed a status of label creation.

**ANSWER:**

Denied.

**"H.    Customers Responded To Syncreon's Poor Performance."**

63.    Dyson's relationships with its customer-retailers are an essential part of Dyson's business model: they are a critical way for Dyson to get its products onto the shelves of stores, to online websites, and into the hands of consumers.

**ANSWER:**

Defendant is without knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 63 and therefore denies the same.

64.    As part of cultivating its relationship with retailers, Dyson strives to deliver exceptional service to them, and they, in turn, expect exceptional service in return. Dyson has worked hard to build significant trust with these customers, which has taken many years to amass.

**ANSWER:**

Defendant is without knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 64 and therefore denies the same.

65.    Syncreon's deficient performance has threatened to erode Dyson's hard-earned business reputation in just a few months, as a few examples show. NexWeb, which services the armed forces procurement, gave Dyson an ultimatum after Syncreon was unable to deliver products to NexWeb for months—either get product into its store or NexWeb would find an alternative supplier: "We either need these goods in the store by Friday ***or an alternative option***

for the customer that spends the time to come in to see us to purchase and leave disappointed . . . **We have been patient, but at this point the patience has worn thin. The brand and your share of the floor is at risk.**"

**ANSWER:**

Defendant denies allegations related to deficient performance. Further answering, Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 65 and therefore denies the same.

66. P.C. Richard & Son, the largest regional retailer in the northeast, refused to set a meeting with Dyson to discuss their relationship until Dyson could prove shipment reliability: "*We will not even consider a meeting until Dyson proves it can deliver product on a timely basis*" Dyson asked Syncreon to shore up its deficiencies to provide P.C. Richard with the service it deserved. Syncreon, however, failed to adjust its actions to respond to such complaints.

**ANSWER:**

Defendant denies it failed to act in response to complaints. Further answering, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 66 and therefore denies the same.

67. P.C. Richard's attitudes about Dyson's business reputation only further diminished, after several more weeks of not receiving its shipping orders from Dyson via Syncreon: "At this point, Dyson has lost all credibility.... Dyson has taken away my ability to do what we have been doing for 107 years — taking care of our customer. ... . **Once Dyson has proven again to be a good supplier, we will set up a meeting**."

**ANSWER:**

Defendant denies it caused any harm to P.C. Richard's relationship with Dyson. Further answering, Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 67 and therefore denies the same.

68. Other customers suffered similar misfortunes due to Syncreon's performance issues. Rymax, one of the largest "loyalty program" servicers in the country, acknowledged to Dyson that "***Dyson is going through a logistical nightmare with your 3PL [Syncreon]***," but regardless, informed Dyson that it would be suspending all sales of Dyson products until Dyson corrected its shipping issues caused by Syncreon.

**ANSWER:**

Defendant denies allegations related to its "performance issues."  Further answering, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 68 and therefore denies the same.

69.     Because of the magnitude of Syncreon errors, by late June 2017, three out of four of the Rewards Accounts had removed Dyson from their rewards programs altogether until Syncreon shipping errors were resolved. Dyson sales representatives have been working diligently to minimize the harm caused by Syncreon to these accounts and to re-start Dyson shipments to them using its new logistics provider, Expeditors.

**ANSWER:**

Defendant denies it committed any "errors."  Further answering, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 69 and therefore denies the same.

70.     Abt, another of Dyson's regional customers, experienced similar problems caused by Syncreon that resulted in late, lost, or missing Dyson shipments. By mid-June, Dyson's account managers for Abt, despite dogged attempts to work with Syncreon to get its shipping logistics on track, were forced to acknowledge that Dyson had "eroded all previous momentum" and, most troublingly, now faced "credibility and accountability concerns" with Abt, a company who sells more Dyson products than any other brick-and-mortar store in the country.

**ANSWER:**

Defendant denies that it caused any "problems."  Further answering, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70 and therefore denies the same.

71.     The inability to get products into customers' hands has also harmed customer trust. For example, Amazon's logistics team informed Dyson it had lost "trust in Dyson's 'shipment integrity.'" Third-party carrier C.H. Robinson's Senior Sales Executive warned of the harm Syncreon was causing: "By not having a good QA process this is creating a lot of extra work, shortages and confusion to put the puzzle back together. ***This is putting Dyson at risk with their customers***."

**ANSWER:**

Defendant denies allegations related to an inability to "get products into customers' hands." Further answering, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71 and therefore denies the same.

72.     Frustrated with Syncreon's performance, retailers also charged Dyson various fines and expenses.

**ANSWER:**

Defendant denies that it caused any retailers' frustrations. Further answering, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72 and therefore denies the same.

73.     Dyson has taken significant steps over the past few months to build back the trust with its customers. This includes providing customers rebates, renegotiating contracts, and promising customers that they will receive products on time and as expected.

**ANSWER:**

Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 73 and therefore denies the same.

74.     Dyson is now at a cross-roads: it simply cannot afford to go back on its word now with an inability to fill its customer's orders in the coming months. The only way Dyson has made any progress with retailers is by telling them they can trust Dyson again. But if Dyson did not have sufficient inventory to fill orders, it would be directly breaking retailers' trust.

**ANSWER:**

Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74 and therefore denies the same.

**"I.     Syncreon's Actions Have Harmed Dyson."**

75.     Syncreon's deficient performance, gross negligence, willful misconduct, and bad faith has already exposed Dyson to millions of dollars in expenses and costs charged by third parties as a result of Syncreon's poor performance.

**ANSWER:**

Denied.

76.     All of the damages Dyson seeks are direct damages caused by Syncreon's actions. Dyson additionally seeks recovery for indirect, consequential damages, given Syncreon's deliberate, intentional, willful, arbitrary, bad faith, reckless, and grossly negligent actions.

**ANSWER:**

Denied.

77.     Dyson's damages include, for example:
        (a)     Expenses and costs charged by retailers for violations of shipping requirements, incomplete shipments, and missing shipments;
        (b)     Expenses and costs charged by shipping, freight, and trucking companies;
        (c)     Expenses and costs for alternative shipping arrangements to get products more quickly in the hands of retailers and consumers; and
        (d)     Expenses and costs to divert and/or transfer products to a new logistics provider. For example, Dyson has incurred costs and expenses to divert products in route from Asia to Syncreon and to store containers that should have been stored by Syncreon. Dyson also expects to incur expenses for transitioning its remaining inventory from Syncreon's facilities to its new warehousing company, Expeditors.

**ANSWER:**

Denied.

78.     As a result of Syncreon's deficient performance, gross negligence, willful misconduct, and bad faith, Dyson also has lost sales to its retailers and consumers, has lost profits, has relocated several Dyson employees to the Syncreon facilities to address Syncreon's performance, and has incurred significant IT expenses, among other damages.

**ANSWER:**

Denied.

79.     Syncreon has also harmed Dyson's customer goodwill, reputation, and brand.

**ANSWER:**

Denied.

80.     If Syncreon keeps hold of Dyson's remaining inventory, this would substantially damage Dyson's remaining customer goodwill, relationships, and reputation beyond repair. This issue is particularly urgent with Black Friday and Cyber Monday approaching, as retailers expect that Dyson will be able to fill their orders on this important sales day and will hold Dyson accountable if that does not happen.

