**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DYSON, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 17 C 6285** |
| | ) | |
| **SYNCREON TECHNOLOGY (AMERICA), INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Dyson, Inc. has sued Syncreon Technology (America), Inc., alleging that

Syncreon breached its contract to provide third-party logistics services to Dyson. Dyson

also alleges that Syncreon committed fraud, fraudulent inducement, and conversion.

Syncreon has counterclaimed, alleging breach of contract, unjust enrichment, and

promissory estoppel. Both parties have moved for summary judgment—Syncreon on all

of Dyson's claims, and Dyson on various aspects of Syncreon's counterclaim.

## Background

The following facts are undisputed except where otherwise noted. Dyson is an

Illinois company that designs and manufactures vacuum cleaners and other home

goods. Rather than handle the distribution of its inventory in-house, Dyson contracts

with third-party providers of logistics services. In 2016, it decided to terminate its

agreement with the company that had previously served as its logistics provider. After

issuing a request for proposals, Dyson settled on Syncreon as its new logistics provider.

The two companies executed a master services agreement in February 2017.

The arrangement was short-lived. Both parties acknowledge that the process of transitioning Dyson's business to Syncreon was plagued with difficulties, though they disagree about why. Among other problems, Dyson alleges that deliveries were delayed and incorrectly shipped, customers were improperly billed, and Syncreon's record-keeping and labeling were deficient. In May 2017, Dyson began transferring some of its business back to its previous logistics provider, and by July it decided to terminate the agreement with Syncreon entirely.

The two companies discussed the possibility of entering a written transition agreement, and Syncreon even drafted a proposed agreement. Dyson alleges that, in an effort to coerce Dyson into accepting the proposal, Syncreon refused to return some of Dyson's inventory under the pretext of conducting a full inventory analysis. Dyson ultimately rejected Syncreon's proposal, however, and the parties never executed a written contract to modify the master services agreement or formally terminate their relationship.

Dyson commenced this suit in August 2017. It alleges that Syncreon breached the master services agreement by committing serious errors and failing to devote adequate resources to the performance of its contractual obligations. Dyson also alleges that Syncreon committed fraud by making false statements about its capabilities to induce Dyson to enter into the master services agreement and that Syncreon converted Dyson's goods by refusing to return them after the contract had terminated. Syncreon filed a counterclaim, alleging breach of contract, unjust enrichment, and promissory estoppel.

Syncreon has moved for summary judgment on all of Dyson's claims.  Dyson has also filed a motion for partial summary judgment on counts 2 and 3 of the counterclaim (unjust enrichment and promissory estoppel) and to bar certain categories of damages. For the reasons stated below, the Court denies both motions.

**Discussion**

"Summary judgment is proper where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 886 (7th Cir. 2019) (internal quotation marks omitted).  In considering a motion for summary judgment, the Court construes all facts and draws all reasonable inferences "in favor of the party against whom the motion under consideration was filed." *Id.*  The party opposing summary judgment must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019).

**A.     Syncreon's motion for summary judgment**

      **1.     Fraud claims**

Syncreon argues that it is entitled to summary judgment on Dyson's claims for fraud and fraudulent inducement because the master services agreement contains a "no-reliance" clause that prevents Dyson from establishing that it justifiably relied on Syncreon's alleged misrepresentations.  Syncreon also contends that the allegedly fraudulent statements are expressions of opinion, not statements of material fact. Finally, it argues that the fraud claims are barred because they substantially overlap with Dyson's claim for breach of contract.

### a. No-reliance clause

Because fraud claims under Illinois law require the plaintiff to show that it justifiably relied on the defendant's misrepresentations, a clause in a contract stating that the parties did not rely on any representations or promises outside the contract bars claims of fraud. *ADM All. Nutrition, Inc. v. SGA Pharm Lab, Inc.*, 877 F.3d 742, 749–750 (7th Cir. 2017). Both the Seventh Circuit and the Illinois Appellate Court have held that an integration clause—i.e., a provision stating that the contract represents the full and complete agreement of the parties—does not by itself constitute a no-reliance clause for the purposes of defeating a fraud claim. *See Vigortone Ag Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644–45 (7th Cir. 2002); *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 760, 814 N.E.2d 960, 968 (2004) ("As a general rule, an integration clause will not preclude a plaintiff from relying upon extrinsic evidence in order to establish a cause of action for fraud.").