**ANSWER:**

Denied.

**"J.    The Parties Terminate The Contract And Syncreon Initially Agrees to Cooperate."**

81.    To try to protect its reputation with its critical downstream business partners, Dyson attempted to work with Syncreon to correct Syncreon's errors and deficient performance.

**ANSWER:**

Denied.

82.    Syncreon's performance only deteriorated further, to the point that the parties agreed to terminate the agreement. Syncreon's Dan Bombrys described the termination as "our mutual decision to separate ways."

**ANSWER:**

Denied.

83.    Upon termination, Dyson contracted with a different logistics provider, Expeditors, to serve as its sole logistics provider in the United States.

**ANSWER:**

Defendant denies that the parties agreed to terminate the MSA.  Defendant admits that

Plaintiff prematurely pulled all business from Defendant and gave that business back to

Expeditors.

84.    Syncreon agreed to work with Dyson to transition the remaining Dyson inventory from the Syncreon facilities to Expeditors' warehouse. Specifically, Syncreon agreed it would ship three truckloads of inventory per day from its Reno, Nevada facility and five truckloads per day from its Olive Branch, Tennessee facility to Dyson's new logistics provider, for a total of eight shipments per day. As one Syncreon employee put it: "Three trucks a day from Reno has always been our commitment and the agreed transition plan." Another Syncreon employee stated: "[T]he transition plan that was agreed to with dyson states that we would ship 3 per day from Reno and 5 out of OB [Olive Branch]."

**ANSWER:**

Defendant agreed to work with Dyson to transition inventory pursuant to a Transition

Agreement proposed by Defendant, but rejected by Dyson.  Further answering, denied.

85.    Dyson currently is filling all of its orders out of the Expeditors warehouse.

**ANSWER:**

Admit.

86.     On August 30, 2017, Dyson sent Syncreon a letter further memorializing its bases for termination of the parties' agreement.

**ANSWER:**

Defendant admits that it received a letter from Dyson dated August 30, 2017, the same day

that Dyson filed this lawsuit.  Defendant denies that the August 30, 2017 letter memorializes

Dyson's alleged "bases for termination of the parties' agreement."

**"K.     Syncreon Shifts From Cooperating to Blocking Dyson From Its Own Products."**

87.     In mid-August 2017, Syncreon reversed course and decided to stop transferring Dyson's inventory to the new logistics provider, Expeditors.

**ANSWER:**

Denied.

88.     While the contract requires Syncreon to use it best efforts to assist Dyson in transferring the work to another logistics provider, Syncreon suddenly demanded that Dyson enter into a new transition agreement, rather than continue the transfer as agreed.

**ANSWER:**

The MSA speaks for itself.  Defendant admits to those obligations imposed by the MSA

but denies breach or violation of those obligations.  Further answering, Defendant admits that it

proposed a Transition Agreement and that Dyson rejected the same.

89.     On August 9, 2017, Syncreon's Marc Boonen expressed to Dyson that he wanted his team's "focus to continue on a successful transition," but that Syncreon wanted to "amend the existing [contract] with a transition agreement" and that Syncreon's executive team expected Dyson to prioritize Syncreon's proposed transition plan such that an agreement in principle be reached by August 14, 2017.

**ANSWER:**

Defendant admits that "Marc Boonen expressed to Dyson that he wanted his team's 'focus to continue on a successful transition[.]'" Further answering, denied.

90.     Syncreon's proposed new contract demanded that if Dyson wanted to continue shipping eight truckloads of inventory from the Syncreon warehouses, then Dyson would need to pay millions of dollars in fees—including for items expressly precluded under the parties' original contract. Syncreon also demanded a broad, general release of liability, meaning Dyson would have to forego millions of dollars in legitimate claims for Syncreon's admittedly poor performance under the contract.

**ANSWER:**

Defendant admits that it proposed a Transition Agreement and that Dyson rejected the same. The proposed Transition Agreement speaks for itself. Further answering, Defendant denies the remaining allegations of Paragraph 90.

91.     Specifically, Syncreon's proposed transition agreement required Dyson to pay over $4 million for Syncreon to transition the work to Expeditors. Whereas the parties previously agreed the inventory would be transitioned by August 31, 2017, the proposed transition agreement included a target completion date of September 15, 2017. Syncreon demanded that Dyson pay not only for the transition services, but also for items preluded under their original contract, such as half of the remaining 38 months on Syncreon's leases for the Olive Branch and Reno facilities and severance for Syncreon's employees.

**ANSWER:**

Defendant admits that it proposed a Transition Agreement and that Dyson rejected the same. Defendant denies that "the parties previously agreed the inventory would be transitioned by August 31, 2017[.]" . Further answering, Defendant denies the remaining allegations of this paragraph.

92.     Most egregiously, Syncreon's proposed transition amendment included a mutual release, whereby Dyson would be required to release Syncreon from "all claims, damages, losses, or injuries . . . which [Dyson] ever had, now [has] or in the future may claim to have against [Syncreon] . . . relating in any way to one or more events that occurred, or was supposed to occur but did not occur, prior to the date of this [Transition Agreement], including without limitation, Claims arising out of or related to the MSA or the services provide[d] thereunder."

**ANSWER:**

Defendant admits that it proposed a Transition Agreement and that Dyson rejected the

same. The proposed Transition Agreement speaks for itself. Further answering, Defendant denies

the remaining allegations of this paragraph.

93. The reason for Syncreon's sudden change is simple: inventory is key to Dyson's business. Once Syncreon transitioned all of Dyson's property to Expeditors, it would no longer have any leverage to pressure Dyson into a new agreement on unfavorable terms. But if Dyson could not deliver its products to third-party retailers on time, it would suffer business and reputational harm. Syncreon saw a narrow window to try to avoid liability for its poor performance and extract more money from Dyson.

**ANSWER:**

Denied.

94. On August 15, 2017, Dyson responded to Syncreon's unconscionable demand, requesting the parties focus on the transition of Dyson's remaining product over the next few weeks, and upon completion of the transition, discuss resolution of the other outstanding issues.

**ANSWER:**

Defendant admits that it proposed a Transition Agreement and that Dyson rejected the

same. Defendant denies that it was unconscionable. Defendant is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph 94

and therefore denies the same.

95. On August 16, 2017, Syncreon threatened to stop the transition altogether. Syncreon's Marc Boonen informed Dyson that his "CEO [Brian Enright] [ ] had made it very clear to [him] that [Mr. Enright] will not continue the transition unless Dyson come[s] to the table to agree" to Syncreon's demands. Dyson's James Mullen told Mr. Boonen that Dyson was not in a position to agree to Syncreon's proposed transition agreement because Dyson did not yet have clarity on the impact of Syncreon's poor performance on its business. Mr. Mullen said the parties should instead focus on a smooth transition now and then have an informed and fair conversation later to negotiate the end of their relationship. Mr. Boonen then stated that he received instructions from Syncreon's CEO Mr. Enright "to stop further shipments and not allow Dyson to collect [its] stock from [4:00 pm] until Dyson agree[s] to come to the table to negotiate a full transition agreement." Mr. Mullen "pressed" Mr. Boonen "on whether this meant [Dyson was] locked out," as "by not shipping and not allowing Dyson to collect" its product, "it effectively would appear to be a lock out."