Syncreon argues that the master services agreement contains a no-reliance clause and that Syncreon is therefore entitled to summary judgment on Dyson's fraud claims. In relevant part, section 23.12.1 of the contract reads,

> This Agreement, including all Exhibits, and Attachments, hereunder, constitutes the entire agreement between the parties in connection with the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, between the parties.

Master Services Agreement, Def.'s Ex. 8, dkt. no. 153-9, § 23.12.1. Syncreon argues that the clause's reference to "all prior . . . understandings" broadly disclaims reliance on any extra-contractual representations and thus makes section 23.12.1 a no-reliance clause.

Syncreon's argument is unavailing because section 23.12.1 does not disclaim

reliance. What differentiates a no-reliance clause from an integration clause is that a no-reliance clause specifically indicates that the parties have not *relied* on any extra-contractual representations in agreeing to the contract. *See Vigortone*, 316 F.3d at 645 (noting that the disputed contractual provision was "a standard integration clause" because it "contains no reference to reliance"); *Mukite v. Advocate Health & Hosps. Corp.*, No. 15 C 7604, 2016 WL 4036755, at *5 (N.D. Ill. July 28, 2016) (explaining that a contract did not include a no-reliance clause because it did not "warrant, represent, declare, or acknowledge that the parties relied only on the representations set forth in the Agreement"). No reference to reliance—or any synonyms thereof—appears in section 23.12.1. And the use of the word "understandings" does not meaningfully differentiate the clause in this case from a standard integration clause. As the Seventh Circuit explained in *Vigortone*, the purpose of an integration clause is to "prevent[] a party to a contract from basing a claim of breach of contract on agreements or *understandings*, whether oral or written, that the parties had reached during the negotiations. . . ." *Vigortone*, 316 F.3d at 644 (emphasis added). That is precisely what section 23.12.1 does.

Because the provision of the master services agreement on which Syncreon relies is solely an integration clause, it does not preclude Dyson's fraud claims.

### b. Material falsehoods

Syncreon next argues that it is entitled to summary judgment because the misrepresentations it allegedly made to Dyson are not actionable as fraud. At the threshold, however, Syncreon argues that Dyson is precluded from relying on any of Syncreon's statements other than those specifically alleged in Dyson's amended

complaint. Syncreon rests its argument on Federal Rule of Civil Procedure 9(b), which requires that a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." It also points to the Seventh Circuit's decision in *Kennedy v. Venrock Associates*, 348 F.3d 584 (7th Cir. 2003), in which the court noted that the purpose of Rule 9(b) "is thwarted by the filing of a stealth complaint in which allegations of fraud are avoided only to be added later by way of brief or other filing." *Id.* at 594.

But Rule 9(b) is a rule of pleading, not a rule of evidence. *Cf. Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) (noting that "[h]eightened pleading requirements apply to complaints alleging fraud" and explaining that the reason for this rule is that "[g]reater precomplaint investigation is warranted in fraud cases"). Syncreon cites no cases applying Rule 9(b) to preclude consideration of allegedly fraudulent statements at the summary judgment stage merely because they were not specifically mentioned in the pleadings. Nor has Syncreon alleged that the disclosure of these statements during discovery, rather than in the complaint, had any prejudicial effect. The Court concludes that excluding those statements under Rule 9(b) would be inappropriate.

Syncreon also argues that even if the Court considers all of its alleged misrepresentations, it is entitled to summary judgment because no reasonable jury could find that the statements at issue were material factual misrepresentations. In response, Dyson points to eight categories of statements that it contends are false statements of fact. Syncreon contends that none of these statements constitutes actionable fraud for one or more of the following reasons: the statements are mere

opinion or puffery; they are immaterial; or a jury could not reasonably find that they are false.

### i. Opinion and puffery

Syncreon argues that many of the statements that Dyson cites in its motion constitute statements of opinion that are not actionable as fraud under Illinois law. *See Antonacci v. Seyfarth Shaw, LLP*, 2015 Il App (1st) 142372, ¶ 35, 39 N.E.3d 225, 238 ("A statement of opinion . . . cannot form the basis of an action for fraudulent misrepresentation."). Specifically, it contends that many of these statements amount to "puffing," meaning "exaggerations reasonably expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined." *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 73, 879 N.E.2d 910, 926 (2007).