**ANSWER:**

Defendant admits that Marc Boonen and James Mullen had conversations related to the

Transition Agreement proposed by syncreon.  Further answering, denied.

96.     That is exactly what it meant. Because Dyson would not capitulate to Syncreon's demands, Syncreon stopped all shipments from its facilities to Expeditors' warehouses as of the next day. In fact, while eight loads were scheduled to leave Syncreon's warehouses on August 17, Syncreon abruptly pulled the plug on those already-scheduled shipments: "Please cancel all shipments until further notice."

**ANSWER:**

Defendant is without knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 96 and therefore denies the same.

97.     Currently, approximately 150,000 units of finished goods and 56,000 accessories remain in Syncreon's warehouses.

**ANSWER:**

Denied.

98.     Mr. Mullen spoke with Mike Fahy, Syncreon's President of Technology on the morning of August 17. Mr. Fahy stated that Syncreon decided to perform a wall-to-wall inventory count and would not ship any product out of the facilities until the count was complete. Mr. Mullen told Mr. Fahy that they had previously discussed a full wall-to-wall inventory count and decided that it was better to count products as they were loaded onto trucks. The sudden need for a wall-to-wall count was a clear way to delay the transfer of Dyson's property to Expeditors. Mr. Fahy responded that he would go talk this over with Syncreon's CEO, Mr. Enright.

**ANSWER:**

Defendant admits that it started to perform a wall-to-wall inventory in August pursuant to

Dyson's request and communicated that to Dyson.  Defendant is without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in paragraph 98 and therefore

denies the same.

99.     Syncreon did not hide the fact that this was merely a stall tactic. When Mr. Fahy and Mr. Mullen spoke later that same day, Mr. Fahy indicated that he spoke with Mr. Enright and would be willing to start shipping again if Dyson would come to the negotiating table. Mr. Mullen pushed on what would happen if Dyson did not agree to negotiate, and Mr. Fahy stated that the inventory count would continue. Mr. Mullen asked what would happen once the count was finished

and whether Syncreon would re-start its shipments or allow Dyson to collect its property, and Mr. Fahy would not answer.

**ANSWER:**

Defendant denies allegations related to a "stall tactic." Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99 and therefore denies the same.

100.    Syncreon's inventory count began on August 17, 2017. Whereas in June, Syncreon estimated it would take only four days to complete a stock count for over 350,000 units of inventory, Syncreon's current inventory count has taken over eight days so far for the 150,000 units currently in the facility (and is not yet completed). The inventory count is still ongoing today, nine business days later.

**ANSWER:**

Defendant admits that it started to perform a wall-to-wall inventory in August pursuant to Dyson's request. Further answering, denied.

101.    Throughout the inventory count, Dyson repeatedly asked Syncreon to confirm it would restart transferring Dyson's inventory or give Dyson access to its property. Specifically, on August 21, Mr. Mullen asked Mr. Boonen to confirm that Syncreon would restart the transition: "Can you confirm that goods will start moving from tomorrow, or Wednesday at the latest"? And then on August 23 and 24, he again emailed Mr. Boonen, asking that "Syncreon immediately allow Dyson full access, control and possession over our own product and inventory." Syncreon never responded to these requests.

**ANSWER:**

Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101 and therefore denies the same.

102.    Instead, on August 25, Syncreon tried a new stall tactic. It claimed it was "forced to . . . reduc[e] the headcount" of employees and would "be unable to give you a timing on when we will finish the inventory count and reconciliation of goods" or "the time it will take us to complete the transfers."

**ANSWER:**

Defendant admits that it was forced to reduce headcount after Dyson prematurely pulled all business from Defendant and moved it back to Expeditors. Defendant denies any "stall tactic."

Further answering, Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 102 and therefore denies the same.

103.    As a result, Dyson asked Syncreon point blank on August 25 whether it could remove its inventory from Syncreon's facilities the next Tuesday:

> [P]lease directly answer this question: Will Syncreon allow Dyson full and complete access to all of our inventory starting on Tuesday of next week (August 29th)? We have made the necessary arrangements for trucks, equipment and staff to remove all remaining stock from both facilities. Once completed, we fully intend to address the outstanding issue of costs and fees, inclusive of those incurred by Dyson to complete this transfer. However, right now we need to be able to move our product out of Syncreon's warehouses. Please confirm that Syncreon will give its full cooperation to allow Dyson to move its inventory out of Syncreon starting on Tuesday.

**ANSWER:**

Defendant admits only that the language quoted in paragraph 103 appears in an email dated August 25, 2017.  Further answering, denied.

104.    Syncreon again refused to answer Dyson's question.

**ANSWER:**

Denied.

105.    So on August 30, Dyson dispatched a truck to Syncreon's facility to collect its inventory. Syncreon refused to allow Dyson to remove its own product from the Syncreon facilities.

**ANSWER:**

Defendant admits that it turned-away a truck away from its facility on August 30 because no pick-ups were scheduled for August 30 and Defendant was performing a wall-to-wall inventory at that time, pursuant to Dyson's request.  Further answering, denied.

### "L.    Syncreon Ignores Dyson's Contractual Request For Documents."

106.    On August 16, 2017, Dyson sent Syncreon a written request for copies of documents that Section 16.1 of the parties' contract requires Syncreon to retain, such as bills of lading and packing slips. Pursuant to its rights under Section 16.2, Dyson requested that Syncreon produce the requested documents by 5 p.m. the next day. Dyson is contractually entitled to and

needs these documents to confirm and reconcile retailer disputes, inventory integrity, and missing bills of lading.

**ANSWER:**

Defendant admits that it received a request for documents from Dyson. The MSA speaks

for itself. Further answering, denied.

107. Syncreon failed to produce the documents by 5 p.m. on August 17, 2017 or to respond to the written request at that time.

**ANSWER:**

Defendant admits only that it did not produce the documents requested by Dyson on August

16, 2017 by 5 p.m. on August 17, 2017. Further answering, denied.

108. Dyson instead received a response from Syncreon on August 21, 2017, stating that it would provide certain documents to Dyson by August 25. Syncreon did not provide Dyson with any documents on August 25 as promised. And since that time, Syncreon has not provided Dyson any documents or otherwise responded to its request in violation of its contractual obligations.

**ANSWER:**

Defendant admits that it responded to Dyson that it would provide documents to Dyson by

August 25. Further answering, denied.

**"COUNT I: BREACH OF CONTRACT"**

109. Dyson re-alleges and incorporates each and every allegation of Paragraphs 1-108 of this Complaint as if set forth herein.

**ANSWER:**

syncreon restates and incorporates each and every response to each and every allegation

made in paragraphs 1-108 of Dyson's Complaint as if set forth herein.

110. Dyson and Syncreon are parties to the MSA, which is a valid, binding, and enforceable contract.

**ANSWER:**

syncreon admits that Dyson and Syncreon are parties to the MSA. The MSA speaks for itself.

111.    Dyson has performed all of its obligations under the MSA.

**ANSWER:**

Denied.