But many of the statements Syncreon characterizes as mere puffery are in fact specific representations of fact whose truth or falsity can be demonstrated. These include Syncreon's alleged statements that it had substantial experience working in retail supply chain logistics; its IT system had particular functional capabilities; and it had successfully completed business launch and facilities transition projects for other well-known companies. Because it was reasonable for Dyson to interpret these statements as factual representations about Syncreon's experience and capacity to provide retail logistics services, they are actionable as fraud. *See Thacker v. Menard, Inc.*, 105 F.3d 382, 386 (7th Cir. 1997) ("Opinions or ambiguous statements by the salesperson may be considered as factual representations if it would be reasonable for the other party to treat it as such.").

Syncreon is correct, however, that other allegedly false statements cannot form the basis of a fraud claim. "A statement which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities, rather than to pre-existent or present facts, ordinarily does not constitute an actionable misrepresentation under Illinois law." *Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1298 (7th Cir. 1993) (internal quotation marks omitted). The allegedly fraudulent statements that fall into this category are Syncreon's statements that its warehouse facilities would be able to meet Dyson's needs,[1] its predictions about meeting the launch timeline, and its statements about its ability to improve its performance after a fraught initial launch. These statements constitute opinions, predictions, or expressions of aspiration that are not actionable as fraud.

Dyson also argues, however, that Syncreon's promises about its ability to perform on the contract are actionable under a theory of promissory fraud. "[P]romissory fraud, involving a false statement of intent regarding future conduct, is generally not actionable under Illinois law unless the plaintiff also proves that the act was part of a scheme to defraud." *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007). To withstand summary judgment on a promissory fraud theory, therefore, Dyson must point to evidence from which a jury could reasonably find that Syncreon had no intention to fulfill its promises at the time it made them. *See id.* Dyson must also present evidence supporting a reasonable inference that Syncreon

---

[1] Dyson also emphasizes Syncreon's statement that its warehouses would have "similar automation" to the example warehouse it showed Dyson. But this general comparison is at most an "exaggeration[] reasonably expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined." *Barbara's Sales*, 227 Ill. 2d at 73, 879 N.E.2d at 926.

had engaged in a "scheme to defraud," which the Seventh Circuit has interpreted to mean that the misrepresentations were "particularly egregious" or "embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." *Desnick v. ABC, Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995).

Dyson points to evidence from which a reasonable jury could find that Syncreon knew it lacked the ability to perform on the contract but repeatedly promised to do so anyway. Specifically, Dyson points to e-mails and deposition testimony indicating that Syncreon did not believe its launch timeline was realistic even before it signed the master services agreement and that it knew it faced worker shortages that would prevent it from successfully implementing its improvement plan. Based on this and other evidence that Syncreon was aware of its inability to meet Dyson's logistics needs since even before the parties reached an agreement, a jury could reasonably conclude that Syncreon's promises regarding the launch timeline and its improvement plan were knowingly false when they were made and formed part of a pattern of deceptive conduct. Syncreon's predictive statements about its ability to perform on particular promises can therefore withstand summary judgment on a theory of promissory fraud.

### ii. Materiality

Syncreon also argues that its alleged misrepresentations about its retail experience were immaterial. It points out that Dyson's request for proposals did not seek logistics providers with retail experience and that the master services agreement required Dyson to provide Syncreon with information about its shipping and labeling requirements. This argument is unpersuasive, however, because a jury could

reasonably conclude that misrepresentations about Syncreon's retail experience were nonetheless material to Dyson's decisionmaking. "Facts are considered material if they would likely influence the principal's beliefs regarding the desirability of the transaction." *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 591, 948 N.E.2d 132, 156 (2011). For this reason, the fact that Dyson was open to hiring providers that lacked retail experience or chose to supply certain information to Syncreon is not dispositive. A reasonable jury could nonetheless infer that Syncreon's alleged misrepresentations— which suggested that it was particularly well-suited to serve as Dyson's logistics provider because of its relevant experience—made it appear to be a more desirable business partner and that these statements thus were material.

### iii. Falsehood

Syncreon also appears to contend that it is entitled to summary judgment with respect to its allegedly false explanation for refusing to return Dyson's inventory in August 2017 because Dyson has not pointed to sufficient evidence to permit a reasonable jury to find that its explanation was false. But Dyson cites to e-mails among Syncreon employees about the decision to conduct the inventory analysis that support a reasonable inference that the real motivation for holding on to Dyson's inventory was to gain leverage in their negotiations over a possible termination agreement. Syncreon emphasizes the undisputed fact that it *did* conduct the inventory analysis, but this fact alone is not sufficient for summary judgment; Dyson contends not that Syncreon lied about conducting the analysis but rather that it lied when it said the *purpose* of retaining the inventory was to conduct the analysis. That is, a reasonable jury could conclude that Syncreon took stock of Dyson's inventory but that it did so with ulterior motives.