112.    Syncreon has breached the parties' contract because Syncreon has (a) committed multiple, significant errors in performing its services under the contract; (b) not performed its services in a competent and professional manner, in accordance with industry standards; (c) not devoted the time, personnel, and resources necessary to perform its services; (d) not performed its services with care and diligence consistent with industry standards, with employees that are sufficiently experienced, properly qualified, and equipped to perform the services; (e) not used its best efforts to assist Dyson in transferring the work to Expeditors; (f) not permitted Dyson to remove its own inventory from the Syncreon facilities; and (g) not produced copies of certain important records within twenty-four hours of Dyson's request.

**ANSWER:**

Denied.

113.    Moreover, Syncreon's willful, arbitrary, and bad faith conduct, as described herein, further constitutes a breach of the implied covenant of good faith and fair dealing.

**ANSWER:**

Denied.

114.    As a direct result of Syncreon's breaches and its deliberate, intentional, willful, arbitrary, bad faith, reckless and grossly negligent actions, Dyson has suffered and will continue to suffer significant damages and/or harm, including but not limited to (a) payment for re-performance and corrective work; (b) damages, costs, and expenses incurred by Dyson due to Syncreon's late, incomplete, and incorrect shipments to third parties; (c) damages due to business disruption; (d) lost profits; (e) harm to Dyson's reputation, goodwill, and customer relationships; and (f) additional damages to be proven at trial. Such damages are natural, highly probable consequences of Syncreon's breaches of the parties' contract.

**ANSWER:**

Denied.

115.    As supported by Dyson's request for a preliminary injunction, Dyson also seeks immediate interim relief to prevent irreparable harm. Unless Syncreon is enjoined from preventing Dyson from removing its own remaining product within Syncreon's possession, custody, and/or

control, Dyson will continue to suffer incalculable harm, including to its reputation, good will, and customer relationships for which there is no adequate remedy at law.

**ANSWER:**

Denied.

## "COUNT II: CONVERSION"

116.    Dyson re-alleges and incorporates each and every allegation of Paragraphs 1-115 of this Complaint as if set forth herein.

**ANSWER:**

syncreon restates and incorporates each and every response to each and every allegation

made in paragraphs 1-115 of Dyson's Complaint as if set forth herein.

117.    Despite Dyson's absolute and unconditional ownership and possessory rights to and demand for the return of its inventory, Syncreon has refused to return Dyson's inventory.

**ANSWER:**

Denied.

118.    Dyson has suffered damages from Syncreon's conduct.

**ANSWER:**

Denied.

119.    Additionally, as supported by Dyson's request for a preliminary injunction, Dyson also seeks immediate interim relief to prevent irreparable harm. Unless Syncreon is enjoined from preventing Dyson from removing its own remaining product within Syncreon's possession, custody, and/or control, Dyson will continue to suffer incalculable harm, including to its reputation, good will, and customer relationships for which there is no adequate remedy at law.

**ANSWER:**

Denied.

120.    Syncreon has willfully and wantonly retained Syncreon's inventory in bad faith. Syncreon's actions, which have deprived Dyson of its ownership right and interest in its own inventory, constitutes an unlawful conversion of Dyson's property, for which an award of punitive damages is warranted.

**ANSWER:**

32

Denied.

**WHEREFORE,** Defendant syncreon Technology (America) Inc. respectfully requests that the Court enter judgment in its favor and against Dyson, Inc. on Dyson's complaint in its entirety and for any other relief deemed just and equitable; furthermore, Dyson is not entitled to any amount or relief whatsoever.

## AFFIRMATIVE DEFENSES

Defendant syncreon Technology (America) Inc. ("syncreon"), through counsel, states the following affirmative defenses:

1.      Dyson's Complaint fails to state a claim upon which relief can be granted.

2.      Dyson's alleged claims are barred, in whole or in part, by the terms and conditions of the parties' contract.

3.      Dyson's claims are barred, in whole or in part, because Dyson failed to satisfy conditions precedent under the parties' contract.

4.      Dyson's claims are barred, in whole or in part, by Dyson's own breaches of contract and Dyson's conduct.

5.      Dyson's claims are barred, in whole or in part, by Dyson's misrepresentations as to the required scope and content of the third-party logistics business.

6.      Dyson's claims are barred, in whole or in part, for the reasons set forth in syncreon's Counterclaim.

7.      Dyson's claims are barred, in whole or in part, by waiver.

8.      Dyson's claims are barred, in whole or in part, by estoppel.

9.      Dyson's claims are barred, in whole or in part, by unclean hands.

4852-7000-2254, v. 4

10.     Dyson's claims are barred, in whole or in part, because no conduct by or attributable to syncreon caused Dyson damage.

11.     syncreon expressly reserves the right to supplement or amend these affirmative defenses to the fullest extent allowed by law.

**WHEREFORE,** Defendant syncreon Technology (America) Inc. respectfully requests that the Court enter judgment in its favor and against Dyson, Inc. on Dyson's complaint in its entirety and for any other relief deemed just and equitable; furthermore, Dyson is not entitled to any amount or relief whatsoever.

4852-7000-2254, v. 4

## SYNCREON TECHNOLOGY (AMERICA), INC.'S COUNTERCLAIM

Defendant/Counter-Plaintiff syncreon Technology (America), Inc. ("syncreon") submits the following Counterclaim against Plaintiff/Counter-Defendant Dyson, Inc. ("Dyson"):

### PARTIES, JURISDICTION, AND VENUE

1. Dyson is a corporation formed under the laws of Illinois, with its principal place of business in Chicago, Illinois.

2. syncreon is a corporation formed under the laws of Michigan, with its principal place of business in Auburn Hills, Michigan.

3. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 by virtue of diversity of citizenship and an amount in controversy in excess of $75,000.00, exclusive of interest and costs.

4. This Court has personal jurisdiction over syncreon and Dyson.

5. This Court is a proper venue for the civil action asserted in this Counterclaim.

### INTRODUCTION

6. In late 2016 Dyson sought requests for proposals for a new third party logistics service provider. Over the course of the request for proposal period, the award, and the months following the award of the business to syncreon, it became apparent that Dyson lacked critical knowledge about its own business needs, which in combination with Dyson's misrepresentations and continuous changing of specifications, set up the business launch for failure and all at substantial cost and damage to syncreon.

7. Between January and August 2017, Dyson misrepresented requirements related to transition of inventory from Dyson's previous provider, failed to approve work instructions, constantly changed requirements from its original instructions or expectations of the parties often

4852-7000-2254, v. 4

with no advance notice to syncreon, failed to provide accurate shipping document specifications, provided obsolete information to syncreon, and failed to provide specific outbound standards for product shipments.

8.      During the same timeframe, syncreon provided and Dyson required extensive out of scope work and projects for which syncreon has not been compensated (despite numerous demands) and which essentially sabotaged a successful launch of this business.

9.      Finally, Dyson failed to abide by the terms of the contract with respect to termination and is in breach of its contractual termination obligations.

10.     As a result of Dyson's misrepresentations and contract breaches, syncreon has suffered significant damages resulting from work performed for which it has not been compensated, start-up costs, and transition costs.

## FACTUAL ALLEGATIONS

11.     Dyson does not operate its own warehouse and distribution center for receiving of product, storing product, or delivery of product to its customers.  Rather, Dyson uses a third-party logistics provider.