Syncreon is therefore not entitled to summary judgment on this basis.

###### c.    Overlap with contract claims

Syncreon's final argument for summary judgment on Dyson's fraud claims relies on the Seventh Circuit's decision in *Greenberger v. GEICO General Insurance Co.*, 631 F.3d 392 (7th Cir. 2011).  In *Greenberger*, the court explained that under Illinois law, fraud claims must be "more than restatements of the claimed breach of contract, albeit using the language of fraud."  *Id.* at 399.  It based its decision on the Illinois Supreme Court's holding that a "breach of a contractual promise, without more, is not actionable under the [Illinois] Consumer Fraud Act."  *Id.* (quoting *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 169, 835 N.E.2d 801, 844 (2005)).  In *Avery*, the court adopted the reasoning of an Illinois Appellate Court case that held that "a deceptive act or practice involves more than the mere fact that a defendant promised something and then failed to do it.  That type of misrepresentation occurs every time a defendant breaches a contract."  *Avery*, 216 Ill. 2d at 169, 835 N.E.2d at 844 (quoting *Zankle v. Queen Anne Landscaping*, 311 Ill. App. 3d 308, 312, 724 N.E.2d 988, 993 (2000)) (internal quotation marks omitted).  And although the decision in *Avery* might seem to apply only to claims under the Illinois Consumer Fraud and Deceptive Practices Act, the Seventh Circuit in *Greenberger* applied its reasoning to common-law fraud claims as well.  *Greenberger*, 631 F.3d at 401.

Syncreon argues that it is entitled to summary judgment on Dyson's fraud claims under *Greenberger* and *Avery*.  In particular, it points to section 10.2 of the master services agreement, which states, "Vendor represents that they are sufficiently experienced, properly qualified, and equipped to perform the Services and will devote

the time, personnel and resources necessary to perform the services."  Master Services

Agreement, Def.'s Ex. 8, dkt. no. 153-9, § 10.2.  This section, Syncreon contends,

shows that all of its allegedly fraudulent misrepresentations are really unfulfilled

contractual promises and that Dyson must therefore be limited to a cause of action in

contract.

Syncreon's argument is unavailing because the doctrine of *Greenberger* and

*Avery* encompasses only fraud claims that "are nothing more than restatements of the

claimed breach of contract, albeit using the language of fraud."  *Greenberger*, 631 F.3d

at 399.  In this case, however, Syncreon's alleged fraudulent misrepresentations extend

beyond an unfulfilled promise to perform its contractual obligations.  Dyson contends,

for example, that Syncreon induced it to enter the contract by misrepresenting its

experience in retail logistics and its existing technological capacity.  Those allegedly

false statements are not promises to perform obligations under the contract, and

allowing Dyson to pursue a fraud claim based on those statements does not

supplement its breach of contract claim "with a redundant remedy."  *Id.* at 399 (quoting

*Zankle*, 311 Ill. App. 3d at 312, 742 N.E.2d at 992–93).  Rather, a jury could reasonably

find that Syncreon's statements were "affirmative acts of misrepresentation and not a

simple breach of contract."  *Id.* at 400; *see also Boyd Grp. (U.S.) Inc. v. D'Orazio*, No.

14 C 7751, 2015 WL 3463625, at *9 (N.D. Ill. May 29, 2015) (holding that *Greenberger*

did not apply to a fraud claim "premised on alleged false statements that were made

prior to the closing" of the agreement because they were "fraudulent misrepresentation

separate and apart" from the alleged breach of contract).  Summary judgment on

Dyson's fraud claims is therefore inappropriate.

### 2.     Contract claim

Syncreon argues that is entitled to summary judgment on count 3, Dyson's breach of contract claim, because no reasonable jury could conclude that Dyson terminated the contract "with cause."  The master services agreement specifies that Dyson may terminate the contract with cause if Syncreon has materially breached the agreement and Dyson provides "sixty days' prior written notice."  Master Services Agreement, Def.'s Ex. 8, dkt. no. 153-9, § 2.3.3.  Syncreon does not dispute that a jury could reasonably find that it had materially breached the agreement, but it contends that Dyson did not provide the required notice.  Syncreon argues that, under the terms of the master services agreement, Dyson's termination without cause precludes it from recovering "incidental, special, or consequential damages including without limitation, lost profits."  *Id.* § 2.2.2.