12.     In 2016, Dyson decided to transition its warehouse and distribution center operations to a new third-party logistics service provider.

13.     Dyson hired a third-party logistics consultant, Cascade Business Group ("Cascade"), to conduct a supply chain network study, facilitate a Request for Proposal ("RFP"), and transition Dyson's logistics services to a new third-party provider.

14.     As a result of the supply chain network study conducted by Cascade, Dyson decided to relocate its distribution center operations for the United States to the areas surrounding Reno, Nevada and Memphis, Tennessee (the "Distribution Centers").

4852-7000-2254, v. 4

15.     On or around September 14, 2016, Dyson issued a US Logistics 3PL Selection Request for Proposal (the "Dyson RFP") to syncreon and others.[1]

16.     The Dyson RFP sought candidates to receive and process Dyson finished products inbound from Dyson manufacturers, store those products, and supply Dyson finished products outbound to two distinct channels of Dyson customers: (1) distributors, retailers, and professionals that resold the Dyson products ("DRP"), and (2) direct to consumers that purchased Dyson products directly from the Dyson website ("D2C").

17.     Prior to issuing the Dyson RFP, Expeditors International of Washington, Inc. ("Expeditors") provided the same or similar third-party logistics services at issue in this lawsuit to Dyson.

18.     On information and belief, Expeditors was Dyson's first, and only other third-party logistics provider for the United States.

19.     The Expeditors' facilities were located in Roselle, Illinois and Sumner, Washington.

20.     During the time that Expeditors provided logistics services to Dyson, neither Dyson nor Cascade were permitted access to Expeditors' facilities to observe Expeditors' operations.

21.     During the RFP process, Dyson or Cascade did not disclose that neither had access to Expeditors' facilities to observe the operations of the services it sought to describe in an RFP and transfer to a new third-party service provider.

22.     syncreon submitted a response to the Dyson RFP on or around October 17, 2016.

---

[1] The Dyson RFP and all associated documents, including syncreon's RFP response, are Confidential and are in Dyson's possession.

23.     In December 2016, Dyson issued an RFP Addendum and requested candidates evaluate condensing the implementation timeline by two months so the new Distribution Centers could start receiving and storing Dyson inventory at the beginning of April 2017, rather than the beginning of June 2017, and start filling outbound sales orders to Dyson customers by mid-April 2017, rather than mid-June 2017.

24.     On information and belief, Dyson condensed the implementation timeline because Dyson's previous service provider, Expeditors, informed Dyson that it would vacate its distribution centers by May 31, 2017, and all Dyson inventory had to be transitioned to the new service provider before May 31, 2017.

25.     During the RFP phase, Dyson represented to syncreon that Dyson's relationship with Expeditors was poor, and that Dyson needed out of the relationship.

26.     The condensed implementation timeline accelerated material events included in the Dyson RFP Transition Plan that were required to occur prior to launch, such as:

- complete facilities and equipment fit-up and installation by May 22, 2017,
- complete IT system set-up and configuration by May 26, 2017,
- complete and approve set of personnel work instructions (e.g. receiving, put-away, cycle counting, picking, packing, shipping, etc.) by May 26, 2017,
- complete hiring of personnel to support Dyson workload by May 30, 2017,
- complete "Train-the-Trainer" training by May 30, 2017,
- complete training of personnel to support Dyson and testing by June 2, 2017

27.     syncreon agreed to the condensed implementation timeline but cautioned Dyson that timely and accurate information would be required in order to transition the services to syncreon and launch two new Distribution Centers in the condensed time period.

28.     Dyson agreed to work with syncreon to achieve the condensed implementation timeline despite syncreon's warnings.

29.     Dyson failed to live up to its end of the bargain, failed to provide timely and accurate information to syncreon, and instead of working with syncreon to remedy Dyson's failures, Dyson ultimately, and prematurely, transitioned the 3PL business back to its previous service provider, Expeditors.

**A. Dyson 3PL Business Awarded to syncreon and Business Requirements Workshop.**

30.     On January 17, 2017, Dyson awarded the 3PL business to syncreon.

31.     From January 24-27, 2017, the parties held a business requirements workshop at Dyson's offices to discuss the scope and requirements of the Dyson 3PL business.

32.     Dyson made the following representations to syncreon regarding the scope and requirements of the business:

    a.  that there would be routing guide requirements for twenty-nine (29) Dyson retailer customers (routing guides detail specific requirements for filling outbound orders to retailer customers);

    b.  that all existing Dyson inventory would be transitioned  from Expeditors to syncreon palletized and storage ready, and syncreon would only be required to scan incoming product serial numbers;

    c.  that Dyson would timely provide syncreon examples of and specifications for shipping documents syncreon was required to generate for outbound shipments to Dyson retailers so that syncreon could format its IT system to generate the required documentation to fill Dyson retailer orders.

    d.  that Dyson product could be palletized and floor-stacked, 4 high;

    e.  that product volumes would be at levels expressed in the Dyson RFP.

33.     Each of the following representations was false:

    a.  that there would be routing guide requirements for twenty-nine (29) Dyson retailer customers (routing guides detail specific requirements for filling outbound orders to retailer customers);

    b.  that all existing Dyson inventory would be transitioned  from Expeditors to syncreon palletized and storage ready, and syncreon would only be required to scan incoming product serial numbers;

    c.   that Dyson would timely provide syncreon examples of and specifications for shipping documents syncreon was required to generate for outbound shipments to Dyson retailers so that syncreon could format its IT system to generate the required documentation to fill Dyson retailer orders.

    d.   that Dyson product could be palletized and floor-stacked, 4 high;

    e.   that product volumes would be at levels expressed in the Dyson RFP.

34.    Dyson rejected syncreon's proposal to install racking at the syncreon Distribution Centers, and instead instructed that all Dyson product would be stored by floor stacking Dyson pallets 4-high.

35.    The Logistics, Warehousing, and Fulfillment Master Services Agreement between Dyson and syncreon was entered into approximately one week after the business requirements workshop, on February 8, 2017 (the "MSA"). *See* Doc. #1-1.

36.    The MSA was to remain in effect until October 31, 2020, unless terminated earlier in accordance with the provisions of the MSA.

37.    syncreon incurred substantial costs to procure Distribution Centers in Sparks, NV (near Reno) and Olive Branch, MS (near Memphis, TN), equipment, and other items in order to provide third-party logistics services to Dyson for the full term of the MSA. *See* Doc. #1-1, ¶ 2.1.

**B. Inbound Operations and Out-of-Scope Requirements Begin.**

38.    On or around April 3, 2017, syncreon's Olive Branch Distribution Center began inbound receipt of Dyson inventory being transferred from Expeditors' (the "launch date").

39.    The following week, syncreon's Reno Distribution Center began inbound receipt of Dyson inventory.

40.    Around the same time, syncreon also began to receive floor-loaded (un-palletized) ocean containers of Dyson product from Dyson's overseas product manufacturers.

41. During week one of operations, representatives from Dyson UK were on-site at the Distribution Centers and questioned why there was no racking installed.