The premise underlying Syncreon's argument is flawed because a reasonable jury could conclude that notice was adequate under the circumstances to satisfy the notice requirements for termination with cause.  Dyson points to evidence that Syncreon and Dyson jointly agreed to terminate the contract on July 31, 2017.  Illinois courts have held that actual notice of termination satisfies formal notice provisions.  *See Bloom Twp. High Sch. v. Ill. Commerce Comm'n*, 309 Ill. App. 3d 163, 179, 722 N.E.2d 676, 689 (1999) ("[T]he purpose of a notice provision in either a contract or a statute is to ensure that a party is actually informed."); *Vole, Inc. v. Georgacopoulos*, 181 Ill. App. 3d 1012, 1019, 538 N.E.2d 205, 210 (1989) ("In general, the object of notice is to inform the party notified, and if the information is obtained in any way other than formal notice, the object of notice is attained.")  Syncreon does not allege that it lacked actual notice of

termination.  Indeed, Dyson points to evidence that Syncreon subsequently assented to termination by firing its warehouse employees and starting to ship Dyson's inventory to the replacement logistics provider.  This conduct not only suggests that Syncreon had actual notice, but it would also permit a reasonable jury to conclude that Syncreon waived strict compliance with the notice provisions.  *See Indianapolis Life Ins. Co. v. Lucky Stores, Inc.*, No. 90 C 2675, 1993 WL 291687, at *11 (N.D. Ill. Aug. 2, 1993) (holding that the plaintiff knowingly waived its right to enforce a formal notice provision by taking "action directly inconsistent with its assertion that the defendants' lease termination [was] invalid because it did not receive prior written notice").

Syncreon's discussion of these issues in its reply brief is limited to three perfunctory sentences that fail to respond to any of Dyson's arguments concerning actual notice or waiver.  Syncreon has thus forfeited any counter-arguments it might have made.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("[F]ailure to respond to an argument . . . results in waiver.").  The Court concludes that Syncreon has not shown that it is entitled to summary judgment on Dyson's claim for breach of contract.

### 3.    Conversion

Syncreon argues that it is entitled to summary judgment on Dyson's conversion claim under the economic loss doctrine.  The economic loss doctrine, also called the *Moorman* doctrine after *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 435 N.E.2d 443 (1982), holds that "a plaintiff may not recover solely for economic loss in tort."  *Fattah v. Bim*, 2016 IL 119365, ¶ 24, 52 N.E.3d 332, 337.  The doctrine does not apply, however, when there is "an extra-contractual duty between the parties, giving

14

rise to a cause of action in tort separate from one based on the contract itself." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 693 (7th Cir. 2011). The Seventh Circuit has considered this principle in the context of a conversion claim and noted that if a defendant breached "a common-law duty . . . that arose from a source other than the contract, the *Moorman* doctrine would not bar" the claim for conversion. *Toll Processing Servs., LLC v. Kastalon, Inc.*, 880 F.3d 820, 827 (7th Cir. 2018).

Dyson points to evidence that the parties had already terminated the master services agreement as of August 2017, when Syncreon allegedly converted Dyson's inventory. And Syncreon does not dispute that there is a common-law duty not to convert property. *See, e.g.*, *In re Karavidas*, 2013 IL 115767, ¶ 59, 999 N.E.2d 296, 310 (restating the definition of conversion under common law). Syncreon instead argues that the conversion claim is yet another recapitulation of the breach-of-contract claim, rather than being rooted in a freestanding common-law right. If a jury were to find, however, that the contract had terminated at the time that Syncreon engaged in the conduct allegedly constituting conversion, then it could conclude that Syncreon's conduct violated a duty that was wholly independent of the contract. Syncreon is therefore not entitled to summary judgment on the conversion claim.

### 4. Damages issues

Finally, Syncreon asks the Court to bar Dyson from recovering certain categories of damages. It argues that Dyson failed to follow the procedures outlined in the master services agreement for submitting notice of a loss or damages and alternatively that the master services agreement caps any damages at $2 million. Syncreon also contends that the contractual prohibition on consequential damages precludes Dyson from

seeking compensation for lost profits and other financial harm, and that Dyson has not

introduced sufficient evidence to permit a jury to find in its favor with respect to certain

damages claims. The Court will address each of these contentions in turn.