42. After being informed that Dyson rejected syncreon's proposals to install racking and instead instructed syncreon to floor stack pallets 4-high, Dyson required that syncreon reconfigure and re-palletize 100% of the inventory transitioned from Expeditors so that it could be floor stacked.

43. syncreon was required to tear-down 100% of the palletized inventory received from Expeditors and reconfigure and re-palletize all products.

44. The only work instruction communicated before the launch date regarding the transition of inventory from Expeditors was that syncreon would be required to scan the serial numbers of product that would be palletized and ready for storage. syncreon relied on these representations for planning purposes, including labor requirements.

45. The unanticipated out-of-scope work created by this undisclosed requirement was substantial; for example, Dyson planned to transition approximately 600 pallets of inventory to syncreon's Olive Branch Distribution Center per day during the first two weeks of operations, all of which was required to be broken down, reconfigured, and re-palletized.

46. Pursuant to section 1.6 of Exhibit D to the MSA, Dyson was required to approve all work instructions before the launch date.

47. However, the standards to which syncreon was required to reconfigure and re-palletize 100% of the inventory transitioned from Expeditors was not pre-approved, the standards were undefined, and the instructions made up by Dyson on the fly and constantly changing depending on the Dyson product.

4852-7000-2254, v. 4

48.     Additionally, the reconfiguration standards provided to syncreon were not consistent; different Dyson representatives provided different instructions on how the inventory transitioned from Expeditors should be reconfigured.

49.     Representatives from Dyson UK required pallets be reconfigured pursuant to European specifications that did not work for U.S. pallets of different size.

50.     Reconfiguring U.S. pallets to European specifications, as required by Dyson, caused incorrect weight distribution between the pallets once the pallets were floor-stacked, as required by Dyson, which caused damage to Dyson product packaging on the pallets and created health and safety issues in the Distribution Center.

51.     The reconfiguration standards provided by Dyson required that product boxes be configured on a pallet inconsistent with how the product box was engineered to bear weight, which caused damaged to Dyson product packaging and created health and safety issues in the Distribution Center.

52.     The out-of-scope, undefined, inconsistent, and evolving Dyson product configuration and palletization standards also materially slowed inbound receipt, processing, and palletization of floor-loaded ocean containers from Dyson manufacturers.

53.     As inbound product accumulated, health and safety issues arose related to floor stacking pallets 4-high, such as packaging failing, and unstable and leaning pallet stacks.

54.     syncreon and third-party logistics consultants eventually agreed that pallets could not be stacked 4-high and Dyson agreed to move to stacks of 2 or 3 pallets.

55.     Decreasing the pallet stack height substantially increased the footprint of the storage space required for the Dyson product, and further congested existing space on the Distribution Center floor.

56. At additional cost to syncreon, syncreon was required to acquire additional space in the Distribution Center to accommodate the larger footprint of Dyson product in combination with other ongoing changing specifications and demands from Dyson.

57. As a result of the substantial additional work created by reconfiguring and re-palletizing 100% of the inventory transferred from Expeditors, as well as palletizing floor-loaded ocean containers, both according to undefined, inconsistent, and changing Dyson standards, the timeline to transition all Dyson inventory from Expeditors to syncreon was expanded from May 15, 2017, to June 15, 2017.

58. Originally Dyson required a condensed implementation timeline and April 3, 2017, launch date because Expeditors was vacating its facilities by May 31, 2017.

59. On information and belief, after realizing that the out-of-scope inventory transfer requirements imposed by Dyson delayed the inventory transfer into June 2017, Dyson and Expeditors negotiated a deal whereby Expeditors would continue to provide certain third-party logistics services to Dyson beyond May 31, 2017.

**C. Outbound Operations Begin and Additional Out-of-Scope Requirements are Imposed.**

60. Approximately two weeks after the launch date, outbound shipments to Dyson customers began from syncreon's Distribution Centers.

61. June 26, 2017, was the original target date to start outbound shipments from the syncreon Distribution Centers.

62. As outbound operations began, syncreon discovered that Dyson failed to provide syncreon with timely or correct information required to process and prepare outbound shipments to Dyson's retailer customers.

63. In order to fill outbound orders, syncreon was required to generate shipping documents specific and unique to Dyson's retailer customers' requirements.

64. Dyson committed to providing syncreon with timely examples and specifications for the specific shipping documents syncreon was required to generate.

65. Dyson failed to provide syncreon with timely examples and specifications for the specific shipping documents syncreon was required to generate.

66. While Dyson did provide some examples and specifications of shipping documents for some of its retailer customers, those examples and specifications were obsolete and incorrect.

67. In some instances, Dyson even approved shipping documents that were based on incorrect information provided by Dyson that did not contain all content required by Dyson's retailer customer.

68. syncreon discovered that Dyson provided and approved obsolete and incorrect information only after syncreon had formatted its IT systems, created shipping documents based on information provided by Dyson, and in some instances processed and prepared outbound shipments according to the information provided.

69. In addition to generating shipping documents specific to Dyson's retailer customers' requirements, syncreon also was required to generate Electronic Delivery Information ("EDI") messages to send to retailer customers for outbound loads that contained specific content based on the unique requirements of the particular Dyson retailer customer.

70. Dyson also gave syncreon incorrect information for the required content of EDI retailer messaging.

71. Dyson signed off on and approved incorrect retailer EDI requirements.

72.     syncreon did not discover that Dyson provided incorrect EDI information until after outbound operations began and retailers began rejecting EDI messages from syncreon.

73.     Dyson was not capable of providing syncreon with the requisite information to properly process an outbound shipment to Dyson's own retailer customers, and syncreon was ultimately required to obtain that information on its own.

74.     Dyson's inability to provide syncreon with accurate customer shipping and labeling requirements is a breach of section 2.10.3.8 of Exhibit D to the MSA, which required Dyson to "provide a detailed list of specific customer shipping and labeling requirements."

75.     Moreover, Dyson represented that there would be retailer routing guide requirements for 29 Dyson retailer customers while in reality there were specific routing requirements for approximately 50 Dyson retailer customers.

76.     Dyson also provided inconsistent direction on how retailer routing guide requirements should be interpreted.  In some instances, syncreon prepared outbound shipments based on one interpretation, only to have a different Dyson representative provide a different interpretation which required that the outbound load be reprocessed.

77.     In addition to routing requirements from Dyson's retailers, Dyson also imposed certain out-of-scope specific outbound order fulfillment requirements of its own.

78.     During the RFP phase, syncreon specifically asked Dyson for a copy of any Dyson specific outbound requirements.

79.     Dyson first provided a draft of its specific outbound standards on March 27, 2017, only one week before the launch date.

80.     Dyson specific outbound standards dictated how certain Dyson products were packaged or palletized depending on which retailer customer would receive the product being shipped.

81.     The specific outbound standards impacted the vast majority of outbound shipments from the syncreon Distribution Centers.

82.     During the launch period of April and May 2017, Dyson specific outbound requirements changed several times from what was communicated on March 27, 2017.

83.     In some instances the justification for the Dyson specific outbound standards were not clear.  For example, Amazon, a large Dyson retailer customer agreed that syncreon did not need to label each product box included in outbound shipments to Amazon (as required by Dyson), and that syncreon could simply label every pallet.

84.     Additionally, although not required by Costco's routing guide, Dyson required syncreon to place a shroud over all pallets that were shipped to Costco.