### a. Notice requirements and damages cap

Syncreon relies on section 6.4 of the master services agreement, which appears

under the heading "Inventory Control and Loss Liability." Section 6.4 provides,

> Vendor's responsibility[] shall commence only upon Product delivery to,
> and acceptance by Vendor employees, whether at the Vendor Warehouse
> or in preparation for transportation by Vendor, and shall cease
> immediately upon shipment of the Products from the Vendor Warehouse.
> Subject to the allowance for shrinkage in inventory described herein, in the
> event of Vendor's liability hereunder, Vendor's liability for damages shall
> be limited to two million dollars (US$2,000,000) aggregate annually. All
> claims for loss or damages must be submitted to Vendor in writing (i)
> within 30 days after shipment from the Vendor Warehouse, or (ii) within 30
> days of receipt of notice of loss or damage by Dyson from Vendor,
> whichever time is shorter.

Master Services Agreement, Def.'s Ex. 8, dkt. no. 153-9, § 6.4. Syncreon contends that

Dyson did not submit written notice of any claims for loss or damages within the

required timeframe, and that even if had, its damages must be capped at $2 million.

Both of these arguments fail because section 6.4 of the agreement plainly

contemplates only loss of or damage to inventory. The heading of section 6 of the

master services agreement is "Inventory Control and Loss Liability." All of the

surrounding subsections of the agreement specifically discuss Dyson and Syncreon's

obligations with respect to Dyson's inventory. And section 6.4 uses the phrase "30 days

after shipment from the Vendor Warehouse," strongly indicating that this section too

pertains to inventory. In response, Syncreon argues that the phrase "[a]ll claims for loss

or damage" sweeps broadly, and it contends the Court may not limit the scope of

section 6.4 by implication from surrounding provisions. But "[c]ontract language must

be interpreted in light of the contract as a whole." *Gomez v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 130568, ¶ 13, 22 N.E.3d 1, 4. Moreover, contractual provisions that limit one party's liability for breaching the contract "are not favored in Illinois and are strictly construed against the party they benefit." *Chicago Steel Rule & Die Fabricators Co. v. ADT Sec. Sys., Inc.*, 327 Ill. App. 3d 642, 645, 763 N.E.2d 839, 842 (2002). Applying these principles, the Court concludes that Syncreon's suggested interpretation is untenable in light of the substance, context, and phrasing of section 6.4 of the agreement.

Alternatively, Syncreon argues that even if the provision requiring notice and limiting damages applies only to loss of or damage to inventory, all of Dyson's alleged damages (including lost profits and reputational harm) flow from Syncreon's alleged errors in the handling of Dyson's inventory. But this argument is unavailing; construing the exculpatory provision narrowly requires understanding "loss or damages" to refer specifically to loss of or damage to inventory, not all damage that is in any way inventory-related.

### b. Consequential damages

Syncreon next argues that because the master services agreement bars Dyson from recovering consequential damages, Dyson cannot obtain lost profits or the difference between the rate it paid Syncreon and the higher rate it paid the subsequent logistics provider (which the parties call the "rate differential"). As Dyson points out, however, it is pursuing fraud claims that allow it to recover consequential and incidental damages. *Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 90, 990 N.E.2d 738, 759 ("In an action for fraud, consequential damages proximately resulting from the

fraud are recoverable.").  Syncreon responds that the master services agreement says that "*in no event* will either party be liable to the other for any special, incidental, or consequential damages."  Master Services Agreement, Def.'s Ex. 8, dkt. no. 153-9, § 11.1 (emphasis added).  But the contention that the phrase "in no event" exculpates Syncreon from consequential damages not just under the contract but also for alleged torts—which, in this case, amounts to an argument that Dyson is precluded from recovering damages for fraud based on a term in a contract that Dyson alleges it was fraudulently induced to sign—lacks supporting authority and is wholly unpersuasive.

Dyson also argues that although the master services agreement expressly precludes the parties from recovering lost profits for breach of the agreement, it may recover the "rate differential" if a jury determines that the rate differential is a direct, rather than consequential, result of Syncreon's alleged breach.  *See, e.g.*, *BP Amoco Chem. Co. v. Flint Hills Res., LLC*, 697 F. Supp. 2d 1001, 1024 (N.D. Ill. 2010) (holding that there was sufficient evidence to permit the jury to reasonably conclude that damages resulting from the defendant's breach "were not consequential and therefore recoverable").  In determining whether damages are direct or consequential, the Illinois Supreme Court has considered whether the damages are closely related to the purpose of the contract.  *See Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 318–19, 515 N.E.2d 61, 67–68 (1987) (holding that the plaintiff's lost profits implicated the purpose of the contract such that "lost profits were a direct and foreseeable consequence of defendant's breach as a matter of law"); *see also Cencula v. Keller*, 180 Ill. App. 3d 645, 650, 536 N.E.2d 93, 96 (1989) (suggesting that direct damages are ones that "arise naturally, in the usual course of things, as a result of a breach of

contract").  In this case, it is undisputed that Dyson switched back to its previous

logistics provider after terminating the agreement with Syncreon.  Whether or not higher

rate Dyson paid after returning to its previous provider was a sufficiently direct, natural,

and foreseeable result of a breach of the master services agreement is a question of

fact that the Court cannot appropriately resolve at summary judgment.  *See Unilever*

*U.S., Inc. v. Johnson Controls, Inc.*, No. 16  C 01849, 2017 WL 3311038, at *5 (N.D. Ill.