85.     The "specification" for how a completed Costco pallet, with shroud, should look was drawn by a Dyson representative on a cigarette box and provided to syncreon.

86.     At the same time that syncreon was forced to address (1) the operational impact of reconfiguring and re-palletizing 100% of inbound inventory transferred from Expeditors according to Dyson's undefined standards, syncreon was also required to (2) attempt to fill outbound shipments with obsolete and incorrect information, and (3) according to Dyson specific outbound standards that syncreon had received for the first time only a few weeks earlier.

87.     These unanticipated and out-of-scope requirements materially impacted syncreon's outbound operations and by the end of May 2017 Dyson transitioned certain Dyson retailer

customers back to Expeditors, thereby depriving syncreon of a large basis for the Dyson 3PL business and the benefit of its bargain.

**D. The Out-of-Scope Dyson Special Projects Required During the Launch Period.**

88.    In addition to adding out-of-scope requirements being realized on the (1) inbound and (2) outbound side of operations within the first weeks of launch, during that same time period Dyson also required that (3) syncreon perform additional out-of-scope "Special Projects."

89.    "Special Projects" comprise a separate scope of work in addition to processing Dyson products inbound, storing, and filling outbound shipments.

90.    Appendix 9 to the Dyson RFP outlined twenty-five (25) Special Projects covering 270,463 pallets.

91.    Of those twenty-five (25) Special Projects, five were for "displays" covering 19,092 pallets across five different retailers and one was applying shrouds to 801 pallets for Costco.

92.    The MSA provides that "From time to time, Dyson may require [syncreon] to provide special project support or procedures with respect to the Distribution Center Services. *Dyson shall notify [syncreon] in writing of such requirements or procedures."  See* Doc. #1-1, MSA, ¶ 1.2 (emphasis added).

93.    Prior to the April 3, 2017, launch date, syncreon advised Dyson to leave a Costco Special Project with Expeditors and not to send it to syncreon during the first month of a condensed implementation at two different Distribution Centers.

94.    Dyson refused and said that it could not, and would not, leave the Costco Special Project with Expeditors.

95.    In addition to the Costco Special Project, during the launch period, Dyson also required that syncreon complete Special Projects for QVC and Lowes.

96.     Dyson materially understated the complexity and volume of these Special Projects and failed to notify syncreon in writing of the requirements or procedures for the Special Projects.

97.     Dyson retailers placed orders for the Special Projects before routing guides and requirements were approved between syncreon and Dyson.

98.     For example, rather than simply applying shrouds to 801 pallets for Costco, the Costco Special Project required syncreon to (1) source custom "chep" pallets for retail display at Costco stores; (2) build and place cardboard inserts on top of each Costco pallet; (3) configure Dyson products on the Costco pallet for retail display at Costco stores; and (4) custom fit cardboard shrouds over top of pallet to disguise the Dyson product in transit to the Costco stores.

99.     The volume of these unique Special Projects also was severely understated by Dyson and actually accounted for 44% of all volume of outbound shipments during the launch period.

**E. The Effect of Unanticipated and Out-of-Scope Requirements was Compounded by Higher than Forecasted Volumes.**

100.    The RFP included volume forecasts for inbound and outbound shipments.

101.    syncreon relied upon the forecasts in the RFP for planning purposes, including labor requirements.

102.    Beginning on the launch date, overall volumes were much higher than forecasted or anticipated, and were at actual levels not expected to be experienced until years 2 and 3 of the MSA based on forecasts provided.

103.    The Dyson RFP provided historical shipping data along with forecast information.

104.    The MSA also provided a "Sales Forecast" itemizing forecasted volumes and provided that syncreon would not "ramp up" to full volume until May 31, 2017.

4852-7000-2254, v. 4

105.    On information and belief, increased volumes at the syncreon Distribution Centers was caused by Expeditors vacating its facilities earlier than anticipated and thereby requiring Dyson to rely on syncreon for full volume immediately, rather than transitioning volume to syncreon.

106.    Not only did Dyson substantially increase the scope of the required operations, Dyson also "opened the flood gates" in terms of volume.

107.    syncreon's direct labor requirements and costs increased significantly as a result of the out-of-scope and unanticipated (1) inbound and (2) outbound processing requirements, and (3) Special Projects required to be completed during the launch period, and those impacts were compounded as a result of higher than anticipated volumes.

108.    Faced with the constantly changing and expanding scope of work based on misrepresentations and incorrect information provided by Dyson, syncreon acted in good faith and did everything that it could to meet Dyson's requirements.

109.    syncreon flew in managerial and executive resources from all over the globe to assist with operations at its Distribution Centers and address the expanded scope of work created by the undisclosed out-of-scope requirements and higher than forecasted volumes.

110.    syncreon also hired labor support from third parties to help address the expanded scope of work created by the undisclosed out-of-scope requirements and higher than forecasted volumes.

111.    Dyson acknowledged that there was no lack of commitment from syncreon to attempt to address the operational issues created by Dyson's failure to adequately describe the scope of its third-party logistics operations, or to provide timely or correct information to syncreon.

4852-7000-2254, v. 4

112.     During the launch period, Dyson terminated its relationship with Cascade and hired KPMG as a third-party logistics consultant.

113.     KPMG acknowledged the fault of Dyson and Cascade resulting from omissions in the Dyson RFP relating to the completeness of descriptions of processing required in the operation.

114.     KPMG recognized the operational difficulties caused by Dyson and Cascade's failure to alert syncreon to the deficiencies in the description of work until well after the MSA was executed and only one week before operations commenced, in the midst of an already condensed implementation timeline.

**H.  Dyson Breaches the MSA by Pulling All Business From syncreon.**

115.     Despite syncreon's efforts, the commercial impact of the additional and substantial out-of-scope requirements was that syncreon needed to re-price and re-engineer its facility and labor to support the actual, previously-undisclosed requirements of the Dyson business in the long term.

116.     Three months after launch, in July 2017, syncreon advised Dyson that the business should be re-launched so that syncreon could re-price and re-engineer its facility and labor to support the actual requirements of the Dyson business in the long term.

117.     Dyson responded by advising syncreon that it was pulling all business from syncreon and transitioning back to Expeditors.

118.     Prior to advising syncreon that Dyson was transitioning all business back to Expeditors, Dyson did not provide syncreon notice of any alleged breach or termination of the MSA, and made no attempt to resolve any alleged breach pursuant to Dyson's obligations under the MSA.

4852-7000-2254, v. 4

119.     Because Dyson did not provide syncreon notice of any breach or termination of the MSA prior to advising syncreon that Dyson was transitioning all business back to Expeditors, syncreon had no opportunity to cure any purported breach as required by the MSA.

120.     Dyson's course of conduct clearly demonstrates that Dyson had no intention of fulfilling its obligations to syncreon under the MSA, that Dyson did not understand the scope of its required services when the business was transitioned away from Expeditors, and that Dyson had set up the launch by syncreon for failure.

121.     After Dyson advised syncreon that it was pulling all business from syncreon and transitioning back to Expeditors, syncreon in good faith offered to enter into a Transition Agreement with Dyson, which outlined syncreon's costs to and obligations incurred to perform under the Agreement and that were also associated with Dyson's breach of the MSA.