Aug. 2, 2017) ("In this case, as in many others, the precise demarcation between direct

and consequential damages is a question of fact." (internal quotation marks omitted)).

### c.    Evidence of particular damages categories

In its opening brief, Syncreon argued that Dyson has not pointed to evidence

from which a reasonable jury could find that it suffered lost sales, reputational harm, and

other consequential damages.  Syncreon also argued that "Dyson cannot meet the high

bar for seeking [punitive] damages in this case," Def.'s Mem. in Supp. Mot. Summ. J.,

dkt. no. 152, at 25, though it did not support this argument with evidence or explanation.

In response, Dyson pointed to testimony from its employees about the reputational

harm it suffered and an internal financial analysis of its lost profits.  It also pointed to

evidence from which a reasonable jury could find that Syncreon deliberately and

egregiously misrepresented its logistical capabilities for more than six months and

attempted to hold Dyson's inventory hostage to extort a favorable termination

agreement.  From this a jury reasonably could find that Syncreon engaged in willful and

wanton conduct sufficient to support the imposition of punitive damages under Illinois

law.  Syncreon failed to address these issues at all in its reply brief, and it has thus

forfeited the point for purposes of summary judgment.  *See Bonte*, 624 F.3d at 466.

**B.     Dyson's motion for partial summary judgment**

Dyson has moved for partial summary judgment on Syncreon's counterclaim.  It argues that counts 2 and 3 (alleging unjust enrichment and promissory estoppel, respectively) are not cognizable because the parties had an enforceable express contract.  Dyson also argues that the master services agreement precludes Syncreon from recovering four particular categories of damages under its breach-of-contract claim.

**1.     Quasi-contract claims**

In its response brief, Syncreon has agreed to voluntarily withdraw counts 2 and 3 of the counterclaim because Dyson has not challenged the validity or enforceability of the master services agreement.  The Court therefore dismisses counts 2 and 3 of the counterclaim with prejudice.

**2.     Damages**

The rest of Dyson's motion concerns particular categories of damages.  Dyson contends that the unambiguous language of the master services agreement bars Syncreon from recovering the following alleged losses:  lease expenses; equipment expenses; employee expenses, including severance payments; and startup capital expenditures in excess of the amount that Dyson has already paid to Syncreon.

Two sections of the contract are particularly relevant to Dyson's arguments concerning expenses for employees, leases, and equipment.  First, section 7.1 states, "Vendor shall be solely responsible for payment of wages, salaries and other amounts due to all Vendor Personnel in connection with this Agreement . . . ."  Master Services Agreement, Def.'s Ex. 8, dkt. no. 153-9, § 7.1.  Second, section 20.1 provides,

Unless otherwise specified, all real property, standard equipment, warehouse facilities, and computer systems used by Vendor in the performance of services in this Agreement will at times be owned or leased by Vendor. Costs associated with property, standard equipment, facilities and computer systems are understood to be part of Vendor's operating costs and there shall be no specific additional compensation and fees for this, unless otherwise specified and mutually agreed to by the parties.

*Id.* § 20.1. Dyson contends that these provisions expressly preclude Syncreon from recovering the specified categories of expenses. Syncreon argues that these sections of the agreement concern only the responsibilities of the parties *during* the contract and do not limit Syncreon's possible remedies in the event of a breach.

The Court concludes that the scope of these provisions is ambiguous. Under Illinois law, a contract "is ambiguous only if the language used is reasonably or fairly susceptible to having more than one meaning." *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). Put another way, an ambiguous contract is one that "may reasonably be interpreted in more than one way." *Shapich v. CIBC Bank USA*, 2018 IL App (1st) 172601, ¶ 18, 123 N.E.3d 93, 98. On the one hand, these provisions of the master services agreement are not expressly limited to Syncreon's obligations during performance of the contract, and the requirement that Syncreon must bear the specified costs reasonably suggests that it must continue to do so even in seeking remedies for breach. But the fact that sections 7.1 and 20.1 contain no reference to a limitation on contract remedies—in contrast with other contract terms that specifically delineate the available remedies in the event of breach—supports a reasonable inference that Syncreon's interpretation is correct. The existence of these two interpretations, each reasonably consistent with the text of the master services agreement, constitutes an ambiguity.