122.     Dyson rejected and refused to enter into the proposed Transition Agreement.

123.     Subsequently, Dyson filed this lawsuit against syncreon without having provided syncreon notice of any purported breach of the MSA, or providing syncreon with any opportunity to cure such a breach, as required by the terms of the MSA.

## COUNT I
## BREACH OF CONTRACT

124.     syncreon re-alleges and incorporates each and every preceding allegation of this Counterclaim as if set forth herein.

125.     Dyson and syncreon are parties to the MSA.

126.     syncreon substantially performed its obligations under the MSA.

127.     Dyson's breaches of the MSA include but are not limited to the following , failing to provide Dyson with documented and approved work instructions in advance of the launch date as required by Exhibit D section 1.6 of the MSA; rejecting syncreon's proposals to install racking

at the syncreon facilities, instead requiring syncreon to floor stack Dyson pallets 4-high in violation of sections 2.4.3, 2.6.3.1, and 2.6.7 of Exhibit D to the MSA and to reconfigure and re-palletize all inventory transitioned from Expeditors in a futile attempt to stack Dyson pallets 4-high; failing to provide an accurate detailed list of specific customer shipping and labeling requirements, failing to provide syncreon special instructions for handling, packaging, shipping, routing or other requirements through an electronic data interface (EDI) as required by section 2.10.3.8 of Exhibit D to the MSA; failing to notify syncreon in writing of the requirements or procedures for the Special Projects that Dyson required during the launch period as required by section 1.2 of the MSA; and by failing to provide syncreon with notice of any alleged breach or termination of the MSA, or any opportunity to cure any alleged breach as required by section 2 of the MSA, before Dyson transitioned the business away from syncreon and back to Expeditors.

128.    Dyson's conduct as described herein also constitutes a breach of the implied covenant of good faith and fair dealing.

129.    As a direct result of Dyson's misrepresentations and breaches of the MSA, syncreon has suffered damages.

**COUNT II**
**UNJUST ENRICHMENT**

130.    syncreon re-alleges and incorporates each and every preceding allegation of this Counterclaim as if set forth herein.

131.    Through performance of services outside the scope of the terms of the MSA, syncreon conferred a benefit on Dyson.

132.    Despite repeated requests from syncreon for payment for the performance of services outside the scope of the MSA, by failing to compensate syncreon for the performance of

services outside the scope of the MSA, Dyson has wrongfully retained the benefit of those services, to syncreon's detriment.

133.     Dyson's retention of that benefit violates fundamental principles of justice, equity, and good conscience and Dyson must compensate syncreon for the performance of services outside the scope of the MSA.

## COUNT III
## PROMISSORY ESTOPPEL

134.     syncreon re-alleges and incorporates each and every preceding allegation of this Counterclaim as if set forth herein.

135.     Dyson made unambiguous promises to syncreon to pay syncreon for the performance of services outside the scope of the terms of the MSA.

136.     In performing services outside the scope of the MSA, syncreon relied on Dyson's promises to pay syncreon for the performance of services outside the scope of the MSA.

137.     syncreon's reliance on Dyson's promises was expected and foreseeable by Dyson.

138.     syncreon's reliance on Dyson's promises to pay syncreon for the performance of services outside the scope of the MSA was to syncreon's detriment because Dyson has failed to pay syncreon for the performance of such services.

## COUNT IV
## NEGLIGENT MISREPRESENTATION

139.     syncreon re-alleges and incorporates each and every preceding allegation of this Counterclaim as if set forth herein.

140.     In connection with the transition of the Dyson third-party logistics business to syncreon, Dyson made numerous false statements of material fact related to the scope and requirements of that business.

141.    Dyson was careless or negligent in ascertaining the truth of the statements made by Dyson related to the scope and requirements of the third-party logistics business.

142.    Dyson owed syncreon a duty to communicate accurate information pertaining to the scope and requirements of the third-party logistics business so that syncreon could adequately price and prepare to meet the needs of the Dyson business.

143.    By making the false statements of material fact related to the scope and requirements of the Dyson third-party logistics business, Dyson intended to induce syncreon to act.

144.    syncreon reasonably relied on the truth of Dyson's statements related to the scope and requirements of the Dyson third-party logistics business.

## COUNT V
## DECLARATORY JUDGMENT

145.    syncreon re-alleges and incorporates each and every preceding allegation of this Counterclaim as if set forth herein.

146.    syncreon is entitled to a declaratory judgment finding:

   a.   syncreon did not agree to terminate the MSA between the parties absent Dyson's agreement to a full transition agreement;

   b.   Dyson's purported notice of termination of the MSA dated August 30, 2017, is an ineffective notice of termination with cause by Dyson; and

   c.   due to Dyson's termination of the MSA without cause, Dyson shall pay for any completed Services received from syncreon before the effective date of termination (120 days from August 30, 2017), as well as syncreon's start-up and capital expenses and damages for breach.

4852-7000-2254, v. 4

147.   There is an actual case and controversy between Dyson and syncreon wherein Dyson contends that "the parties recently agreed to terminate the agreement."  Doc. #1, ¶8.

148.   syncreon did not agree to terminate the MSA between the parties absent Dyson's agreement to a full transition agreement.

149.   Dyson's purported notice of termination of the MSA dated August 30, 2017, is an ineffective notice of termination with cause by Dyson because it references a non-existent agreement to terminate the MSA and fails to provide notice of any alleged breach of the MSA by syncreon.

150.   Dyson's purported notice of termination of the MSA dated August 30, 2017, can only be construed as a termination without cause pursuant to ¶2.2.2 of the MSA which requires that "Dyson shall pay for any completed Services received from [syncreon] before the effective date of termination [120 days from August 30, 2017,] as well as [syncreon's] Start-Up and Capital Expenses …."

**WHEREFORE**, syncreon prays for a judgment in favor of syncreon and an award of monetary damages in an amount to be determined, together with pre-judgment and post-judgment interest on such amount, and any other or alternative relief that this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), syncreon respectfully demands a trial by jury on all matters raised in the pleadings filed in this case.

Dated: October 24, 2017                              Respectfully submitted,

HOWARD & HOWARD ATTORNEYS PLLC

/s/ *David C. Van Dyke*
One of Defendant's Attorneys

David C. Van Dyke
Emily E. Bennett
Howard and Howard Attorneys, PLLC
200 S. Michigan Ave., Ste. 1100
Chicago, IL 60604
(312) 372-4000
email: dvd @h2law.com
email: eeb@h2law.com

## CERTIFICATE OF SERVICE

I, David C. Van Dyke, hereby certify that on October 24, 2017, I caused a copy of the foregoing to be served by filing the foregoing electronically through the CM/ECF system, which caused a Notice of Electronic Filing to the parties registered to the Court's CM/ECF system for this action.

Dated: October 24, 2017         */s/     David C. Van Dyke*

David C. Van Dyke
Emily E. Bennett
Howard and Howard Attorneys, PLLC
200 S. Michigan Ave., Ste. 1100
Chicago, IL 60604
(312) 372-4000
email: dvd @h2law.com
email: eeb@h2law.com

4852-7000-2254, v. 4