"Under Illinois law, when a court decides that a contract is ambiguous, its interpretation generally becomes a question of fact for the jury." *Harmon v. Gordon*, 712 F.3d 1044, 1050 (7th Cir. 2013). Neither party has pointed to undisputed extrinsic evidence that would permit the Court to resolve this ambiguity at the summary judgment stage. *See id.* The Court therefore declines to hold that Syncreon is precluded from recovering damages for equipment, lease, and employee expenses under sections 7.1 and 20.1.

Dyson also contends that Syncreon may not recover start-up costs and capital expenses in excess of the amount to which the parties agreed. It points to exhibit C to the master services agreement, which provides that Dyson will pay an initial charge for start-up capital expenditures in the amount of $864,907. It is undisputed that Dyson has paid this amount in full.

Syncreon argues that it incurred additional start-up costs that it may recover under section 2.2.2 of the master services agreement, which requires Dyson, in the event that it terminates the agreement without cause, to "pay for any completed Services received from Vendor before the effective date of termination as well as the Vendor Start-Up and Capital Expenses as set forth in Exhibit A." Master Services Agreement, Def.'s Ex. 8, dkt. no. 153-9, § 2.2.2. The parties agree that they never completed exhibit A.

Dyson does not dispute that a reasonable jury could find that it terminated the agreement without cause. Instead, it argues that the parties' separate agreement in exhibit C on the amount of capital expenditures limits the total amount that Syncreon can recover, even under section 2.2.2. This argument is unconvincing; section 2.2.2

expressly refers to the capital expenditures set forth in the uncompleted exhibit A, not exhibit C. There is no basis in the text of the contract to conclude that the dollar amount in exhibit C should limit Syncreon's recovery of capital expenses and start-up costs in the event that Dyson terminates the agreement without cause. Indeed, that conclusion would seem to contradict the provision's specific reference to exhibit A.

Under Illinois law, courts must interpret words in a contract to carry their "plain, ordinary, and popular meaning" unless they are otherwise defined in the contract. *Hess v. Kanoski Assocs.*, 668 F.3d 446, 453 (7th Cir. 2012) (quoting *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 115, 607 N.E.2d 1204, 1215 (1992)). Section 2.2.2 requires Dyson to pay "Start-Up and Capital Expenses" but fails to define the scope of those expenses. In the absence of any terms limiting this phrase, the Court concludes that Syncreon may recover its start-up and capital expenses as those terms are ordinarily defined, without reference to the dollar amount listed elsewhere in the contract.

Finally, Dyson argues that section 2.2.2 does not permit Syncreon to recover certain other expenditures, including leasing and equipment costs, because those expenditures are not properly characterized as start-up costs. It cites other provisions of the contract that appear to use "start-up costs" in contrast with other categories of expenditures, including operating costs, which include lease and equipment expenses. But although these other provisions provide some hint at the correct interpretation of section 2.2.2, it is also reasonable to interpret the phrase "start-up costs" as carrying its ordinary meaning. *See, e.g.*, *Start-up*, Random House Dictionary (2d ed. 1997) ("of or pertaining to the beginning of a new project or venture, esp. to an investment made to

initiate such a project, as in a commercial or industrial enterprise"). This broad definition would encompass expenses for leases and equipment that were made to initiate Syncreon's business with Dyson. The parties do not point to undisputed extrinsic evidence bearing on this ambiguity. The precise scope of the start-up costs that Syncreon may potentially obtain on its claim for breach of contract is therefore a question of fact for the jury.

### Conclusion

For the foregoing reasons, the Court denies both parties' motions for summary judgment [dkt. nos. 151, 170] but dismisses counts two and three of the defendant's counterclaim with prejudice. The Court sets the case for a status hearing on July 16, 2019 at 8:30 a.m. (in chambers) for the purpose of discussing scheduling and the possibility of settlement. The Court advises that it will be unavailable during the week of September 30, 2019—the currently set trial date—based on an intervening commitment and will therefore need to move the trial date. The parties are to be prepared to set a new trial date when they come to the status hearing, either earlier or later than the currently scheduled date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 11, 2019